UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SPECTRUM CREATIONS, L.P.,            )
                                     )
        Plaintiff,                   )
                                     )
VS.                                  )        Civil Action No.: SA-05-CV-750-XR
                                     )
CAROLYN KINDER INTERNATIONAL,        )
LLC & THE UTTERMOST COMPANY,         )
                                     )
        Defendants.                  )

**ORDER**

On this date, the Court considered Defendant The Uttermost Company's Motion for Partial

Summary Judgment Regarding Claims of Tortious Interference with Existing Contract (docket no.

255), Defendant The Uttermost Company's Motion for Partial Summary Judgment Regarding Trade

Secret Misappropriation and Unfair Competition Claims (docket no. 256), Defendant The Uttermost

Company's Motion for Partial Summary Judgment on Plaintiff's Claim of Tortious Interference with

Prospective Business Relations (docket no. 257), and the various responses and replies thereto.

**I. Background**

The undisputed facts indicate that the relationship between Spectrum and CKI began when

Jeff Lee, a Home Depot buyer, suggested that Spectrum and Carolyn Kinder/CKI collaborate to

design and manufacture lighting products for sale to Home Depot.  Carolyn Kinder and CKI had a

pre-existing relationship with The Uttermost Company (Uttermost), wherein Kinder designed lamps

and other items for Uttermost.  Apparently, Lee had seen Kinder's lamp designs at an Uttermost

showroom and liked them, but preferred to buy from existing vendors, such as Spectrum. On January

1

20, 2003, Jim Kelly of Uttermost wrote Mac Cooper, Uttermost's CEO, and informed him that Lee would not be going forward with an Uttermost lamp program because he could not justify adding a new vendor.  That same month, representatives from Home Depot, Spectrum, and CKI  met to discuss an arrangement for Kinder/CKI to design lighting for Spectrum.  The parties began negotiating an agreement, and CKI began preparing designs for Spectrum while negotiations were ongoing.  At some point, Jeff Lee was promoted to Home Depot's plumbing division, and Marsha Harbaugh Young became the portable lighting buyer (portable lighting, track lighting, and accent lighting) and Greg St. John became the buyer for decorative lighting for Home Depot.

On December 2, 2003, CKI signed a copy of the Design Services Agreement.  The Agreement provided that CKI would produce for Spectrum "certain Designs (which includes the entire Family thereof), for Spectrum's sole and exclusive use, on a worldwide basis, to make, have made, distribute and sell Products that incorporate the Designs, as such Designs shall be further described and defined in the Design Documentation."  Agrmt. ¶ 1.  Each Design was to cover a Product Family, including such things as lamps, pendants, hard-wire lighting, fans, and mirrors, and CKI was to provide conceptual drawings, design finishes, and instructions for Spectrum's factories.  Agrmt. ¶ 7.  CKI agreed to initially provide design documentation for at least two families, and thereafter "provide such documentation for designs that are candidates to be Designs" as reasonably requested by Spectrum or Home Depot, but at a minimum of two families per quarter.  Agrmt. ¶ 8.  CKI also granted Spectrum the exclusive worldwide rights to use Designs on Products sold by Spectrum, though "any such Designs for which Products in a Family are not reasonably commercialized during any eighteen (18) continuous months shall be deemed abandoned by Spectrum, and such Designs will revert to CKI."  Agrmt. ¶ 5.

The Agreement contained a non-compete provision, under which CKI committed "to not design or knowingly permit any <u>hard-wired lighting product</u> made from CKI designs to be sold to Home Depot, directly or indirectly, other than through and by Spectrum as provided in this Agreement, unless CKI is specifically authorized by Home Depot or unless Spectrum has not accepted the specifically submitted design, within twelve months of originally receiving submission of said design from CKI, as a Design for Product(s)."   Agrmt. ¶ 6 (emphasis in original). Furthermore, "CKI will not, nor will CKI permit any third-party to sell, distribute or market CKI designed families of lighting products, except for portable lighting and mirrors that are not a member of a Design Family, in or to other 'Big Box' home improvement retailers and mass merchandisers without the prior consent of Home Depot."   *Id.*

The Agreement also contained a confidentiality agreement, in which the parties acknowledged that "certain information provided by Spectrum, including, but not limited to, sales information, cost information, and production volume, pursuant to this Agreement shall be maintained in confidence and not disclosed to any third party without the express written consent of Spectrum." Agrmt. ¶ 16.  Further, both parties agreed "to maintain any designs being considered as Designs and accepted in a timely manner, confidential except for the inclusion of Home Depot in deciding upon the selection of the Designs for Products and Families thereof."   *Id.*

The Agreement was to last for a term of three years, and "[b]oth parties agree[d] to negotiate in good faith to try to resolve any concerns."  Agrmt. ¶ 10.  However, "in the event that Spectrum defaults or materially breaches any of the provisions of this Agreement or fails to account for or to pay to CKI any of the compensation due and payable hereunder, CKI reserves the right to cancel this Agreement upon sixty (60) day written notice to Spectrum; provided, however, that if Spectrum,

3

within the sixty (60) day period referred to, cures the default or breach, this Agreement shall continue in full force and effect until its normal expiration date in accordance with its terms."

CKI produced three design families for Spectrum, complete with detailed drawings, in the first quarter of 2003. Spectrum alleges that, after that initial production, "CKI's production for Spectrum plummeted." In 2004, Uttermost began selling Kinder-designed portable lamps to Home Depot. Cooper depo. at 178. Spectrum alleges that these products infringe its copyrights in Kinder-designed lamps under the Agreement. Uttermost also began considering getting into fixed-wire lighting, and discussed the prospect with Kinder. In September 2004, Cooper suggested that Kinder hire his brother-in-law, Roy Woolson, as CKI's CFO, and Kinder did so. Spectrum alleges that Cooper used Woolson to obtain confidential information about Spectrum and influence CKI's relationship with Spectrum. At some point in late 2004, Spectrum began withholding CKI's royalty payments based on its position that CKI had not provided the required designs under the Agreement.

Spectrum further alleges that Uttermost/Cooper continued to press Kinder about fixed lighting and finally gave Woolson an ultimatum on April 7, 2005 in an email stating, "[W]e intend to move in at least one significant new direction for '06, and if this doesn't start moving quickly, we will look at all options." Pl. ex. 114. The email states that Woolson "was going to relay to Kinder and totally agreed that Utt fixed is their best opportunity." *Id.* Spectrum asserts that, that very same day, CKI notified Spectrum of its intent to terminate the Agreement.[1]

---

[1]Spectrum cites Plaintiff's exhibit 50, which is a copy of an April 7, 2005 letter from Kinder to Michael Barnes of Spectrum, providing formal notice pursuant to section 11 of the Agreement. This information is somewhat at odds with Plaintiff's exhibit 114, the April 7 Cooper email, however, because it states that "Kinder put Spectrum on notice several weeks ago to terminate their contract."

Spectrum sent CKI a letter on April 26, 2005 stating that "Spectrum has no intention of allowing such termination nor of not paying every penny owed to CKI under our Design & Services Agreement dated December 2, 2003." Pl. ex. 51.  The letter asserted that CKI was in default for not providing any Design Documentation since September 2004 and not supplying the required drawings for each of the family members for most of the designs submitted.  Michael Barnes urged CKI to fulfill its contractual obligations.  Barnes sent Kinder another letter on May 13, 2005 to "try one last time to work these issues out." Pl. ex. 52.  He explained that Spectrum had withheld royalties because CKI refused to give designs as called for in the Agreement, and proposed that, because CKI owed Spectrum eight design families, Spectrum would pay 1/8 of the commissions due in exchange for each complete new design family submitted.  The conflict was not resolved.  Spectrum filed suit against CKI on July 26, 2005.

Maria Scutaro of Uttermost spoke with Kinder in September 2005 about selling Kinder-designed fixed-wire lighting to Expo (a Home Depot entity).  Pl. ex. 151.  Uttermost publicly announced that it would begin selling fixed-wire lighting in December 2005, and began selling Kinder-designed fixed-wire lighting in 2006.  Cooper depo. 249-50.  The evidence shows that Uttermost was discussing sales of Kinder-designed fixed-wire lighting with Expo in January 2006.

Spectrum's claims against Uttermost include a claim for tortious interference with its contract with CKI, a claim for tortious interference with prospective business relations between Spectrum and Home Depot, a claim for trade secret misappropriation, and a claim for common-law unfair competition.  Uttermost moves for summary judgment on these tort claims.

## II. Analysis

### A. Tortious Interference with Existing Contract with CKI

Plaintiff's Second Amended Complaint (docket no. 97) asserts a claim for tortious interference with existing contract against Uttermost, stating that "Spectrum has a valid contract for 'Design and Services Agreement' with CKI, Uttermost in conspiracy with CKI willfully and intentionally interfered with the contract, [s]uch interference was the proximate cause of injury to Spectrum, [and as] a result of the interference, Spectrum has incurred actual damage or loss." Second Am. Compl. ¶¶ 48-50.

To recover for tortious interference with an existing contract, a plaintiff must prove: (1) the existence of a contract subject to interference[2]; (2) a willful and intentional act of interference; (3) the act was a proximate cause of the plaintiff's damages; and (4) actual damage or loss. *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996). In this motion, the parties dispute whether there was a "willful and intentional act of interference" by Uttermost in the Agreement between CKI and Spectrum. Specifically, Uttermost moves for summary judgment on the bases that: (1) "Spectrum does not have in its possession admissible evidence reflecting that Uttermost interfered with the CKI/Spectrum contract, that any such interference was intentional or that Uttermost 'took an active part' in persuading CKI to breach its contract with Spectrum," and (2) CKI acted within its rights in terminating its contract with Spectrum because Spectrum failed to pay CKI's royalties, and "inducing a party to do what it already had a right to do does not constitute tortious interference."

---

[2]Whether there is a contract between Spectrum and CKI remains a disputed fact issue. For the purpose of considering these motions, the Court will assume that the December 2, 2003 Agreement signed by CKI is valid and is the governing contract.

Spectrum argues that there is "ample evidence" of interference, arguing that Uttermost: (1)

repeatedly discouraged CKI from working with Spectrum[3]; (2) suggested that CKI's working with

and investing its time with Uttermost would be more profitable and less conflict-prone than working

_____

[3]Plaintiff cites to its exhibit 105, an email from Mac Cooper to Kinder and David Voth and Mike Toups of CKI, dated January 21, 2004, in which he states that he met with Lee Nemeth (a Home Depot Expo merchant) and "For the YOW program, he said he still doesn't know where it's headed. He said he and Marsha like the Utt product, but other people want to stick with current HD vendors. CONFIDENTIALLY (please don't share this with anyone), he said he would not try to work with Spectrum if he were in our shoes. No further explanation given on this."

Spectrum also relies on a March 9, 2004 email from Cooper to Kinder and others at CKI in which he discusses his "thoughts on the Home Depot portable opportunity." Cooper states that "handing over partial control to Spectrum is definitely not our first choice as a way to get into Home Depot. ... If Kinder and Utt is in control from start to finish, we'll make the right decisions and protect what we have. Spectrum's concerns will be HD, but not our other business and customers. I still think working direct is much better in the long run for Kinder and Utt, but we will be as flexible as we can." Cooper then outlines some possible ways "to allow us to maintain some control yet let Spectrum handle the HD relationship" but notes that "this isn't our preference and probably wouldn't be a close, trusting partnership like we have with all our current partners." Pl. ex. 63.

Spectrum further cites a March 19, 2004 email from Cooper to Kinder recounting a conversation he had with Young, the Home Depot merchant. Cooper wrote, "She asked what Spectrum had to do with us. I told her that our understanding is that HD has a great relationship with Spectrum, and that HD was not interested in adding factories, therefore there has been some discussion of working together in some way. She immediately said that 'if Jeff said that we must work with Spectrum and that HD wouldn't add another lamp vendor, that's wrong! This is my call, I'm over portables, and I can add a vendor if I want to. Of course the vendor must qualify ... and we are trying to reduce vendors.' I didn't really comment on this or point fingers, but between us, Jeff did say in writing in October 'I'm not interested in adding factories...', and she said that this is her call not Jeff's. She had already thought about this I'm pretty sure, due to her immediate strong response. She said that she does buy a few lamps from Spectrum but she doesn't have any significant relationship at all with Spectrum. She said if we want to sell directly to HD, then that's what we should work towards, not a relationship with Spectrum. She also indicated that Spectrum may have a close relationship with Jeff, but that doesn't mean she does." Later in the email, Cooper writes, "Anyway, a surprising conversation. My intent wasn't to kill Spectrum's chance to sell Kinder portables to Marsha, but she was clear that if [we] want to sell her portables, don't try to do it through Spectrum. She even said, 'if Michael Barnes calls you, tell him our interest is selling HD direct.' ... Carolyn, Mike, and Dave, I'm trying very hard not to let any of this interfere with what you guys have happening with Spectrum. It's like she was waiting for someone to clarify our relationship with Kinder and then she unloaded her thoughts." Pl. ex. 64.

with Spectrum[4]; (3) repeatedly asked for and obtained confidential information from CKI about

Spectrum's sales and promotional activities with respect to both portable and fixed wire lighting[5];

---

[4] Spectrum relies on an October 28, 2004 email from Cooper to Kinder in which he states, "I think if you look at the time you and your company invested into Uttermost product development this year versus the revenues earned, your ROI was very, very high.  I suspect much higher than any other Licensee.  Same for previous year.  Same for future years." Pl. ex. 110.

[5]Spectrum cites to several emails to support this claim.  Spectrum asserts that Cooper thanked CKI for breaching its confidentiality obligations in a March 9, 2004 email to Mike Toups, Kinder, and others at CKI, in which he stated, "Thanks Mike for your call and keeping us in the loop on Home Depot."  Pl. ex. 63.  Spectrum also cites a May 5, 2004 email from Wayne at Uttermost to Ken Delp, Cooper, and Tony Doss at Uttermost stating that "David [Simpson] who left Kinder Group is working at Unicon (JV of Spectrum)" and Cooper's reply that "One of the reasons Spectrum hired Dave Simpson is to try to get more lamps into HD."  Pl. ex. 106.

Spectrum also relies on a January 23, 2005 email from Kinder to Cooper, in which she states that "Spectrum opened their new lighting showroom right around the corner from you on the 10th floor at the Dallas show, and the new buyer from Home Depot Canada was there as their guest" and that "Spectrum has 'signed on' a full team of specialist reps (they say ..) and are preparing to push hard into this arena with their Tiffany product, and a variety of looks from their designers, but are very serious about also using the collections that I have contributed via the off-fall from the Home Depot buyers, Jeff Lee and Greg St. John."  Pl. ex. 160.

Spectrum cites a March 14, 2005 email from Cooper to Maria Scutaro of Uttermost regarding CKI and Spectrum: "Confidentially, she [Kinder] has little respect for Spectrum, the vendor to HD, but her contract for HD FW [fixed wire] is with Spectrum.  Also, this HD program is probably not super successful at this point.  After more than a yr, it's still only 'special order' product at HD rather than 'in stock', making the retail prices not great at HD.  She's fairly frustrated with the lack of progress."  Pl. ex. 116.

Spectrum also points to an April 7, 2005 email from Cooper to Maria Scutaro and several other recipients at Uttermost, in which he states that he "called Ray [Woolson] on the way home today for a clarification on the Fixed Ltg situation.  The situation between Spectrum and Kinder is getting ugly.  Some disappoints on sales (don't know specifics, might be certain items), some returns from HD to Spectrum, no royalty pmts since October, poor communications, no trust, not sharing sales info, etc.  Apparently Ray 'threatened' to turn them over to a collection attorney and Spectrum responded with a lawyer letter stating lack of performance on Kinder's part.  Per Ray, the contract calls for 2 collections per quarter (or 10 to date) and they have submitted 26 collections.  Kinder put Spectrum on notice several wks ago to terminate their contract (1 ½ yrs to go on contract) and offered a very limited contract in return.  The limited contract would not really interfere with us/Kinder on fixed at all except at HD. Spectrum has 60 days from notice to respond and pay up, or the original contract is terminated.  I asked Ray about the original contract, and he doesn't think even this contract would effect any fixed lighting we do with Kinder, other than at HD.  Ray also thinks CK is ready to get started on us with fixed, she's just wanting to get the Spectrum situation resolved

(4) pressed CKI to design portables for direct sale to Home Depot, and accepted CKI designs that "blend[ed] in well with Spectrum's collection," and violated Spectrum's copyright rights[6]; (5) pressed CKI to violate its exclusive commitment to Spectrum on fixed-wire designs[7]; and (6)

_____

so it doesn't all get more complicated." Pl. ex. 114.

[6]*See* Pl. ex. 64 (March 19, 2004 email from Cooper to Kinder regarding selling portables directly to HD instead of going through Spectrum). Spectrum argues that "Uttermost successfully dissuaded CKI from fully performing its contractual obligations" to Spectrum, citing Kinder's response that she "almost broke [her] ankle while cartwheeling around the airport after the first reading of this fantastic letter."
Spectrum cites to a September 22, 2004 email from Mike Toups, who was no longer with CKI, to Cooper congratulating him "on getting products into THD." He continued, "I just received a flyer in the mail that included some of your products including mirror, lamps and clock. I attached a copy in case you have not seen it. It blends in well with Spectrum's collection."

[7]Spectrum argues that, "[e]ven before Uttermost got its foot in the Home Depot door with respect to CKI-designed portables, Uttermost set its sights on the fixed-wire lighting business." Spectrum cites Cooper's deposition, in which he states that Uttermost's confidential discussions with CKI about getting into fixed lighting "became more serious around late 04 and early 05." Spectrum also points to an August 2004 email from Cooper to Kinder discussing selling fixed lighting, noting that they were "currently selling many, or most, of the largest retailers of fixed lighting (Lamps Plus, Georgia Ltg., Expo, The Great Indoors, Ltg One, Home Depot soon, etc, etc.)" and "[t]hese retailers haven't been afraid to buy portable lighting from us, and I don't think they'll be afraid to buy fixed." Pl. ex. 108. Spectrum also points to an October 2004 email from Cooper to Kinder in which he writes, "Fixed Lighting – Still very interested in moving in this direction, but whenever we do, the items must be great since it will initially be such a small line. Please let us know what you are comfortable developing in this category. Possibly 5 collections initially?" Pl. ex. 109. Cooper again raised the issue of fixed lighting in an October 28, 2004 memo to Kinder and Kim Barnes of CKI, writing "Fixed Ltg. Please let us know your thoughts here. I think the timing is right for the introduction of some collections based on best selling portable lamps." Pl. ex. 110. Spectrum also cites a November 2004 email from Cooper to Kinder, in which he writes, "Carolyn, I know you embrace positive change, and the evolution of Uttermost must support our growth together. It seems to me that this conflict over communication is just that, a communication issue. The more challenging conflicts involve partners we have or you have outside of the Uttermost/Kinder relationship." Pl. ex. 111.
Spectrum contends that Cooper knew that CKI's contract with Spectrum and Spectrum's relationship with Home Depot presented a serious obstacle to Uttermost's selling CKI-designed fixed-wire lighting to Home Depot. Spectrum cites Cooper's deposition testimony that he knew the contract "could be a problem" and that, "prior to the termination of the contract, there was a problem under Carolyn Kinder's contract with her designing fixed wiring for you that you would sell into

ultimately pressed CKI to terminate its contract with Spectrum altogether.[8]

Spectrum further argues that "[t]here is ample evidence that as CKI devoted its attention to Uttermost, CKI's performance [of its contractual obligations with Spectrum] suffered." Specifically, Spectrum asserts that CKI: (1) quit producing novel and fresh designs for Spectrum's "sole and exclusive use"; (2) quit presenting the designs in a timely fashion; (3) quit producing complete

---

Home Depot or its subsidiaries," and that he understood that "Carolyn Kinder for fixed wiring for Home Depot was exclusive with Spectrum." Nevertheless, Spectrum contends, on December 24, 2004, Cooper suggested that he, Kinder, and Woolson develop a "secret game plan" for selling fixed wire lighting products to Home Depot. Cooper emailed Kinder stating, "We need to have more conversations about fixed lighting, but I think most of the key players are lined up and the obstacles are surmountable." Kinder replied, "I am glad you are so positive on this, but I think there is one last glitch in this plan we discussed to open up hard wire for you. I need to make triple sure that the current contract that is in place with Home Depot, via Spectrum, will not be compromised. It would hurt you as much as us if we alienated this retailer by incurring their wrath if they think that we have the potential to hurt or exclude them in any way here ... Pulling this off will require kid gloves and tact, Let's keep this plan confidential until we are sure they will be 'OK' with it, or want to suggest something we haven't thought of. After the holidays, I will focus on this and may need to work with you on how to get their [Home Depot's] blessing on this new avenue 'for them.'" Cooper replied, "I'm just feeling more and more positive about the fixed wire, but not ready to finalize this decision on this end either. I think there are still significant challenges to becoming a major player in fixed, but I think we can handle these with good plans, great designs, and great energy. Yes, let us know how your contract reads with Spectrum and then we can discuss how to approach this with HD and what our game plan should be. We will certainly keep this quiet except for a handful of reps who have been involved in discussions on fixed for months." Pl. ex. 113.

Spectrum notes that "these secret discussions began long before CKI attempted to terminate its contract with Spectrum." Spectrum also cites to additional emails in which Cooper pressed Kinder for fixed-wire business. *See* Pl. ex. 116 (Feb. 10, 2005 email from Cooper to Kinder regarding fixed lighting: "If you are fully behind this and we are fully behind this, it could become a huge business. Have you thought about this further and reviewed your current contracts?"); Pl. ex. 115 (March 2, 2005 email to Kinder: "Just wondering if you have any new thoughts on Fixed Lighting at Uttermost.... My thought on fixed lighting is still that we should proceed with a strong introduction of around 150 pieces for the Dallas '06 show.").

[8] Spectrum points to Plaintiff's exhibit 114, which it contends is an ultimatum from Cooper to Kinder. Cooper wrote that he discussed fixed lighting with Woolson and that he "told Ray that we intend to move in at least one significant new direction for '06, and if this doesn't start moving quickly, we will look at all options. He was going to relay to Kinder and totally agreed that Utt fixed is their best opportunity."

families of designs; (4) quit providing the expected Design Documentation; (5) refused to negotiate in good faith to resolve Spectrum's concerns[9], and (6) violated its confidentiality obligations to Spectrum.  Spectrum asserts that CKI also started designing portables for Uttermost that were "knock-offs" of the designs it had made for Spectrum, some of which Spectrum was selling to Home Depot.  Spectrum argues that, "[f]inally, pressured by Uttermost's ultimatum, CKI terminated its contract with Spectrum."

Spectrum also asserts that there is "ample evidence" that Uttermost intended the many interferences to occur, and that Uttermost took an active part in CKI's declining performance and, ultimately, CKI's termination of the Agreement.  Spectrum argues that Uttermost knew of the contract between Spectrum and CKI and that it required CKI to produce designs for two families per quarter and prevented CKI from designing fixed-wire products for Uttermost to sell to Home Depot, yet Uttermost intended for CKI to work with Uttermost instead of Spectrum.  Spectrum contends that Uttermost actively pursued CKI's fixed-wire design services for products it intended to market to Home Depot and actively sought confidential information from CKI about Spectrum, even suggesting that CKI hire Mac Cooper's brother-in-law as CFO to "further Uttermost's intelligence-gathering activities."

Uttermost replies that the Spectrum/CKI Agreement allows CKI to design products for manufacturers other than Spectrum and specifically allows CKI to design fixed-wire products for

---

[9]Spectrum points to evidence that, on April 22, 2005, more than a month before the termination notice could be effective, Cooper and Kinder made plans to review fixed wire items the first week of August.  Pl. ex. 166.  Further, Spectrum cites an email from Woolson to Cooper on May 27, 2005 (less than 60 days after the April 7 letter) stating that CKI has been "trying to clear the decks with two other clients [Spectrum and Seagull Lighting] to really dedicate itself to doing fixed lighting with you."  Pl. ex. 161.

other manufacturers.  In addition, Uttermost contends, those manufacturers are allowed to sell CKI-designed fixed-wire products to Home Depot, provided Home Depot authorizes such purchases, or if Spectrum has failed to accept the design for twelve months.  Further, Uttermost argues, though Spectrum represents that Uttermost involved itself in negotiations between Spectrum and CKI, its involvement was extremely limited and accrued to the benefit of everyone except Uttermost.  Uttermost points to Mac Cooper's deposition testimony, in which he states that Kinder had a pre-existing contract with Uttermost that prohibited her from designing portable lighting products for anyone other than Uttermost.  Cooper agreed to modify Uttermost's contract to allow Kinder to design a limited number of portables complementing the fixtures she was designing for Spectrum to sell to Home Depot.  Uttermost notes that Cooper testified that he never saw the CKI/Spectrum contract during the negotiation stage, while Home Depot's buyer, Jeff Lee, was "in the loop" regarding negotiations of the non-compete language in the contract.

Uttermost contends that Spectrum mischaracterizes the evidence and that Uttermost never discouraged Kinder from working with Spectrum.  Kinder designs or has designed products for several manufacturers, including Uttermost and Spectrum.  Thus, Uttermost contends, "there was nothing improper about Uttermost truthfully reporting to Kinder that Home Depot would prefer to purchase portables from Uttermost without involving Spectrum in the deal" and this can not "be seen as encouraging CKI to violate any contractual obligations to Spectrum," especially considering that Kinder had served multiple clients before and this statement related to portables as opposed to fixtures.

Uttermost also argues that Spectrum fails to show a causative link between something Uttermost did and the fact that Kinder's performance declined in 2004.  Uttermost also contends that

12

Spectrum's remaining evidence shows only that Uttermost was interested in expanding its own business, not in interfering with Spectrum's.  Uttermost argues that the alleged "ultimatum" to CKI to breach its contract with Spectrum is not an ultimatum at all, as the email chain demonstrates that CKI had informed Uttermost that it had already notified Spectrum of its intent to terminate the contract.  Uttermost contends that it did not induce CKI to refrain from negotiating because Spectrum's supposed offers to cure did not offer to pay CKI the overdue royalties, and thus this evidence only confirms that CKI was justified in terminating its contract with Spectrum.

Uttermost further refutes Spectrum's claim that it induced CKI to disclose confidential information in breach of CKI's contractual duty of confidentiality to Spectrum.  Uttermost notes that "the only information relating to Spectrum [that] the contract specifically identifies as confidential is 'sales information, cost information and production volume' and 'designs being considered.'" Agreement § 6.  Spectrum's evidence, Uttermost argues, is only a benign email from Cooper to Kinder and others vaguely expressing thanks to Mike Toups for "keeping us in the loop on Home Depot."  Uttermost contends that Spectrum "comes up well short" in demonstrating that Cooper actually possessed protected information because his email to Maria Scutaro states that Kinder's arrangement with Spectrum is "probably not super successful at this point" and includes his "guess" that Kinder and Spectrum are "making slim margins," and he testified that this was only his own guess and assumption.  Thus, Uttermost argues, this email does not show that Cooper possessed any confidential information, let alone that he ever encouraged CKI to disclose it.

In its supplemental response, Spectrum cites additional "just-produced" documents that it contends show that, "before the Spectrum-CKI deal was even signed, CKI and Uttermost conspired to use Spectrum to establish a relationship with Home Depot's lighting buyers, and once established,

to drive that business from Spectrum to Uttermost." Uttermost replies that, when viewed in context, this and the other evidence relied on by Spectrum does not reveal any improper behavior. Specifically, Uttermost points out that Uttermost had relationships with Home Depot and Kinder that pre-dated the Spectrum/CKI agreement by several years; that Jeff Lee suggested an arrangement under which Spectrum and Uttermost would jointly produce Kinder designs for sale to Home Depot, but this was never able to be worked out; that Spectrum's contract with CKI did not prohibit her from designing any product for any other manufacturer to sell to any retailer, including Home Depot; and that Uttermost first began offering fixed wire products for sale several months after CKI terminated its agreement with Spectrum.  Viewed with these facts in mind, Uttermost argues, Spectrum's evidence is not evidence of anything improper or unethical on Uttermost's part.

Uttermost argues that CKI had the right to terminate the contract because Spectrum failed to pay royalties, and "[i]nducing a party a to do what it already had a right to do does not constitute tortious interference."  Uttermost contends that, "CKI exercised its contractual right to terminate the contract and any alleged act by Uttermost which Spectrum claims brought that event to pass is not actionable."  Spectrum counters that Uttermost's proposition is "way overbroad" and argues that the Texas Supreme Court rejected that proposition in *Sterner v. Marathon Oil*, 767 S.W.2d 686 (Tex. 1989) when it held that a contract terminable at will is subject to tortious interference. *Id.* at 689 ("Until terminated, the contract is valid and subsisting, and third persons are not free to tortiously interfere with it.").

Not long after *Sterner*, the Texas Supreme Court held that "the terminable upon notice status of [a contract] is not a defense to an action for tortious interference with its performance." *Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.*, 793 S.W.2d 660, 666 (Tex. 1990).  Thus, Spectrum is

14

correct that the fact that CKI could terminate the contract based upon an alleged breach by Spectrum would not preclude an action for tortious interference with the contract if Uttermost wrongfully induced CKI to breach the contract. However, "merely inducing one of the parties [to a contract] to exercise his right to terminate contractual relations after giving the required notice does not *necessarily* constitute tortious interference with contract under Texas law." *Juliette Fowler Homes*, 793 S.W.2d at 667 (emphasis in original). In making this statement, the Texas Supreme Court cited *C.E. Services, Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985)[10] and *Kingsbery v. Phillips Petroleum Corp.*, 315 S.W.2d 561, 576 (Tex. Civ. App.–Austin 1958, writ ref'd n.r.e.). These cases hold that "[a] third party's efforts to induce another to exercise his right to dissolve a contract at will or to terminate contractual relations on notice does not constitute tortious interference with contract under Texas law" if "a legitimate purpose of their own" was served. *C.E. Servs.*, 759 F.2d at 1248; *Kingsbery*, 315 S.W.2d at 576 ("[S]ince the contract was by its express language terminated by either party upon 60 days' notice, Phillips had the legal right to cancel and the other appellees had the legal right to persuade or attempt to persuade Phillips to exercise that right if a legitimate purpose of their own was served."). This reasoning relies on the distinction between inducing a breach of contract before it is terminated and inducing one to exercise one's legal right to terminate a contract upon notice (*i.e.*, to do what it had a right to do). *See id.* ("Appellant has not produced evidence that its clients 'breached' anything – they merely exercised their respective rights

---

[10]The Court later disapproved of *C.E. Services* on other grounds. *Wal-Mart v. Sturges*, 52 S.W.3d 711, 726 n.80 (Tex. 2001) ("Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations, and we disapprove of cases that suggest the contrary."). But, the case remains good law for the cited proposition. *See Hightower v. Kidde-Fenwal, Inc.*, 159 Fed. Appx. 555, 556 n.3 (5th Cir. 2005) (citing the case with the parenthetical "holding that inducing a party to cease contractual relations when it has a right to do so cannot be tortious").

of termination as provided for in their contracts.").

Uttermost cites *Archives of Am. v. Archive Litig. Servs.*, 992 S.W.2d 665, 667-68 (Tex. App.–Texarkana 1999, pet. denied), for the proposition that "[o]rdinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference." Spectrum erroneously argues that the Texas Supreme Court "rejected that overbroad proposition in *Sterner*." In fact, the Texas Supreme Court stated this same proposition in *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997), which was decided well after *Sterner*. And, as noted above and in footnote 10, the Fifth Circuit has similarly so held. Thus, Uttermost is correct that, insofar as it only induced CKI to do what it already had a right to do under the contract, there is no tortious interference so long as it served a legitimate purpose of Uttermost's (such as lawful competition).

Thus, Spectrum's tortious interference claims based on allegations that Uttermost induced CKI to do what it had a right to do under the contract (*i.e.*, that did not breach its contract with Spectrum) are not actionable. However, this case is distinguishable from the cases cited above in that this is not a terminable-at-will contract. Rather, it had a three-year term, terminable by CKI upon sixty days notice only in the event of default or material breach by Spectrum, with the proviso that if Spectrum cured the default or breach within the sixty-day notice period, the Agreement would continue in full force. Agrmt. ¶ 11. In addition, both parties agreed to negotiate in good faith to resolve any concerns. Agrmt. ¶ 10. Thus, the success of Uttermost's position that its actions are not actionable because CKI rightfully terminated the agreement is extremely limited – only those actions inducing CKI to tender notice of termination based on Spectrum's default (and thus only those actions taken after Spectrum began withholding royalty payments in late 2004) would be protected, and only to the extent that Uttermost did not induce CKI to fail to negotiate in good faith to resolve

the issue.

However, this case law does have broader implications for the case.  Spectrum argues that the evidence shows that Uttermost was inducing CKI to breach its agreement with Spectrum and design fixed-wire lighting products for Uttermost to sell to Home Depot.  In contrast, Uttermost argues that the evidence shows only that Uttermost was inducing CKI to take actions consistent with the contract (such as design portables for Uttermost to sell to Home Depot or others) (or was "inducing" CKI to take certain actions either before or after the contract was in place).  Thus, essentially, Uttermost argues that it only induced CKI to do what it had a right to do under the contract.  Both parties rely on essentially the same evidence to support their respective positions. Though Uttermost's cast on the facts is credible and would tend to negate liability, the Court's focus at this stage is only whether Spectrum has produced some evidence to support its claim.

To support a claim for tortious interference with an existing contract, a plaintiff must produce evidence that the defendant actually caused or brought about a breach of the agreement and that the actionable conduct was willful and intentional with actual knowledge of the contract in question. *Sabine Prod. Co. v. Frost Nat'l Bank*, 596 S.W.2d 271, 275 (Tex. Civ. App.–Corpus Christi 1980, writ dism'd).  Thus, the defendant must be more than just a "willing participant." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993).  Spectrum's evidence, if viewed in the light most favorable to Spectrum, meets this requirement.  Accordingly, the Court finds that fact issues remain that preclude summary judgment on Spectrum's claim for tortious interference with its contract with CKI.[11]

---

[11]Uttermost filed a motion to strike certain of Plaintiff's evidence.  The motion is denied. Many of the exhibits objected to were not relied on in determining the motions for summary judgment.  Some documents were authenticated by Kinder (52, 63, 64, 65) and other documents (50,

**B. Tortious Interference with Prospective Business Relations with Home Depot**

The Second Amended Complaint asserts a claim for tortious interference with prospective business relations as follows: "Due to the long standing business relationship between Spectrum and Home Depot, there is a reasonable probability that Spectrum would continue to have a business relationship with Home Depot; Defendants willfully and intentionally attempted to interfere with that business relationship with Home Depot; Defendants' conduct in interfering with the business relationship was independently tortuous [*sic*] and unlawful; The interference by Defendants with the business relationship between Spectrum and Home Depot was the proximate cause of injury to Spectrum."  Second Am. Compl. ¶¶ 52-54.

In *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711 (Tex. 2001), the Texas Supreme Court brought "a measure of clarity" to the tort of tortious interference.  The Court held that "to establish liability for interference with a prospective contractual or business relation the plaintiff must prove that it was harmed by the defendant's conduct that was either independently tortious or unlawful. By 'independently tortious' we mean conduct that would violate some other recognized tort duty."  *Id.* at 713.  "By independently tortious we do not mean that the plaintiff must be able to prove an independent tort.  Rather, we mean only that the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort."  *Id.* at 726.  "Conduct that is merely 'sharp' or unfair is not actionable and cannot be the basis for an action for tortious interference with prospective relations."  *Id.* at 726.  Thus, "an action for interference with a prospective contractual or business relation provides a remedy for injurious conduct that other tort actions might not reach . . . , but only

51, 52) are not essential to the Court's decision, and the evidence relied on therein is either merely background, is undisputed, and/or is relevant to Uttermost's argument that CKI had reason to terminate the Agreement.

18

for conduct that is already recognized to be wrongful under the common law or by statute." *Id*. at
713.

Uttermost moves for summary judgment on the basis that Uttermost did not interfere and
Spectrum cannot demonstrate that Uttermost committed any conduct that was independently tortious
or unlawful.  Uttermost relies on the testimony of two Home Depot witnesses, who testified that
Uttermost exerted no improper influence upon them.

Spectrum argues that there is "ample evidence that Home Depot did buy CKI-designed
portables and fixed wire lighting from Spectrum, and would have bought more of them" and there
is "ample evidence that Uttermost hindered Spectrum's sales to Home Depot by discouraging CKI
from working with Spectrum and by encouraging CKI to design portables, and later fixed wire, for
Uttermost to sell to Home Depot."

Spectrum asserts that "Uttermost's acts were independently tortious in a variety of ways
because Uttermost induced CKI to breach its duty of confidentiality toward Spectrum,
misappropriated Spectrum's trade secrets (including Spectrum's designs and sales and production
information), violated Spectrum's copyright rights, and tortiously interfered with the Spectrum/CKI
Agreement."  Spectrum argues that Uttermost's acts were also fraudulent because, when asked by
Home Depot's representative, Uttermost said there were no issues with Home Depot Expo
purchasing fixtures from Uttermost, fraudulently concealing the exclusivity provisions of the
Spectrum/CKI Agreement.

Uttermost's evidence does not conclusively establish the lack of tortious interference.  In
addition, since the evidence must be viewed in the summary judgment context, the Court will focus
on whether Spectrum has produced evidence that raises a fact issue on whether Uttermost tortiously

interfered.  The Court finds that Spectrum has produced some evidence to raise a fact issue as to whether Uttermost engaged in conduct that was independently tortious.  The Court has already concluded that Spectrum has raised a fact issue regarding whether Uttermost tortiously interfered with the Agreement between CKI and Spectrum.  In addition, Spectrum has produced some evidence that Uttermost made a misrepresentation to a Home Depot Expo representative who asked Uttermost whether there were "any issues with Expo purchasing fixtures from Uttermost" and "they said no." Weisner depo. at 31.  Though slim, Spectrum's evidence is sufficient to defeat summary judgment.

## C. Trade Secret Misappropriation

The Second Amended Complaint also asserts a claim for Trade Secret Misappropriation against both CKI and Uttermost.  Spectrum alleges that, "[d]uring the course of Spectrum's relationship with CKI, Spectrum shared many trade secrets that Spectrum owns with CKI; CKI either used, or disclosed the trade secrets to Uttermost, in violation of a confidential or contractual relationship with Spectrum; CKI knew the information provided by Spectrum to CKI was confidential; As a result of the trade secret misappropriation by CKI and/or Uttermost, Spectrum has suffered damages in an amount not yet known ...."  Second Am. Compl. ¶¶ 65-69.

In its response to Uttermost's interrogatory asking Spectrum to identify every trade secret that it contended Uttermost misappropriated, Spectrum responded, "all aspects of Spectrum's business that are not generally known to the public, including, without limitations, all formulae, patterns, devices, designs, drawings, design documentation, samples, and products related to lighting, compilations of information which is used in Spectrum's business, and which gives Spectrum an opportunity to obtain an advantage over competitors who do not know or use it, products and customers, customer lists, contact and referral information, contemplated business dealings, price

strategies and lists, equipment, specifications, contracts, and business operations constitute Plaintiff's trade secrets. Specifically, Uttermost and/or Mac Cooper, with the assistance of CKI and/or Carolyn Kinder, stole the designs for lighting products that Kinder and/or CKI had prepared for Spectrum. Plaintiff further states that every design contained in the excel spreadsheet titled 'Copy of Spectrum all-collections composite 022306' which Uttermost stole and produced only as recently as December 8, 2006 are Spectrum's trade secrets that Uttermost misappropriated." Spectrum now asserts that the evidence shows that Uttermost misappropriated trade secrets including confidential product designs, information about Spectrum's relationship with CKI and Home Depot, and Spectrum's sales and contemplated business activities.

Under Texas law, trade secret misappropriation is established by showing: (1) a trade secret[12] existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) use of the trade secret without authorization from the plaintiff. *Alcatel, U.S.A. v. DGI Technologies, Inc.*, 166 F.3d 772, 784 (5th Cir. 1999). Uttermost moves for summary judgment on the basis that "the only alleged trade secrets specifically identified by Spectrum are product designs" and "all state law claims relating to such alleged trade secrets are preempted by 17 U.S.C. § 301."

Spectrum argues that the Copyright Act does not preempt its trade secret misappropriation claims related to its product designs. In contrast, Spectrum argues, numerous cases have held that the Copyright Act does not preempt a claim for trade secret misappropriation whether or not the trade secret itself is copyrightable.

---

[12]A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1994).

In *Alcatel v. DGI Technologies*, the Fifth Circuit held that the plaintiff's state law unfair competition by misappropriation action was preempted by federal copyright law. The Court noted, "With a few exceptions, all causes of action falling within the scope of the Copyright Act are expressly preempted. Section 301 of the Act sets forth two conditions, both of which must be satisfied, for preemption of a right under state law to occur: First, the work in which the right is asserted must come within the subject matter of copyright as defined in sections 102 and 103. Second, the right that the author seeks to protect must be equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." *Alcatel*, 166 F.3d at 785-86 (footnotes omitted).

With regard to the first prong, it appears undisputed that the product designs come within the subject matter of copyright. The preemption issue thus turns on whether the rights are determined to be equivalent. The court evaluates the equivalency of rights under the "extra element" test. *Id*. at 787. Under this test, if the act or acts of the defendant about which the plaintiff complains would violate both misappropriation law and copyright law, then the state right is deemed "equivalent to copyright" and is preempted. *Id*. If, however, one or more qualitatively different elements are required to constitute the state-created cause of action being asserted, then the right granted under state law does not lie "within the general scope of copyright" and there is no preemption. *Id.*

In *Alcatel*, the Fifth Circuit noted that if a work is granted copyright protection, the owner has exclusive rights over its reproduction, adaptation, distribution, performance, and display. Use of a copyrighted work by one who does not own the copyright constitutes infringement under federal law, provided the use falls within the scope of a copyright owner's exclusive rights. *Id.* at 787-88. In contrast to federal copyright law, which focuses on the value of creativity, state misappropriation

law is specifically designed to protect the *labor* – the so-called "sweat equity" – that goes into

creating a work. *Id.* at 788. The Fifth Circuit then stated the elements of the misappropriation claim

as: (1) the creation by plaintiff of a product through extensive time, labor, skill and money; (2) the

use of that product by defendant in competition with plaintiff, thereby giving the defendant a special

competitive advantage because he was burdened with little or none of the expense incurred by

plaintiff in the creation of the product; and (3) commercial damage to plaintiff. "Despite the

seemingly divergent purposes of federal copyright and state misappropriation law," the Court held

that the rights protected were equivalent "under the discrete facts of [the] case." Specifically, the

Court noted that the acts that formed the basis of the plaintiff's misappropriation claim touched on

interests clearly protected by the Copyright Act, including (1) the reproduction of its firmware,

software, and manuals; (2) the use of these materials in the preparation of allegedly derivative works;

and (3) the distribution of these works in competition with plaintiff. *Id.* at 789. The Court also

relied on its earlier case, *Daboub v. Gibbons*, 42 F.3d 285 (5th Cir. 1995), in which it found a music

band's misappropriation claim to be preempted by the Copyright Act when it was based on the

improper copying, distribution, and performance of a song.

Uttermost cites *Alcatel* and *Daboub* in support of its motion. Spectrum argues that reliance

on these cases is misplaced and that these cases "held that the Copyright Act pre-empted common

law claims for misappropriation of the 'labor – the so-called "sweat equity" – that goes into creating

a work' because the rights protected under the two causes of action were essentially equivalent."

Spectrum also argues that Uttermost cites no case holding that the Copyright Act preempts a trade-

secret misappropriation claim as opposed to an unfair competition by misappropriation claim. The

Court notes that, in *Alcatel* itself, the Fifth Circuit found preemption of the unfair competition by

misappropriation claim, but affirmed the jury's determination of liability on the plaintiff's misappropriation of trade secrets claim, even though both were based on the misappropriation of the plaintiff's firmware.

Spectrum argues that copyright law does not preempt trade-secret law because, among other reasons, trade secret protection extends to subject matter that is not copyrightable, and provides protection in a manner that does not clash with the objectives of copyright laws.  In addition, Spectrum contends that the "extra element" test is satisfied because proof of trade secret misappropriation has two extra elements – (1) proof of the confidential or secret nature of the information and (2) violation of a confidential or contractual relationship, acquisition through improper means, or use after notice of an improper disclosure.

Spectrum argues that numerous courts have held that the Copyright Act does not preempt a claim for trade secret misappropriation, and this conclusion follows whether or not the material subject to the trade secret is itself copyrightable.  Spectrum cites *Stromback v. New Line Cinema*, 384 F.3d 283, 303 (6th Cir. 2004), which criticized the district court for lumping together a commercial misappropriation claim and a misappropriation of trade secrets claim, stating that the district court "failed to recognize that a considerable number of cases have held that misappropriation of trade secrets claims are not preempted because they require proof of a confidential relationship, which provides the extra element required to survive preemption."  The Sixth Circuit cited a Second Circuit case noting that "many state law rights that can arise in connection with instances of copyright infringement satisfy the extra element test, and thus are not preempted by section 301.  These include unfair competition claims based upon breaches of confidential relationships, breaches of fiduciary duties, and trade secrets."  *Computer Assocs. Int'l*

*v. Altai*, 982 F.2d 693, 717 (2d Cir. 1992).  The Court agrees with Spectrum that its claim for trade secret misappropriation based on the misappropriation of its product designs is not preempted.[13]

Though it did not specifically identify these misappropriated "trade secrets" in the response to Uttermost's interrogatory, Spectrum now claims that Uttermost misappropriated information about Spectrum's relationship with CKI and Home Depot and Spectrum's sales and contemplated business activities.  These claims would not be preempted by the Copyright Act because the misappropriated items are not copyrightable.  However, Spectrum should be prepared to address at the pretrial conference whether these items qualify as trade secrets and whether Spectrum should be estopped from proceeding on these claims because it failed to identify them during discovery.

## D. Unfair competition

The Second Amended Complaint also asserts a claim for Common Law Unfair Competition against both CKI and Uttermost.  The Complaint alleges only that "Uttermost and/or CKI are in competition with Spectrum; As a result of the acts complained of herein above, Defendants have engaged in unfair competition with Spectrum; ... Spectrum has been damaged in an amount not yet known."  Second Am. Compl. ¶¶ 61-64.  Uttermost moves for summary judgment on the basis that "Texas only recognizes a claim for unfair competition in the event of trade secret misappropriation" and thus "any claims of unfair competition are also preempted by 17 U.S.C. § 301."

---

[13]*Carson v. Dynegy, Inc.*, 344 F.3d 446 (5th Cir. 2003), cited by Uttermost, is not to the contrary.  *Carson* involved a claim for conversion, not a claim for misappropriation of trade secrets, and thus did not address the extra element test in the context of trade secrets.  Further, it did not hold that all state law claims involving copyrightable intangible property are preempted.

Spectrum correctly argues that Uttermost's arguments must fail because Spectrum's trade secret misappropriation claims are not preempted and, under Texas law, unfair competition can be based on more than just trade secret misappropriation – it is "the umbrella for all statutory and non-statutory causes of action arising out of business conduct that is contrary to honest practice in industrial and commercial matters." *See Sefton v. Jew*, 201 F. Supp. 2d 730, 745 (W.D. Tex. 2001) (quoting *Amer. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)). Uttermost's motion is based solely on its argument that Spectrum's trade secret misappropriation claim is preempted and therefore its unfair competition claim must be preempted as well. Because it is premised on that limited basis, the motion is denied. The Court is concerned, however, that Spectrum has failed to specifically identify the contours of its unfair competition claim. Spectrum must clearly identify the bases for its claim in its pretrial submissions.

In addition, to the extent that the unfair competition claim is based on misappropriation of copyrightable designs, it appears that it would be preempted by the Copyright Act even though the trade-secret misappropriation claim is not preempted. This was the result in *Alcatel*. The parties should be prepared to address this issue at the pretrial conference.

### Conclusion

Docket no. 255, Uttermost's Motion for Partial Summary Judgment Regarding Claims of Tortious Interference with Existing Contract, is DENIED.

Docket no. 256, Uttermost's Motion for Partial Summary Judgment Regarding Trade Secret Misappropriation and Unfair Competition Claims, is DENIED.

Docket no. 257, Uttermost's Motion for Partial Summary Judgment on Plaintiff's Claim of

Tortious Interference with Prospective Business Relations, is DENIED.

Docket  no. 264, Uttermost's Motion to Strike, is DENIED.

SIGNED this 5th day of April, 2007.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE