UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

SPECTRUM CREATIONS, L.P.,        )
                                 )
        Plaintiff,               )
                                 )
VS.                              )        Civil Action No.: SA-05-CV-750-XR
                                 )
CAROLYN KINDER INTERNATIONAL,    )
LLC & THE UTTERMOST COMPANY,     )
                                 )
        Defendants.              )

**FACT FINDINGS AND CONCLUSIONS OF LAW**

This Court conducted a bench trial on the liability issues in this case. In accordance with

Rule 52, the Court issues its fact findings and conclusions of law.

**I. Background**

At the suggestion of a Home Depot buyer, designer Carolyn Kinder and her company,

Carolyn Kinder International, LLC ("CKI") entered into an agreement to design lighting to be

manufactured by Spectrum Creations, L.P. ("Spectrum") for sale by Spectrum to Home Depot

primarily (but also to others through its lighting showroom). The parties negotiated for about a year

and eventually entered into a Design and Services Agreement ("DSA"). The two companies had a

rocky relationship that eventually deteriorated, with both sides complaining of a lack of performance

by the other.

        CKI had a pre-existing business relationship with another manufacturer of home decor and

lighting, The Uttermost Company ("Uttermost"). CKI designed portable lighting[1] for Uttermost,

---

[1] Generally, portable lighting is a category of lighting that includes products that are plugged
into a wall, such as a table lamp or floor lamp.

1

and, after the CKI/Spectrum relationship ended, CKI also designed fixed-wire lighting[2] for Uttermost.

Plaintiff Spectrum initiated this suit against CKI in state court on July 26, 2005.  CKI removed this case on August 9, 2005.  On March 9, 2006, Spectrum amended its Complaint and added numerous tort and copyright infringement claims against Uttermost.

**A. The parties' claims**

Plaintiff's Second Amended Complaint (docket no. 97) is its live pleading.  The first cause of action is a claim for civil conspiracy against CKI and Uttermost, alleging that they conspired to violate Spectrum's rights.  Second Am Compl. ¶¶ 38-41.  The second cause of action is a breach of contract claim against CKI for breach of the DSA.  ¶¶ 42-46.  The third cause of action asserts a claim for tortious interference with existing contract against Uttermost, stating that "Uttermost in conspiracy with CKI willfully and intentionally interfered with the [DSA], [s]uch interference was the proximate cause of injury to Spectrum, [and as] a result of the interference, Spectrum has incurred actual damage or loss." Second Am. Compl. ¶¶ 48-50.        The fourth cause of action asserts a claim for tortious interference with prospective business relations as follows: "Due to the long standing business relationship between Spectrum and Home Depot, there is a reasonable probability that Spectrum would continue to have a business relationship with Home Depot; Defendants willfully and intentionally attempted to interfere with that business relationship with Home Depot; Defendants' conduct in interfering with the business relationship was independently tortuous [sic] and unlawful; The interference by Defendants with the business relationship between Spectrum and

---

[2]Generally, fixed-wired lighting is a category of lighting that describes those lighting fixtures that are hard-wired into a building, such as a chandelier or ceiling fan.

2

Home Depot was the proximate cause of injury to Spectrum." Second Am. Compl. ¶¶ 51-54.

The fifth cause of action asserts a claim for breach of fiduciary duty against CKI, asserting that, "[d]uring the time that CKI was providing designs for Spectrum, either under oral or written contract, CKI had a fiduciary relationship with Spectrum," and "CKI breached its fiduciary duty to Spectrum." ¶¶ 55-60.

Spectrum's sixth cause of action is a claim for common-law unfair competition against CKI and Uttermost. It asserts that "Uttermost and/or CKI are in competition with Spectrum. As a result of the acts complained of herein above [Spectrum incorporates paragraphs 1 - 60 of the Complaint], Defendants have engaged in unfair competition with Spectrum." ¶¶ 61-64.

The Second Amended Complaint's seventh cause of action asserts a claim for trade secret misappropriation against both CKI and Uttermost. Spectrum alleges that, "[d]uring the course of Spectrum's relationship with CKI, Spectrum shared many trade secrets that Spectrum owns with CKI; CKI either used, or disclosed the trade secrets to Uttermost, in violation of a confidential or contractual relationship with Spectrum; CKI knew the information provided by Spectrum to CKI was confidential; As a result of the trade secret misappropriation by CKI and/or Uttermost, Spectrum has suffered damages in an amount not yet known ...." Second Am. Compl. ¶¶ 65-69.

The eighth cause of action is a claim for copyright infringement. ¶¶ 70-80. Spectrum alleges that the DSA specifically provides that the copyrighted designs may be registered and that Spectrum had the exclusive use of those copyrighted designs that were commercially attractive to Home Depot. "As a result of the Agreement between Spectrum and CKI, Spectrum has the exclusive right to use each of these copyrighted designs, and may sue others for infringement of the copyrights." Spectrum alleges that Uttermost is willfully and knowingly infringing its copyrights, and that CKI has

conspired with Uttermost in such acts of infringement.  In the alternative, Spectrum alleges that, "if CKI provided the designs to Uttermost first, CKI violated the agreement with Spectrum by not providing original designs in which Spectrum had exclusive use."

Defendant CKI filed a Second Amended Counterclaim against Spectrum Creations, L.P. and a First Amended Third Party Complaint against Spectrum Creations, Inc. and Spectrum Creations Management, Inc. (docket no. 139).  Therein, CKI sought a declaratory judgment that no written agreement is in effect between Spectrum and CKI and that, in the absence of a written agreement, Spectrum's right or license to sell CKI-designed products is solely based on an oral, non-exclusive license.  ¶ 109.  In the alternative, CKI sought a declaration that, if a written agreement is in effect, the Agreement signed by CKI is the operative written contract and that Spectrum materially breached the contract by failing to pay royalties and "by Spectrum's late reporting and/or withholding of royalty reports and statements."  ¶ 110.  In the "further alternative," CKI sought a declaration that the first ten sets of designs provided by CKI to Spectrum (Tropics, West Indies, San Marino, Antler, Sedona, Vienna, Mazatlan, Coronado, Providence, and Lotus) are not governed by any written agreement and are subject only to an oral, non-exclusive license.  ¶ 114.  CKI further sought a declaration that certain copyright registrations (Ex. D-J) were fraudulently obtained and are false and invalid.  ¶ 115.  CKI also sought a declaration that Spectrum's failure to pay royalties constitutes a material breach of the DSA or any oral or implied agreement between the parties, and that breach entitles CKI to rescind and recover any and all license rights that may have been granted to Spectrum. ¶116.  CKI also asserted a claim for breach of the written contract (the DSA), ¶¶ 117-120, and breach of an oral or implied contract, ¶¶ 121-124.  CKI further asserted causes of action for negligent misrepresentation and/or fraudulent inducement, ¶¶ 125-127, unjust enrichment, ¶¶ 128-

131, accounting, ¶ 132, and copyright infringement, ¶ 133-139.

Defendant Uttermost filed a Counterclaim for declaratory judgment against Spectrum (docket no. 141). Uttermost seeks a declaration that CKI can design products for Uttermost and that Uttermost is not restricted from selling any of the CKI-designed fixtures in its product line to Home Depot due to any agreement between CKI and Spectrum or any other basis. Uttermost also seeks attorney's fees.

**B. The Court's previous orders**

On January 23, 2007, this Court issued an order on Defendant CKI's Motion for Partial Summary Judgment. Docket no. 246. The parties disputed whether a written contract was formed between Spectrum and CKI because Spectrum did not sign the contract. The Court concluded that fact issues remained whether the parties intended the signatures of both parties to be a condition precedent to formation of a contract. Further, the Court concluded that, even if they did so intend, fact issues remained regarding whether CKI waived the condition precedent. Thus, to the extent that CKI's motion would have required the Court to find as a matter of law that signatures were a condition precedent to the formation of a binding written contract, the motion was denied. However, the Court granted the motion insofar as it sought a declaratory judgment that, if a written contract was in place, it was the December 2 contract signed by Voth and not the contract later altered by Michael Barnes.

On March 22, 2007, this Court issued an order dismissing Plaintiff's "conspiracy to breach contract" claim to the extent any such claim might be construed from Plaintiff's Second Amended Complaint. Docket no. 268.

On March 27, 2007, this Court issued an order granting summary judgment on CKI's claim

5

of fraudulent inducement against Spectrum based on all misrepresentations other than those relating to Spectrum's CAD department and CAD drawings. Docket no. 269. The Court found that CKI had presented sufficient evidence to raise a fact issue whether Spectrum had a CAD department as represented and whether Spectrum intended to fulfill its obligation to provide its CAD department and its services for CKI. Accordingly, the Court denied summary judgment on this claim. The Court further held that, to the extent that CKI based its negligent misrepresentation claim on the same injury as its breach-of-contract claim, the negligent misrepresentation claim was barred by the independent injury rule. Further, the Court held that, to the extent that CKI's negligent misrepresentation claims were based on promises of future performance, they failed to state a claim. Last, the Court found that CKI had produced no summary judgment evidence to raise a fact issue with regard to the third element of its negligent misrepresentation claim – that Spectrum did not exercise reasonable care or competence in obtaining or communicating the information on which CKI based its claims, nor did it point to any evidence from which such an inference may arise. Accordingly, the Court entered summary judgment in favor of Spectrum on CKI's negligent misrepresentation claim.

On April 5, 2007, the Court issued an order regarding various claims asserted by Spectrum. The Court found that fact issues remained on Spectrum's claim against Uttermost for tortious interference with its existing contract (the DSA) with CKI. The Court also denied summary judgment on Spectrum's claim against Uttermost and CKI for tortious interference with prospective business relations with Home Depot. The Court agreed with Spectrum that its claim for trade secret misappropriation based on the misappropriation of its product designs is not preempted by the Copyright Act. Though it did not specifically identify the information in its response to Uttermost's

interrogatory, Spectrum claimed in its summary judgment pleadings that Uttermost misappropriated information about Spectrum's relationship with CKI and Home Depot and Spectrum's sales and contemplated business activities. The Court found that these claims would not be preempted by the Copyright Act because the misappropriated items are not copyrightable.  However, the Court directed Spectrum to be prepared at the pretrial conference to discuss whether these items qualify as trade secrets and whether Spectrum should be estopped from proceeding on these claims because it failed to identify them during discovery.  At the pretrial conference, Spectrum agreed to limit its trade secret misappropriation claim to its designs only.  The Court also denied summary judgment to Uttermost on Spectrum's unfair competition claim because Uttermost's motion was based on the narrow ground that the claim was preempted.  However, the Court was concerned that Spectrum had failed to specifically identify the contours of its unfair competition claim and directed Spectrum to clearly identify the bases for the claim in its pretrial submissions.  The Court also noted that, to the extent that the unfair competition claim was based on misappropriation of copyrightable designs, it appeared to be preempted by the Copyright Act.

On April 17, 2007, the Court issued an order on Uttermost's Motion for Partial Summary Judgment Concerning Plaintiff's Copyright Claims and CKI's Second Motion for Partial Summary Judgment (docket no. 303).  The Court denied the motion for summary judgment on the basis of no written contract due to its prior conclusion that fact issues remained regarding whether a written contract was in effect between Spectrum and CKI.  Uttermost and CKI also moved for summary judgment on the basis that Spectrum had no exclusive license for designs submitted before CKI signed the contract on December 2, 2003.  The Court found that the DSA was ambiguous regarding whether an exclusive license and other rights were granted for designs accepted before December

7

2, 2003 or designs submitted before December 2, 2003 and accepted in whole or in part after December 2, 2003, and thus denied summary judgment on that ground.

Uttermost further argued that Spectrum acquired no rights in designs that it rejected. The Court agreed with this proposition, but held that there were fact issues regarding whether certain designs were accepted or rejected, thus precluding summary judgment. Uttermost also argued that, under section 6 of the DSA, any exclusive rights in fixed wire designs not accepted in twelve months reverted to CKI. The Court rejected this argument because section 6 relates only to the non-compete agreement and does not affect Spectrum's copyright rights. The Court also found that fact issues precluded Uttermost's argument that any license and copyright rights reverted to CKI for any designs not reasonably commercialized within eighteen months. The Court deferred ruling on Uttermost's argument that Spectrum could not pursue copyright infringement claims because the designs were not original.[3]

### C. Pre-trial Conference (April 11, 2007)

As noted, at the pretrial conference, counsel for Spectrum conceded that Spectrum's claim for misappropriation of trade secrets would be limited to the designs. Tr. 20-21. However, with

---

[3]Uttermost moved for summary judgment on the ground that Spectrum's designs were not original. In its order, the Court noted the related argument that Uttermost could not have copied the designs because it had them first, and concluded that Uttermost had not moved for summary judgment on that ground. Uttermost takes issue with this statement, noting that it did assert that it could not have copied the designs because it sold its allegedly infringing products before CKI gave the allegedly infringed designs to Spectrum. The Court recognizes, and did at the time of its order, that Uttermost made that statement. However, the Court concluded that Uttermost moved for summary judgment on the position that Spectrum's designs were not original because Uttermost had them first, but did not move for summary judgment on the "related ground" that Uttermost did not copy the designs because it had them first. Because it was a motion for summary judgment, the Court did not expand the basis for the summary judgment motion beyond that which was clearly asserted as the basis for summary judgment.

regard to the unfair competition claims, Spectrum was permitted to include confidential business information.  Tr. 939.

### D. Post-trial submission by Spectrum regarding copyright claims

On May 14, 2007, Spectrum filed a Notice of Dismissal of certain of its copyright claims against Uttermost (docket no. 332).

## II. FINDINGS OF FACT

1.  Any finding of fact herein that also constitutes a conclusion of law is adopted as a conclusion of law.  Any conclusion of law herein that also constitutes a finding of fact is hereby adopted as a finding of fact.

2.  The Home Depot ("Home Depot") is currently one of the largest retailers dedicated to the home improvement market, with over 1800 stores in the United States and in Canada.  (stipulated)

3.  Plaintiff, Spectrum Creations, LP ("Spectrum") is a vendor to Home Depot, offering lighting products for sale to Home Depot.  Home Depot is Spectrum's largest customer, comprising more than ninety percent of Spectrum's annual business. (stipulated) Tr. 70.  Spectrum also offers lighting for sale through its own showroom, Tenth Avenue Lighting.

4.  In 1998, Uttermost began selling products to Home Depot.  (stipulated)  These sales did not include lighting products.

5.  Spectrum was founded in 1998 by Michael Barnes.  Michael Barnes's father, Charles Barnes, managed stores for Home Depot, and Home Depot's predecessor, Handy Dan Home Improvement.  In 1983, the senior Barnes brought Michael Barnes into Home Depot as an employee.  (stipulated)

6.  Michael Barnes worked at Home Depot from 1983 to 1992.  Prior to his departure in 1992, Michael Barnes was a Merchant for Home Depot, being in charge of the regional purchase of decorative lighting, hard-wired electrical lighting, and ceiling fans.  (stipulated)

7.  Using his knowledge and contacts with Home Depot, Michael Barnes set up Spectrum to become a vendor of lighting products to Home Depot.  (stipulated)

8.  From its inception in 1998 through 2002, Spectrum concentrated on designing and offering Tiffany lamps and other Tiffany lighting fixtures for sale to Home Depot.  (stipulated)

9.     In the late nineties, Carolyn Kinder began designing lighting products for some of her customers/clients.

10.    Carolyn Kinder began designing portable lamps for Uttermost in 2002. Uttermost began selling Carolyn Kinder, Inc. designed lamps (portables) in April 2002. (stipulated) Tr. 867. However, Uttermost did not sell those lamps to Home Depot. (stipulated) Home Depot buyers Jeff Lee, Greg St. John, and possibly Marsha Harbaugh[4] visited Uttermost's showroom in High Point in 2002 and liked the Kinder-designed lamps. Tr. 1034-35. At the time, CKI and Uttermost had an exclusive arrangement for portables, with the exception of some preexisting licensees (Austin and Seagull). Tr. 1035.[5] This exclusive arrangement does not appear to have been reduced to writing.

11.    Uttermost and CKI began generally discussing CKI-designed fixed wire for Uttermost after they introduced lamps in 2002. These discussions became more serious in 2004 and 2005. Tr. 1054; AX-37, AX-38.

12.    In January 2003, Home Depot, through Jeff Lee, introduced Michael Barnes to Carolyn Kinder. (stipulated) M. Barnes depo at 17[6]; PX-3002. Lee had known Spectrum's Mike Barnes for several years. (stipulated) Because Lee was impressed with Kinder's designs and trusted Spectrum to keep designs confidential, he wanted Spectrum to manufacture Kinder's lighting designs for sale to Home Depot. M. Barnes depo at 17. Home Depot (through Jeff Lee) suggested that Spectrum and CKI enter into an agreement to design and manufacture fixed-wired lighting for sale to Home Depot. (stipulated) Tr. 190.

13.    Uttermost had been trying to sell its lamps to Home Depot, but Jeff Lee had rejected that idea, mainly because Home Depot did not want to add any new vendors. PX-102.

---

[4]Marsha Harbaugh, also known as Marsha Harbaugh Young, was the Home Depot buyer for portable lighting, track lighting, and accent lighting. Harbaugh depo at 8. At the time, Jeff Lee was the Home Depot buyer for fixed-wire lighting.

[5]The only signed contract between Uttermost and CKI that was produced was dated April 2004. Cooper testified that he felt certain that there was an agreement going back to the late 1990s or 2000. Tr. 1046. It appears undisputed that all parties were operating under the assumption that Kinder and Uttermost had an exclusive arrangement for her to design portables for Uttermost, with the exception of Austin and Seagull, and that Uttermost permitted Kinder to design portables as part of a family for purposes of the DSA with Spectrum. However, no writing was produced as evidence of this exclusive arrangement other than an April 2004 contract.

[6]Deposition excerpts were offered into the record at trial. However, at this time, both the Court and parties are working from the rough transcript, which does not include deposition testimony. Accordingly, the Court will cite to the deposition itself.

14.   Carolyn Kinder International, LLC ("CKI") began negotiations for a design agreement for lighting products with Spectrum in early 2003.  (stipulated)

15.   The contract negotiations between Spectrum and CKI spanned the course of 2003 with several drafts being exchanged between the parties.  (stipulated)  Eric Williams from Spectrum and Mike Toups and David Voth from CKI handled much of the contract negotiation communications.  Tr. 346.  Much of the contract negotiation communication occurred by email and telephone.  Tr. 347.  Eric Williams had a computer virus that caused him to lose many of his emails from the middle of 2003.  Tr. 347.

16.   David Voth of CKI sent a letter to Michael Barnes on February 5, 2003.  AX-5.  This was the first document that was sent back and forth between the parties regarding a proposed agreement.  Tr. 344-46.  The letter stated, "As discussed, it is important to identify each of our specific roles.  We pride ourselves on being very flexible and willing to 'go the extra mile' to deliver a finished product – what ever it takes – so, although we will each have an identified action plan please count on us to fill any gaps necessary to get to the end game.  In fact, Carolyn will stay in China until after the Home Depot meeting to ensure everything is ready for their approval in mid-March."  It further stated, "It is our understanding that the intention of this agreement is to support Spectrum with product design to be sold through Home Depot and that Home Depot intends to roll the product out to all its stores on a 'best efforts' basis based on expanding its product offerings in the categories mentioned below.  To this end the roles of each party are outlined as follows:  Carolyn Kinder International, LLC (CKI) ... will serve in the role of product development – drawings, designs, finishes and instructions to factory regarding finishing; Initially CKI has been requested to provide design and finish for at least two 'suites' of product, which will be manufactured by Spectrum and sold through Home Depot; the suite of products may include, but not be limited to, the following [list of 14 product types]; the designs will remain the sole property of CKI.  Spectrum will have the exclusive right to manufacture said designs.  Home Depot will have the exclusive rights to sell said designs.  These rights revert back to CKI once said design is dropped from the Home Depot line of products.  Home Depot will apply for copyright protection for CKI designs under CKI's name.  Spectrum Creation/Spectrum Creations Offshore, (Spectrum) ... will serve in the role of 'target factory'/manufacturer – sourcing raw product, engineering and developing molds and samples, enforce quality control to conform to identified product specifications and delivering finished product; Spectrum will use its best efforts to meet all deadlines for requested designs and ship dates to Home Depot.  Spectrum will give priority to CKI designs for product development and samples and make resources available to fully support CKI's efforts.  Spectrum will compensate CKI for its role based on the life of the design/product as a percentage of the wholesale cost – defined as the direct sales price to Home Depot from Spectrum....; In addition to the standard compensation, as described above, Spectrum will reimburse CKI for reasonable travel expenses not to exceed $3,500 per month and other such direct expenses which shall be mutually agreed upon by CKI and Spectrum/Home Depot."  The suite of fourteen products included in this letter never changed and was incorporated into the final Agreement.

17.   Mike Barnes testified that Spectrum's attorney, Ed Einstein, was in charge of preparing the first drafts of the Agreement. M. Barnes depo at 24. Barnes also testified that he understood that CKI would provide design services to several companies at the same time. *Id*. at 29. Barnes testified that he did not intend to prevent Kinder from designing fixed-wire lighting for other companies when they were negotiating the contract. *Id*. at 41.

18.   In March 2003, Uttermost personnel discussed "a Home Depot strategy," noting that Home Depot was still mandating "to buy more direct" but that they should keep trying, and that "Carolyn may have some information that may help us." PX-102.

19.   Although no written agreement was in place, CKI began submitting designs to Spectrum for presentation to Home Depot. CKI first submitted design drawings for the Tropics, West Indies, and San Marino collections around the end of February 2003 for a meeting with Home Depot in San Antonio in April. Tr. 16; AX-119; PX-3002; M. Barnes depo at 83-84.

20.   When Carolyn Kinder first submitted the designs for the San Marino, Tropics, and West Indies collections, she gave sketches of the designs, not CAD drawings. Tr. 267. Over the course of 2003, Carolyn, Pat Kryza of Spectrum, and others worked together with the factories to convert Kinder's conceptual designs into CAD drawings. Tr. 268. CKI worked with Spectrum's CAD department in coming up with CAD drawings. Tr. 268. Kinder also worked to develop color finishes. Tr. 269. Kinder's efforts to develop the designs was "excellent." Tr. 47. However, there were some issues with CKI not following Spectrum's product development protocol, which was geared toward meeting the needs of Home Depot. Tr. 272.

21.   Spectrum met with Home Depot in April 2003 to show them the designs. Carolyn did not attend this meeting due to SARS concerns. PX-3002. Mike Barnes testified that the families were "horrendous" and he wanted to cancel the meeting. M. Barnes depo at 83. However, Pat and Liz wanted to have the meeting. *Id.* Home Depot was disappointed, and Mike Barnes cancelled a later meeting scheduled for July 30 to avoid embarrassment. *Id.* at 83-84. Carolyn and Pat Kryza then went to China on August 1 to work on getting samples ready for a meeting with Home Depot in China in August 2003. *Id.*

22.   Pat Kryza was the person at Spectrum that was primarily responsible for working with Carolyn Kinder and CKI to make sure families of designs were completed and presented to Home Depot. (stipulated) Pat Kryza had worked for Home Depot for ten years. Tr. 14. Kryza essentially lived in China until August 2003 to make sure that samples were done to the satisfaction of Spectrum and Home Depot. Tr. 19.

23.   Kryza worked with Kinder on a daily basis to make sure that specific changes requested by Home Depot were made. Tr. 19. Kryza, Carolyn Kinder, and Rick and Maggie Bennett from

Creative Industries[7] went over each of Carolyn's drawn designs to get all the specifications. Tr. 42.  CKI worked with Spectrum's CAD designer, Cindy Dreifort, to develop CAD drawings for the products.  Tr. 26.  Dave Simpson (at the time with CKI) put specific information into an illustration program designed to work with CAD, and Dreifort converted them into CAD drawings.  Tr. 460.  Simpson and Kinder spent many late nights at the factories to get samples completed on time.  Tr. 462.  Kinder spent a lot of time on the factories doing "hands-on" work in the summer of 2003.  Tr. 463.  The samples were completed the second week of August and placed in Kinder's China showroom for the meeting with Home Depot. Tr. 20, 42. Spectrum believed that Carolyn Kinder's and CKI's efforts between January and August 2003 were "excellent."  Tr. 47.  Because it was difficult to coordinate the CAD process internationally, sometime around the end of 2003, Spectrum and CKI agreed to have the factories develop the CAD drawings.  Tr. 27.

24.    Home Depot expected sellers to be "fully prepared," offering a presentation of the designs available in CAD format and with finishes and samples.  Tr. 20-21.  CKI knew that Home Depot wanted samples available at sales meetings.  Tr. 273-74.

25.    Home Depot met with Kinder and Spectrum in Kinder's China showroom in August or September 2003.  Tr. 22; PX-3002.  At the meeting, Home Depot reviewed samples of the first three collections. PX-3002. This meeting was a "home run" and Home Depot selected three out of three collections (the Tropics, West Indies, and San Marino, which had been developed into samples from the sketches provided to Home Depot at the February 2003 meeting).  Tr. 22; AX-119.  Home Depot ordered several items from the San Marino, Tropics, and West Indies collections to be sold initially through their Home Depot Expo stores.  (stipulated).  Home Depot also viewed design drawings for additional collections. After the meeting, Home Depot requested a meeting for October.  Tr. 23.

26.    On September 15, 2003, Mac Cooper emailed Jeff Lee of Home Depot again about Uttermost possibly selling lamps to Home Depot.  AX-328.  He wrote, "I was talking to Carolyn Kinder last week and she suggested that we talk.  She said you might have some interest in her portable lamp designs.  I can confirm to you that she is dead-on with her lamp designs.  I wanted to tell you where we are in Lighting, and see if there might be a fit between us.  Our line of portable lamps are all designed by Carolyn and her team.  Our success with Lighting is happening much faster than I ever thought possible."  Cooper then described their factories and continued, "Jeff, we know how to work with Home Depot, and we know how to make business flow smoothly for our customers, even in tough situations. We've done very significant mirror business with Home Depot over the years, we do container direct business with Expo now in wall decor, and now we're in Expo with lamps.

---

[7]Creative Industries worked as an agent for Spectrum in China between 1997 and 2004.  Tr. 341.  They handled a lot of the China support aspects of development, including working with the factories.  Kinder and Creative Industries did not work well together.  Spectrum stopped using Creative Industries in February 2004 because Rick and Maggie Bennett of Creative Industries were not supportive of Spectrum's relationship with CKI due to conflicts between them.  Tr. 343.

We understand how to support this kind of business, and have the flexibility and capital to do it. Jeff, I'll give you a call in a couple days to see what your interest level is. We'll probably have this new factory running by Spring '04 doing more promotional Kinder lamp designs, and if there is significant interest from you, we'll make sure the capacity of the new factory is sufficient to handle significant Home Depot volume. Do you think we could meet and talk about this? We'd be happy to price out any of our existing Kinder designed lamps under the overhead structure of our new factory to give you an idea of the value we can offer. I'll be at the Expo Supplier Partnership Meeting 10/14 and would love to speak to you then, or any other time that suits you."

27.    On September 18, 2003, Mike Barnes emailed Mike Toups with copies to Kryza, Kinder, Voth, David Simpson, and Liz Barnes. AX-110. He wrote, "Mike, The contract is in the final stages. Spectrums [sic] lawyer is reviewing and as soon as he completes his work it will be forwarded to you for your review and signature. I asked Eric to send September payment prior to the contract being signed. Pat's main responsibilities is [sic] to handle daily directions between Spectrum and your company. I will discuss with you today the proposal between Uttermost and Spectrum however this will not include any possibilities of doing portable table lamps with THD. I wish that we could but THD has given me strict direction."

28.    On September 22, 2003, Cooper sent Jeff Lee another email trying to get input on the possibility of Home Depot buying Kinder-designed lamps from Uttermost. AX-330.

29.    On October 3, 2003, Carolyn Kinder emailed Cooper, writing, "The attached letter describes a path to interact with Home Depot." AX-331.

30.    Spectrum and CKI met with Home Depot in October 2003 in Atlanta. Tr. 23. This meeting was "difficult." Tr. 23. Home Depot wanted designs in CAD format, but Kinder had not sent designs in CAD format. Tr. 24. Rather, she had sent sketches. Tr. 25. At the meeting, Home Depot reviewed the drawings for the Sedona, Mazatlan, Vienna, Providence, Lotus, and Coronado collections. PX-3002.[8] Greg St. John, the Home Depot buyer, said that he did not want to see designs as sketches, but wanted CAD drawings with finishes so that Home Depot buyers could see what the product would look like when finished. Tr. 274.[9] However, Home Depot did select designs from the Sedona, Mazatlan, and Vienna collections.

31.    On October 21, 2003, Kim Barnes forwarded an email letter from Carolyn Kinder to Pat Kryza at Spectrum, with copies to Mike Toups and David Voth. AX 2; AX-524. Kinder wrote, "[T]here still seems to be confusion on the necessary relationship that we must achieve to be able to work together. The Spectrum team by now should be aware of the

_____

[8]AX-119 states that the drawings for all these collections were submitted to Spectrum on November 24, 2003. The Court finds that date to be erroneous.

[9]At trial, the Court overruled a hearsay objection to this statement. This statement was admitted for the limited purpose of showing that CKI was "on notice" regarding what Home Depot required for sales meetings.

services of our company that are separate from the 'actual expertise' that is the basis of the design function and royalty. This design function is usually performed as a sketch of an idea by a known designer that is then sent to a licensee to draft, convey back to the designer for approval, then to their selected factory, which will then develop the idea within a specific time frame, submit back to the licensee to send to the designer for approval, and make the corrections necessary to gain that approval ... if necessary, over and over until the design is developed to the level that will be a credit to all that are associated with it, and 'sell like crazy' when they've photographed the samples, arranged the production of the ongoing sales tools and catalogs, displayed and sold the items to the retailer, then made sure the best factory for the project was selected and could deliver to the prospective retailer. All ongoing adjustment and customizing necessary to meet the retailers's special requests would be handled by the licensee with the designer's approval at each step. The China services agreement provides this critical series of services so that an 'idea' can actually produce a saleable item that creates income for all involved. In addition, we will assist in the selling process of the retailer and participate in planning future tasks that will grow the opportunity for all. We've been funding and executing the above services because without them, my commitments to the person who requested all this couldn't happen with previously available resources. We must have these services in place so the ideas we are capable of generating will reach their full potential for all concerned, including us."

32.   Spectrum discussed a joint venture with Uttermost to sell portables to Home Depot in October and November 2003. (stipulated) The idea of a CKI-Spectrum-Uttermost venture was supported by Jeff Lee. AX-11. Spectrum decided against pursuing this joint venture because it determined that it would not be profitable if all companies were involved. Tr. 193. In addition, in an email dated November 12, 2003 to Carolyn and various Kinder employees, Mac Cooper of Uttermost had stated that he "would prefer to work with [Home Depot and its related entities] without Spectrum," but he also stated that he was open minded. AX-35. He had also stated that his "preference [was] clearly to work with HD the way we normally would, with Uttermost being the vendor. If that [wasn't] an option, [Uttermost was] open to make this work through Spectrum." AX-11. Uttermost never really wanted to work with Spectrum, and would rather sell its lighting products to Home Depot directly. AX-102. Mac Cooper had been trying to work with Jeff Lee directly but "struck out." AX-102.

33.   CKI and Spectrum continued to negotiate the terms of an agreement. During the negotiations, Mike Barnes became concerned that, because it was expensive to tool his equipment to Kinder's designs, he did not want Home Depot to be able to pull the products from Spectrum and have the products manufactured somewhere else. Tr. 196-97.

34.   On October 31, 2003, Eric Williams of Spectrum emailed Mike and Liz Barnes, Ed Einstein, and Pat Kryza regarding changes to the proposed contract. AX-272. The parties had been negotiating two separate agreements – a design agreement and a services agreement. Spectrum and Einstein had been discussing merging the two agreements into one. Williams noted that Einstein had found "more to be added" in combining the previously separate

15

design agreement and services agreement into one contract and included a draft contract with Einstein's changes. The draft contract would compensate CKI at a rate of 3% for the first $10 million sold for Products (incorporating Designs) sold to Home Depot, with decreasing royalty amounts (tiers based on sales amounts) after that. It also included a separate provision wherein Spectrum agreed to compensate CKI $5000 a month for services, and included Schedule A, which stated, "CKI will implement Spectrum's product development protocol. The purpose of the protocol is to produce samples that match the Designs as Prototypes for manufacture of the Products. Matching is to include, but not be limited to, the design specifications for appearance, materials, and finish. The work necessary by CKI to complete the samples may include, but not be limited to: supervision of the sample production process, in-factory personnel assistance, coordinating and tracking of sample orders, and preparation of design and technical information summaries."

35.    When asked about the design documentation aspect of the contract negotiations, Williams testified that Spectrum's "design process ... was something that we figured out worked with the factories and Home depot, as the customer, and it was critical for orderly work flow that the needs of the customer be met...." Tr. 352. Specifically, Williams testified that Spectrum wanted complete design documentation to present to Home Depot and for the factories to be able to produce samples. Tr. 352. The provision for design documentation in the DSA was negotiated with the benefit of experience of developing the three first sets of families, and Spectrum felt that some things needed to be detailed more clearly in the document to reflect what it had learned from that development. Tr. 353.

36.    The draft agreement being discussed by Spectrum personnel had a detailed confidentiality clause that specifically included "identities of suppliers, expenses, pricing techniques and strategies; profits and product line profitability information, existing and future product information, research and development programs; specifications for products; software designs; know-how, trade secrets, and other intellectual property; business plans and records; customer names, lists, files and other customer information; budget and financial information and the goals and objectives of the other party; methods, practices, and techniques for promoting and marketing products; personnel matters; and other confidential processes, formulae, or other materials regarded by such party as privileged, proprietary, or confidential." AX-272. Home Depot (Jeff Lee) had suggested the confidentiality language because Home Depot wanted "strict confidentiality" and no sharing of information among its vendors. Tr. 350.

37.    On November 6, Eric Williams from Spectrum emailed Mike Toups and David Voth a copy of the Design and Services agreements. AX-273. At the time, the parties were still negotiating two separate agreements – a design agreement and a services agreement. The parties had been negotiating for CKI to provide certain services for a monthly contractual rate to be paid by Spectrum. The Services Agreement originally contained Schedule A, which stated: (1) CKI will implement Spectrum's product development protocol.... (2) CKI designs will be produced in Spectrum owned or approved factories. (3) When requested by Spectrum,

16

CKI shall provide Spectrum with additional commercial showroom exposure (in CKI showroom) and sample management, as well as make available English speaking sales staff at showroom.  Unless such additional commercial showroom exposure is requested, all samples of Spectrum products will remain in the showroom of the producing factory, and will remain confidential. (4) Spectrum will rely on CKI to manage Spectrum's photography and marketing programs.... (5) CKI shall coordinate hospitality logistics for visiting Spectrum staff and other Spectrum invitees." Spectrum proposed eliminating all but the first from the Agreement, noting that Spectrum could "buy" the other services "a la carte" as needed.

38.     Spectrum and Uttermost were supposed to meet to discuss a possible relationship on November 12, but the Barneses cancelled the meeting because they wanted to work out the contract with CKI before meeting with Uttermost.  AX-35; AX-104.

39.     On November 12, 2003, Mike Toups wrote an email to Mac Cooper. AX-35;AX-105.  He told Cooper that "Spectrum had wanted to implement a new clause in the contract which would have prohibited Uttermost from selling lighting directly to Home Depot other than through Spectrum.  We do not like this type of negotiating tactic and we are prepared to walk away from the deal if this becomes a sticking point.  Our relationship with you has been built over time based on mutual trust.  We consider you and your team as family and we would never put that relationship or your ability to achieve your maximum potential in jeopardy.  This just reinforces our appreciation of our relationship with you from a personal and business standpoint." Cooper responded, "Spectrum ... I'm sorry that they are taking this approach.  Thanks so much to you guys for being such effective, and honorable, partners to Uttermost.  It is really appreciated, and will be returned in future success together." Toups then wrote Cooper on November 13.  AX-105.  He wrote, "We appreciate you guys as partners as well.  You know we'll do whatever we can to encourage Home Depot your way." At the time, Kinder was designing portables for Uttermost, but not fixed wire.

40.     On November 12, 2003, Mike Toups emailed Mike Barnes about the Agreement.  AX-274.  He wrote, "Attached is the revised agreement.  Based on our discussions and our additional services we continue to provide to Spectrum we need to increase the fee by 1% to keep our margins in tact for our China operations.  This revision allows us to eliminate your concerns with the fixed fee and combine the two agreements.  You will note this in Item 2 [compensation] of the revised agreement.  I am sure Jeff [Lee] will understand the level of commitment we have made and will continue to invest to assure that THD is delivered the best possible designs to grow their lighting category.  The only other changes we made in the agreement were the following: (1) Item 4 Copyrights – adjusted % to reflect change from Item 2 if funds are captured for infringement violations. (2) Item 5 Non-Compete– added back in language Spectrum deleted which protects our existing licensees to do business with THD.  (As discussed, we cannot limit our licensees' business opportunities.) (3) Item 7 Deliverables – added back in language Spectrum deleted which quantifies designs to be delivered based on THD saturation and ensures Spectrums [sic] full cooperation in product

17

development.  Please let me know if you have any questions or need clarification.  I understand you are supposed to be talking to Jeff later tonight.  I hope we can bring this to a mutually agreeable conclusion."

41.   CKI had wanted a 5% royalty, but Spectrum did not agree to this.  Tr. 355.   The services paragraph in Schedule A was eventually moved into the body of the DSA.  Tr. 354.  The royalty rate was increased to 4% in exchange for incorporating the services into CKI's contractual obligations.  Tr. 870-71; Tr. 934-35; M. Barnes depo. At 151:16-25.  Kinder agreed that the extraneous China-related costs were "quite expensive."  Tr. 934.

42.   On November 16, 2003, Pat Kryza emailed Carolyn Kinder and others at CKI about the upcoming meeting with THD.  AX-276.  She included a list of people who would be attending the meeting on 12/19, including Jeff Lee, Marsha Harbaugh, and Greg St. John.  She wrote, "We must get all of the drawings done this week so that Mike can review and see if there is anything else that must be added before we all take off for the States and Liz and him head to China.  This will be our opportunity to shine with Ceiling fans."

43.   On November 17, 2003, Mike Toups responded to Kryza's email.  AX-276.  He wrote, "Pat, I know everyone is looking forward to the Dec. meeting, but we need to complete step one before we take step two...the signed agreement is step one.  When we spoke on Friday in China, Dave and I thought we addressed Spectrum's concerns and we were ready to move forward with the agreement.  Apparently this was not fully communicated back to San Antonio because when I spoke to Eric today the agreement was back at your attorney's office???  We are supposed to receive another draft tomorrow???  We have continued to move forward in good faith, but the new collections will not be released until the agreement is finalized.  We have reached the point where the agreement gets signed or we agree to part company ... enough is enough.  Please do not insult us with another round of legalese.  The ball is in your court to move forward .. we both have a lot to gain."

44.   On November 17, 2003, Eric Williams of Spectrum emailed Kryza and Mike and Liz Barnes about the Agreement.  AX-275.  He wrote, "Here is info on my phone call with Mike Toups today.  1 – Ed is working on changing the language in the revised combined agreement.  He expects to be done on Tuesday.  He is specifically looking at the Non-compete language in section 10 to allow some options for their existing licensees, while protecting Spectrum from THD going directly to Kinder; and the absolute non-disclosure of compensation paid to Kinder....  Mike wrapped up by saying he looks forward to our next draft, and that we need to move forward to get this done."

45.   On November 20, Eric Williams emailed Mike Toups, stating, "Here is the new agreement.  I think you will like it.  I will talk to you on Friday."  AX-277.  Eric Williams sent a draft agreement with attachments to Mike Toups.  Tr. 355.  The attachments included CAD drawings and sample finishes.  Tr. 356.  Although the Word document changed after that, the attachments did not. Tr. 357.  These attachments were intended to be attached to the final

agreement.  Tr. 358.

46.   Spectrum got the Design Documentation for the first three families, and that was what Spectrum wanted going forward.  Tr. 360.  Spectrum believed that CKI was required to furnish all fourteen listed products in a family, and that the designs would have complete design documentation, by the end of each quarter.  Tr. 360-61. With some exceptions, CKI did not provide completed designs and CAD drawings going forward.  Tr. 361.  Spectrum also wanted exclusive rights to designs because Home Depot was expecting exclusivity.  Tr. 361.

47.   On November 24 - 26, 2003, Mike Toups and Michael Barnes exchanged emails concerning the contract negotiations.  AX-8.  Mike Toups stated that CKI wanted "to move forward on [the first] three collections and discuss the next six collections for THD at the appropriate time.  It might serve all parties best to operate under some letter of agreement and re-evaluate the relationship as we move forward."  After Michael Barnes indicated that he would not share his cost information and wanted the final say on which factories would be selected, Mike Toups noted that the parties had "agreed to disagree on how [to] get there."  He suggested they meet to discuss the future of the relationship and stated that "[w]e will forward to your attention a letter of agreement covering the existing three collections [San Marino, West Indies, Tropics]."  AX-8.  Kryza testified that this did not happen, and that when the contract was signed, it was with the understanding that those three collections were covered by the contract.  Tr. 198.

48.   On December 1, 2003, David Voth of CKI emailed Jeff Lee with copies to personnel at Spectrum.  AX-278.  He wrote, "Dear Jeff; Thank you for the call today and your help in pushing this relationship over the goal line.  As we discussed at great length today, it appears that all parties have a mutual desire to make this opportunity a grand success.  Speaking from the CKI side, we want to do all we can to insure a successful launch of the existing collection and facilitate a continuing successful effort for The Home Depot.  Listed below is the addition[al] language as discussed, highlighted in orange, we hope this addresses everyone's concerns.  If you feel we need to add any addition[al] language please let me know.  With your approval of these additions we will execute the agreement with Spectrum.  These changes have been incorporated into the existing Spectrum/Kinder WORKING DRAFT document and will be forward [sic] to Spectrum."  Later that day, Mike Toups emailed Mike Barnes, stating, "We are glad that we were able to come to some resolve on the agreement on the phone today with Jeff's input.  Dave Voth has forwarded the language for the "Big Box" non-compete in fixed wire lighting and the extension of the term for 2 year renewal directly to Jeff.  To expedite the conclusion of the agreement phase the only two changes we made in the last draft of the agreement were the two listed below.  These two are in section 1 – Grant of Rights and section 9 – Term.  These changes are highlighted in orange.  We did not include any language in the agreement regarding factory selection and cost information.  As we agreed these issues would be covered through our understanding that if a factory does not have certain design capabilities we would notify you and change to another approved

THD factory and that with the inclusion of the non-compete language we would share cost information on a non-public disclosure basis. Please let me know if you have any comments. We look forward to getting this wrapped up." AX-177. Eric Williams then emailed Mike Toups stating, "In my discussions with Michael this morning, as well as with you this afternoon, I heard that Michael could accept these changes as long as the previously agreed upon Non-compete section was included. Yet I don't see that in this agreement you sent this afternoon. Did I miss something?" AX-280.

49.     On the morning of December 2, 2003, Eric Williams emailed Mike Barnes about changes in the DSA. AX-281. He listed the changes that had been made, stating, "In Section 1, Grant of Rights, Ed added a phrase to the description of the word Designs, to expand the definition to include the whole family. This was done because of our discussion last night on ensuring that the Non-compete concept applied to entire families at a time. We deleted the sentence added by David Voth on Monday which supposedly had the purpose of providing certain non-compete rights to The Home Depot.... Ed and I added back Section 6 to the Agreement, the purpose of which is to protect Spectrum and The Home Depot by limiting the ability of CKI to compete. This section describes the non-compete provision more clearly than the sentence that had been added to Section 1 by CKI. A second paragraph has been added to ensure that the Section expressly limits CKI from providing Family Designs to anybody else who might sell them to a big box retailer, but allows for portable lighting not in families to be designed (this allows for existing CKI licensees).... As a result of your conference call on Monday morning, CKI wrote an addition to Section 10, Term, which adds two sentences which provide for the ability of CKI and Spectrum to both renew the contract for two years at the end of its initial three-year term, and to negotiate modifications in that renewal. No changes were made by Ed or myself to this addition.... Confidentiality of proprietary information was also discussed in the Monday morning conference call. The first paragraph of Section 15, Confidential Information, already limited the ability of CKI to disclose 'certain' information to third parties, but the additional wording adds 'cost information' to the prohibition." A short while later, Eric Williams emailed David Voth stating, "We received your suggested changes to the Agreement. The changes were not what we were expecting, and as a result we have written changes ourselves in Sections 1, 6, and 16, in addition to your change in Section 10. Please remember that we have a signature deadline of 5:30 pm this afternoon, and we will need a response from you as quickly as possible." AX-282. That afternoon, Mike Barnes emailed Eric Williams regarding the Kinder contract, writing, "Hours [sic] up, please contact Kinder." AX-283. Eric Williams responded to Mike Barnes stating, "Dave and Mike [Toups] have no changes to the document we sent them, and will sign it as is. They did bring up that they gave Sea Gull Lighting some designs in 2001 and 2002 that are still showing up in catalogs, (with one family still to be released). They wanted me to make sure I knew that there is a slight chance one of these families could show up at Lowes (unlikely due to price points according to Dave). I will now convert my document to a final version (change red and green 'ink' to black) and will send it back to Dave and Mike when I hear from you."

50.  Before any party signed a written agreement, CKI had produced designs for Spectrum. CKI provided ten design collections to Spectrum in 2003: Tropics, West Indies, San Marino, Sedona, Mazatlan, Vienna, Providence, Lotus, Antler, and Coronado. Tr. 134-35. Some had been accepted by Home Depot, and samples had been produced. Tr. 348; M. Barnes depo at 32, 123. Home Depot had purchased the items, and the factories started production in the Fall of 2003. Tr. 348. In addition, Spectrum paid CKI royalty payments for these items before any party signed a written agreement. Tr. 348; AX 110.

51.  The final draft of the Design and Services Agreement was sent by Eric Williams from Spectrum to CKI on December 2, 2003. Tr. 361; AX-284. Williams sent the contract by email, writing, "Dave, Here is the contract in its final form. All changes were accepted and the red changed to black. I told Michael your comments about the Sea Gull designs. He said comments noted. Please sign the agreement, and fax the signature page back to us. Please send two originals, and I will have Michael sign them and return one to you." AX-284. The Agreement was signed by CKI's Vice President, David Voth the same day. (stipulated) Spectrum's position at trial was that this version of the contract was then in force between CKI and Spectrum. Tr. 117. On December 2, Eric Williams emailed Liz and Mike Barnes and Pat Kryza, with copies to Mike Toups and David Voth with the subject line, "Contract has been signed!" AX-285. He wrote, "It is official. I just received a fax of a signed Kinder/Spectrum contract signed by David Voth on December 2nd. He will be following up with signed originals in the mail, but the faxed version works very nicely today." Spectrum informed Jeff Lee at Home Depot that Voth had signed the contract on behalf of CKI. Tr. 117. After Lee received a copy of the email that the contract had been signed, he emailed back, writing, "great! welcome aboard team. hope you are ready to run.." AX-286. On January 23, Eric Williams forwarded a copy of the DSA to Jeff Lee, writing, "I am sending you the design contract between Spectrum and Carolyn Kinder, Inc. on behalf of Mike and Liz. Dave Voth signed this agreement for CKI on December 2, 2003. Please let me know if there is anything else I can do for you." AX-287; Tr. 362. The document sent was a Word document without signatures. Tr. 363. Mike Barnes authorized Williams to send this letter. M. Barnes depo at 61. Accordingly, Spectrum was notifying Home Depot that the December 2, 2003 version of the contract was the agreement between the parties. *Id.* at 62. In addition, this agreement was circulated in-house at Spectrum and represented as the operative agreement between the parties. *Id.* at 65.

52.  Eric Williams testified that it was his understanding that Mike Barnes was supposed to sign the agreement and return it to CKI. Tr. 413.

53.  Spectrum did not sign the Design Services Agreement at the time CKI signed the agreement. (stipulated)

54.  The Design Services Agreement contains signature lines for both CKI and Spectrum. (stipulated)

55.    The Design Services Agreement (DSA) states:

CKI is interested in producing specific designs and design families within fixed lighting as further defined in Section 7 below, including finishes, accepted by Spectrum ("Designs"); and Spectrum desires the exclusive, worldwide rights to manufacture, distribute and sell goods that incorporate the Designs ("Products") and particularly to sell certain suites of Products within the Designs ("Families" or, individually "Family") to The Home Depot and its related companies ("Home Depot"). Spectrum also desires the rights to Products on an exclusive basis for lighting showrooms and other customers, and CKI is willing to assign Spectrum such rights upon the terms and conditions herein set forth.

56.    The Agreement further provides in the "Grant of Rights" that CKI "will produce for Spectrum certain Designs (which includes the entire Family thereof), for Spectrum's sole and exclusive use, on a worldwide basis, to make, have made, distribute and sell Products that incorporate the Designs, as such Designs shall be further described and defined in the Design Documentation." Agrmt. § 1. Each Design was to "cover a Product Family," including such things as lamps, pendants, hard-wire lighting, fans, and mirrors, and "[f]or each set of Designs, CKI [was to] provide conceptual drawings, ... design finishes and instructions suitable for Spectrum's factories, including working closely with Spectrum's CAD Department, for each of the 14+ Products that compose a Family, along with color step panels developed in-factory identifying the finish color process ('Design Documentation')." Agrmt. § 7. Section 7 identifies fourteen items that may constitute a family.[10] The "deliverables" section of the Agreement states "CKI shall initially provide Design Documentations, including finishes for at least two (2) families of products" and thereafter "provide such documentation for designs that are candidates to be Designs as reasonably (a minimum of two (2) Families per quarter and up to as many collections as mutually agreed upon by both parties for that particular period of time and based on the ability of Spectrum to fully facilitate and materially direct all product development support requested by CKI) requested by Spectrum and or by Spectrum's customer, Home Depot, for the term of this agreement." Agrmt. § 8. The Agreement further provides that "CKI will lend services to implement Spectrum's product development protocol. The purpose of such protocol is to produce samples, and eventually Products, that match the Designs. Matching is to include, but not be limited to, the design specifications for appearance, materials, and finish. The work necessary by CKI to complete the samples may include, but not be limited to: supervision of the sample production process, in-factory personnel assistance, coordinating and tracking of sample orders, and preparation of design and technical information summaries." Agrmt. § 2. In exchange for the rights and services given by CKI, Spectrum

---

[10]1.  Small Table Lamp – 25"      8.  Hard Wire Flush – 13"
2.  Buffet Lamp – 30"            9.  Hard Wire Semi-Flush – 13"
3.  Wall Sconce                 10.  Hard Wire Island Light 24" & 36"
4.  Large Pendant – 20"         11.  Chandelier – (5 arm)
5.  Small Pendant – 16"         12.  Ceiling Fan(s)
6.  Floor Lamp – 62"            13.  Bath Bar(s)
7.  Touchier – 72"              14.  Mirror(s)

agreed to pay CKI a certain royalty based upon sales of the Products incorporating Designs. Agrmt. § 3. Spectrum was to pay CKI monthly, "within 15 days of the beginning of the month, based on the prior month's actual receipt(s) of payment by Spectrum." *Id.*

57.     The "copyright" section of the Agreement provides that "[a]ll rights to the Designs and copyrights shall be owned by CKI, and Spectrum may register such copyrights." Agrmt. § 5. CKI "appoint[s] Spectrum as CKI's agent for any such copyright registration purposes and grant[s] to Spectrum the <u>exclusive</u> worldwide right(s) to use Designs on Products sold by Spectrum." *Id.* (emphasis in original). Further, "[a]ny such Designs for which Products in a Family are not reasonably commercialized during any eighteen (18) continuous months shall be deemed abandoned by Spectrum and such Designs will revert to CKI." *Id.* "At Spectrum's option and expense, Spectrum may file for copyright registration and/or file and prosecute design patent(s) for the Designs, provided, however, that CKI shall be named as the author and owner of any copyright or patent applied for. In the event that such copyright or patent is issued, Spectrum's rights under this Agreement shall include the use of such copyright or patent." *Id.* "CKI and Spectrum agree to cooperate fully with the other with regard to any actual or suspected infringement of the copyrights, trademarks, trade dress, design patents or other intellectual property rights as designated in the Designs. Spectrum may pursue any infringement of such rights under this agreement and seek remedies as appropriate at its sole expense. CKI agrees to cooperate fully with Spectrum's efforts in this regard. Any amount recovered as a result of the pursuit of such remedies shall be applied first to Spectrum's legal expenses (and any other related expenses), and the remaining monies shall belong to Spectrum except for [a specific percent] which will go to CKI."

58.     Spectrum was contractually obligated to "provide engineering expertise, as necessary, to meet the requirements for suitable manufacturing of the submitted CKI designs." DSA § 7. Spectrum was also contractually obligated to pay CKI its royalties on a monthly basis, "accompanied by a detailed report of the net sales/prices of the Products and the computation thereof for the month being reported and paid." DSA § 4.

59.     The DSA also contained a confidentiality clause. Agrmt. § 16. The final DSA confidentiality clause stated "Both parties hereby acknowledge that certain information provided by Spectrum, including, but not limited to, sales information, cost information, and production volume, pursuant to this Agreement, shall be maintained in confidence and not disclosed to any third party without the express written consent of the [sic] Spectrum. Access to such information shall be limited to those personnel of CKI with a need to know, and who shall have committed to keep such information confidential to CKI. Both parties hereby acknowledge that certain information provided by CKI, including sales information, licensing agreements, designs, and business relationships pursuant to this Agreement shall be maintained in confidence and not disclosed to any third party, other than Home Depot, without the express written consent of the [sic] CKI. Access to such information shall be limited to those personnel of Spectrum and Home Depot with a need to know, and who shall have committed to keep such information confidential to Spectrum and Home Depot. Both

parties hereby acknowledge and commit to maintain the compensation between them hereunder in the strictest of confidence from all non-parties to this Agreement, other than those personnel of Spectrum and CKI with a need to know, and who shall have committed to keep such information confidential to Spectrum and CKI.  Both parties further commit to maintain any designs being considered as Designs and accepted in a timely manner, confidential except for the inclusion of Home Depot in deciding upon the selection of the Designs for Products and Families thereof.  The provisions of this Section 16 will survive termination of this Agreement."  All parties agree that confidentiality of designs is very important.  Tr. 893.  Kinder testified that it was her intent and CKI's intent in entering the Agreement to "keep all of the business information between the parties regarding the development of these products confidential" and to "keep the business affairs between [CKI] and Spectrum confidential."  Tr. 919, 921.  She agreed that the confidentiality provision would survive termination of the DSA and would include information "about how Spectrum operated" and "to a certain extent" "who Spectrum bought from, materials, or what factory Spectrum used."  Tr. 922.  However, if information was already public, Kinder believed that she had no obligation to keep it confidential.  Tr. 923.

60.     The Agreement also contains a non-compete provision, under which "CKI commits ... to not design or knowingly permit any hard-wired lighting product made from CKI designs to be sold to Home Depot, directly or indirectly, other than through and by Spectrum as provided in this Agreement, unless CKI is specifically authorized by Home Depot or unless Spectrum has not accepted the specifically submitted design, within twelve months of originally receiving submission of said design from CKI, as a Design for Product(s)."  Agrmt. § 6 (emphasis in original).  Kinder testified that the non-compete was an important aspect of the Spectrum/CKI relationship.  Tr. 915.

61.     The Agreement was to last for a term of three years.  Agrmt. § 10.  However, it included an early termination right upon default: "In the event that Spectrum defaults or materially breaches any of the provisions of this Agreement or fails to account for or to pay to CKI any of the compensation due and payable hereunder, CKI reserves the right to cancel this Agreement upon sixty (60) day written notice to Spectrum; provided, however, that if Spectrum, within the sixty (60) day period referred to, cures the default or breach, this Agreement shall continue in full force and effect until its normal expiration date in accordance with its terms."  Agrmt. § 11.  Both parties further agreed "to negotiate in good faith to try to resolve any concerns."  Agrmt § 10.

62.     In addition, section 10 of the Agreement states that, "[u]pon expiration or termination of this Agreement for any reason, Spectrum shall maintain its theretofore acquired rights hereunder and continue to pay to CKI all compensation delineated in Section 3 above for Products sold."

63.     The Agreement provides that "[a]ll matters arising under or affecting the interpretation, form, validity, and performance of this Agreement shall be decided under the laws of the State of

Florida."  Agrmt. § 18.

64.    Kinder testified that she understood when she entered into the Agreement that she was going to do more than just supply design sketches to Spectrum and that she "expected to be more involved than just creating the artwork."  Tr. 907.  She testified that her contribution is "bringing it into a reproducible design that can be commercially manufactured."  Tr. 909.

65.    Kinder testified that she did not assist in the process of developing CAD drawings for the initial designs in 2003, but she did assist in the process of bringing the product to the point where it could be manufactured, including selecting finishes and developing samples.  Tr. 901-03.  She testified that the work during 2003 to develop product was "intense" and that CKI received "very little" support from Spectrum during that time because "there were no people there that were able to do the tasks that were needed."  Tr. 871.  Kinder testified that she "went ahead and provided those skills myself from the company I was building in China at the time."  Tr. 872.  She further testified that initially the workload was more complex and responsibility-filled, but "once we switched over some of the tasks and got people that could handle the tasks on board, then the workload leveled out."  Tr. 872.  She testified that CKI's responsibility was "design and design guidance and development" and Spectrum's responsibility was "the ability to produce the competent factory that could execute."  Tr. 873.  The parties initially utilized the Tigon factory.  Kinder testified that Spectrum could not produce a competent factory in 2003, so CKI helped them find competent factories – Unicon and Verona.  Tr. 873.  She testified that she did not get paid a fee from those factories.  Tr. 874.  Dave Simpson testified that she did receive sourcing fees from Unicon and Verona.  Tr. 494.  At Spectrum's insistence, production was then moved to Kind Light.  The factory was moved because there was concern that Unicon and Verona could not meet production demands.  Tr. 342, 396.  Kinder did not work as well with Kind Light as she had with Unicon and Verona.  Tr. 53.

66.    Kinder further testified that her understanding of CKI's contractual responsibilities "was to create fixed wire collections and to provide those at a certain rate of speed and to be able to train their factory to achieve the necessary quality standards that would satisfy me."  Tr. 878.  She understood that the contract required a total of 24 design collections over three years, and that she was to provide "concept drawings and there was a suggestion of a variety of fixtures that might be introduced, may be introduced that [she] could choose from."  Tr. 878.  She testified that the original concept drawings needed only to include "enough to get a feeling for the overall look of the collection, four, six."  Tr. 879.  When asked why she was not required to do all 14 products at the concept drawing stage, she replied, "[O]ne assumes that there is going to be a certain amount of off fall, that certain designs will be selected and a lot will be not selected, and those things that would not be selected, it is kind of pointless to develop entire collections.  It takes a lot of time and effort to develop these things, so we put a series of ideas together.  As it happened, they liked a lot of what we did, so at the end of the day, there weren't that many that were rejected."  Tr. 879.

25

67.   Kinder described her design process as first evaluating the industry and market, and then first, "there is usually a very quick sketch and usually it has to do with the exact type element that will make that lighting group as unique as possible." Tr. 880.  The sketch "tries to illustrate what is important or what is the unique feature that would segregate that particular collection from any other collection." Tr. 881.  She testified that she often shows such quick sketches to the customer, and they will then give "their thoughts on what they prefer, what they like or don't like, and then that will either evolve that group or take it out of the mix." Kinder then testified that, at the next stage, her customer "would want to see probably an expansion of the different types of lighting that would be included in that group." Tr. 882.  She stated that she will usually start with a six-light chandelier and then would start moving out into the different types of lighting. Tr. 883.  She testified that this was the process that she tried to follow with Spectrum.  Tr. 883.

68.   Kinder testified, "[D]uring 2003, we did an enormous amount of work in the first part of – enormous amount of design work, and sort of beginning steps, working products into factories, to get samples to come out of the factory that were acceptable.  After the first part of '03, we had quite a few collections that were maturing and you had an actual sample.  The drawings, although they were important, usually the drawings are not what attracts a buyer.  A buyer wants to buy a finished sample."  Tr. 884.

69.   On December 22, 2003, Cooper emailed Ken Delp, Tody Doss, and D. Hanes at Uttermost.  AX-337.  He wrote, "HD meeting ... Carolyn and David went to the meeting last week, and it's becoming clear to CKI that the 'Kinder brand' is what they want and Spectrum isn't too critical.  Therefore, in Portables, thanks to CK's clear loyalty, 'it looks good'.  The only concern expressed was by Jeff Lee over the 'Utt factory' in China.  They plan another HD buying group visit in March, which may be a big opportunity to sell them on Utt JV factory.  We'll be talking to them by next wk anyway."

70.   On January 21, 2004, Cooper emailed Kinder, Voth, and Toups, stating, "We met with Lee Nemeth[11] in Dallas.  He's not waiting for the 'YOW[12]' thing' to be resolved.  He plans to add 10-15 lamps once he sees the new introduction photography, FOB HK as well as Rocky Mt.  He's rolling out new product June/July.  As you know, the whole gang will be in China 2/28 to 3/13, staying at the new Sheraton.  For our regular Expo business, we're in good shape in lighting and wd.  For the YOW program, he said he still doesn't know where it's headed.  He said he and Marsha like the Utt product, but other people want to stick with current HD vendors.  CONFIDENTIALLY (please don't share this with anyone), he said he would not try to work with Spectrum if he were in our shoes.  No further explanation given on this.  As far as the meetings in China, our guys are just going to miss overlapping with the HD/Expo group.  If we need to be there for YOW, we'll need to re-evaluate.  For EXPO, we don't need to be in China, but Lee does plan to visit the JV plant and our office whether HD does or not.

_____

[11]Lee Nemeth was the global product merchant over lighting for Expo Design Center, a division of THD.  Nemeth depo. at 5.

[12]YOW is a Home Depot entity.

Please let us know if you learn more about the YOW plans." AX-106; AX-442; AX-445.

71.     On January 22, 2004, Spectrum drafted a letter to Home Depot addressing the non compete provision in the Spectrum/CKI Design Services Agreement.  (stipulated) AX 256.  In this letter, Mike Barnes wrote Jeff Lee, stating that "[m]onths of negotiations finally produced an agreement between Spectrum and Carolyn Kinder International (CKI) to" manufacture and produce Kinder-designed lighting for The Home Depot.  Mike Barnes expressed his growing concern about the investment Spectrum had made in the project, as well as "the considerable costs that will be made in preparing to manufacture each family of CKI products."   Barnes's letter further stated that he was concerned that CKI might adversely affect Spectrum's relationship with Home Depot and that Home Depot might request that CKI supply product to Depot directly or through a different manufacturer after Spectrum had made a significant investment in gearing up to manufacture the products. Barnes's letter then acknowledged that the Spectrum/CKI contract permitted Home Depot to authorize a different manufacturer than Spectrum for any given product or family, but stated that "Carolyn's incessant direct communications with people at The Home Depot are what now concerns me about that clause."  Barnes then asked for "a comfort letter" or "some assurance from THD that it will reimburse any direct development costs on any CKI family or product that it first requests from Spectrum, and then somehow decides to obtain instead from another manufacturer."  This letter was not sent, however.  Tr. 202.  Mike Barnes did get some assurances from Greg St. John, however, that he would not buy Kinder fixtures from any source but Spectrum. Tr. 203.  Barnes also had discussion about his concerns with Jeff Lee, and Lee also assured Barnes that that would not happen.  Barnes depo at 44, 71.

72.     Kryza was in China working on the designs from the October 2003 meeting to get them ready for a meeting with Home Depot in March 2004.  Tr. 28.  Kryza testified that Spectrum had to get the samples ready for the designs that were picked in October 2003, including Sedona, Mazatlan, Vienna, and a chandelier from the Coronado, Lotus and "one other collection," presumably Providence.  Tr. 28.  She testified Kinder was "becoming less and less available with the hands-on for the finishes and for the designs and working with the factories." Tr. 28.  Kinder admitted that she was not present at the China factories very much in 2004.  Tr. 885-86.

73.     On January 31, 2004, Kryza sent an email to Carolyn Kinder, David Voth, and Mike Toups.  AX-200.  She wrote, "I have put together the time line for the quarterly designs that SCI is to receive from CKI for 2004.  The first quarter we will use the designs from the Coronado, Lotus, and Providence collections.  Listed below is the time line for the balance.  2nd Quarter Designs are due 4/1.  3rd Quarter Designs are due 7/1.  4th Quarter Designs are due 10/1.  It is important that we receive the design drawings as stated above as I have committed to the budget for 2004.  In order to make the numbers as I have planned them this schedule must be met.  The designs will be used for the Showroom and THD as determined by Mike and Liz after they review the information provided by CKI."  She further wrote, "While we are in China I would like to sit down with you and review our procedures and protocol so that

27

you understand what must be done on SCI's side once we receive the design drawings. Just as CKI has a process, we too must adhere to the process that was setup by SCI in order to start production on the samples and have all of the accurate information pulled together so that we can price the product and prepare the information that will be given to the customer long before the presentation date. Mike and Liz had a very successful meeting with Ted and Morgan [owners of the Unicon and Verona factories] and they understand the process that we go through and have asked that they have more time to prepare cost and tooling information to insure accuracy on their part." AX-200. Kryza testified that she wanted to make sure that CKI fully understood what Spectrum needed from CKI so that Spectrum could be ready to show the designs to Home Depot. Tr. 272. Kryza testified that CKI did not follow the procedures or protocol that Spectrum and Home Depot required. Tr. 272. Simpson acknowledged that CKI "generally had a problem with" the protocols requested by lighting companies because Kinder's style was very hands-on. Tr. 465. Simpson stated CKI was successful in 2003 because Kinder spent a lot of hands-on time in the factories and because CKI tried to adhere as closely as it could to the existing protocol. Tr. 466.

74.    In February 2004, the parties were concerned about extra out-of-pocket costs associated with the venture, and disagreed about who should have to pay the extra costs. AX-13.

75.    Carolyn Kinder left China early in February and did not return until one or two days before the March 2004 meeting with Home Depot. Tr. 29; AX-31. Kryza and Ray Lively and the factory completed work on the samples. Tr. 29. When Carolyn returned, the samples were completed and hung in Carolyn's showroom. Tr. 29. Carolyn was disappointed with the samples and wanted to make changes. Tr. 29.

76.    On February 1, 2004, Mike Toups emailed Pat Kryza regarding developing collections for Spectrum's showroom business. AX-31. He informed Kryza that Carolyn had been working with Kaiyan (a factory) on 10+ collections by tweaking existing designs and finishes to allow them to get to market quickly with minimal tooling costs. He stated that Kaiyan will work hard to ensure Spectrum is taken care of for June introductions. Toups then emailed Winston Wong stating, "Carolyn will take existing design and make minimal changes to the shape, but improve the finish to give it a fresh look. We should be able to get these ready for Spectrum's showroom lighting business introduction in June. We make a good royalty on the Spectrum lighting showroom business so this is something worth paying close attention to."

77.    On February 12, 2004, Eric Williams emailed a copy of the final DSA that was signed by Dave Voth on December 2, 2003 to Pat Kryza. AX-288.

78.    On February 24, 2004, Cooper and Tony Doss of Uttermost emailed regarding finalizing a contract between Uttermost and CKI that would allow Uttermost to keep existing lamp designs even if their contract/relationship terminated. AX-107.

79.     After CKI signed the contract and Spectrum told Home Depot, Spectrum employees engaged
        in a number of conversations regarding possible changes to the contract.  Tr. 118.  In
        addition, Mike Toups of CKI requested an increase in the commission rate.  Tr. 363.
        Spectrum thought that if they considered agreeing to an increased commission rate, CKI
        might agree to making some changes that Spectrum wanted.  Tr. 364.  Spectrum employees
        then discussed certain changes they might want, including expanding the noncompete
        provisions to include all lighting, not just fixed wire, removing Home Depot's ability to
        authorize purchases of Kinder-designed lighting other than through Spectrum, increasing the
        number of families to six per quarter, and increasing the contract term to five years.  AX 258;
        Tr. 364-365.  At this point, the relationship between CKI and Spectrum was already difficult
        and both parties were dissatisfied.  Tr. 365, 956.  On March 2, 2004, Eric Williams of
        Spectrum emailed Mike and Liz Barnes regarding the possible changes to the
        Spectrum/Kinder Agreement.  AX-258.  He wrote, "Mike, We had previously discussed
        some possible changes to the Kinder agreement: they agree to some new provisions, and we
        raise the rate to 5%."  The proposed changes included: "Specify new designs only so that
        designs provided by CKI are new, and not found at another factory; Change to 5%
        compensation to pay CKI more; Delete phrase 'hard-wired' to require CKI designed lighting
        sold to THD to only be manufactured by Spectrum; Delete phrase 'unless CKI is specifically
        authorized by Home Depot' preventing either CKI or THD from avoiding the requirements
        of this agreement; increase quarterly minimum to 6 design families; increase agreement term
        to 5 years."  On March 9, Eric Williams emailed Mike Barnes to inform him that Ed Einstein
        had drawn up the revised CKI contract "based on our desire to close up holes, and make
        other 'business' changes."  AX-259.  These changes were never made.  Tr. 365.

80.     On March 9, 2004, Mac Cooper sent an email to Carolyn Kinder, David Voth, Mike Toups,
        and Kim Barnes at CKI with the subject, "Home Depot ... please read before meeting if
        possible."  AX-193.  He wrote, "Kim, will you be sure Carolyn, Mike and Dave see this
        before their meeting with Home Depot early Wednesday morning?  Thanks Mike for your
        call and for keeping us in the loop on Home Depot.  As we've said, we also want this to be
        successful for Kinder and Uttermost.  The potential of Home Depot's 1500+ stores is
        staggering.  Let me give some more thoughts to you on the Home Depot portable
        opportunity.  1.  We never want to hold the Kinder group back in any way.  We also don't
        want to risk all the wonderful market share and momentum that we've built together.
        Handing over partial control to Spectrum is definitely not our first choice as a way to get into
        Home Depot.  2. Related to point #1, we're quickly passing $20m lamp sales on our way to
        $40m or $40m as we pick up big accounts.... At mostly a 5% royalty, this isn't a bad number,
        especially as a steady growing number secured by thousands of customers in all distribution
        channels.  We can't risk this. ... 4. If we let HD use our best sellers from the Uttermost line,
        there will be a substantial cost to this.... Before we give any best sellers to HD, we need to
        be sure it is a good, long term decision for Kinder and Utt.  If Kinder and Utt is in control
        from start to finish, we'll make the right decisions and protect what we have.  Spectrum's
        concerns will be HD, but not our other business and customers.  5.  I still think working
        direct is much better in the long run for Kinder and Utt, but we will be as flexible as we can.

One thought to allow us to maintain some control yet let Spectrum handle the HD relationship is to: 1-Sublease the third bldg of our JV 2-Create another JV named Spectrum or whatever 3-Michael handle the HD relationship and sales 4-Uttermost and Wolfgang handle operations and productions 5-Set up ownership with Michael owning less than 50%, maybe Utt 45%, Wolfgang 25%, Michael 30%. Again, this isn't our preference and probably wouldn't be a close, trusting partnership like we have with all our current partners. 6. You said Jeff and Marsha are open to meeting with us. Will you tell them I would very much like to meet with them asap, as soon as it can fit their very busy schedules? Not that this probably matters to them, but we're probably meeting with Lee Nemeth [of HD Expo] either here at the factory or in Hpt before mkt so he can select his new product. He wants a 6 month exclusive on his new Utt lamps that he puts in all stores, and we're going to meet him part of the way (pull from Hpt, but show in supplemental catalog, rep photos, and then summer mkts). Good luck in your meeting. I'm sorry if I'm complicating this, I just don't want to end up in a relationship that could jeopardize what we have accomplished together. We'd love to sell HD just as much as you. On a side note, I can't think of a more powerful, safe addition to HD's portable lighting business than to add best sellers from our line. Guaranteed great sales, just a question of how much do we lose with regular customers to do this."

81.   Home Depot brought their lighting staff, including Jeff Lee, Marsha Harbaugh, Greg St. John, and Lee Nemeth, to China for the March 2004 Spectrum/CKI meeting. Tr. 30. Home Depot representatives viewed Sedona, Mazatlan, Vienna, Providence, Lotus, Coronado, and some additional Tropics and San Marino samples. PX-3002; AX-7.

82.   During the March 2004 meeting in China for Home Depot to view the Spectrum/CKI products, Carolyn suggested that she could show Marsha Harbaugh some portable lighting designs from Uttermost, and she took Marsha to the Uttermost showroom on the first floor and walked her through it. Tr. 31. Though the meeting was set up for Home Depot lighting buyers to view the Spectrum/CKI lighting products, Carolyn had wanted some accessories in the showroom, and included some Kinder-designed accessories for her client Austin. Tr. 184. One of the lighting buyers liked an accessory and asked Kinder if a lamp could be included in the collection that incorporated the design. Tr. 185. Kinder then stated that Uttermost had a showroom in the building and that Kinder could show her the lamps there. Tr. 185. No one from Uttermost was present, and Kryza agreed that the occurrence appeared spontaneous.

83.   On March 19, 2004, Cooper emailed Kinder about a conversation he had with Marsha Harbaugh Young from HD. AX-443; AX-194. He noted the following "key points": "1. She asked about the relationship between Utt and Kinder, and of course I told her what a positive, effective and long relationship it was ... 3. She asked what Spectrum had to do with us. I told her that our understanding is that HD has a great relationship with Spectrum, and that HD was not interested in adding factories, therefore there has been some discussion of working together in some way. She immediately said that 'if Jeff said that we must work

with Spectrum and that HD wouldn't add another lamp vendor, that's wrong! This is my call, I'm over portables, and I can add a vendor if I want to. Of course the vendor must qualify ... and we are trying to reduce vendors.' I didn't really comment on this or point fingers, but between us, Jeff did say in writing in October 'I'm not interested in adding factories ...', and she said that this is her call not Jeff's. She had already thought about this, I'm pretty sure, due to her immediate strong response. 4. She said that she does buy a few lamps from Spectrum but she doesn't have any significant relationship at all with Spectrum. She said if we want to sell directly to HD, then that's what we should work towards, not a relationship with Spectrum. She also indicated that Spectrum may have a close relationship with Jeff, but that doesn't mean she does. 5. I told her about our previous experience as a good HD vendor in mirrors, our recent vendor of the yr award with Expo, our relationship with Lee, etc. I told her about the meeting with Lee around April 12th or so. She seriously debated coming with Lee, but then finally said that she should be in Hpt for the mkt, and we can wait til then. Derek, what is the exact date and time of this meeting with Lee? I'm going to send Marsh a catalog as requested along with a note that touches on this. 6. I fully explained the new JV, the third building, etc. She seemed interested. She said any new vendor would have to have their factory qualified. I also said that we understand how to do volume business, how to provide real value, how to hit 100% fill rates, how to ship complete, how to service, how to bend to make things work, etc. Anyway, a surprising conversation. My intent wasn't to kill Spectrum's chance to sell Kinder portables to Marsha, but she was clear that if [we] want to sell her portables, don't try to do it though Spectrum. She even said, 'If Michael Barnes calls you, tell him our interest is selling HD direct.' She also clearly showed very strong interest and admiration for Kinder designs, so the opportunity should be at least as good as it's ever been. This wasn't nearly what I was expecting from our conversation, but it sure sounded like she's very interested in doing business soon. As a next step, I'll send a note, catalog, some of the new lamp images, give the specifics on the meeting with Lee Nemeth, and follow up with a call close to mkt. Carolyn, Mike, and Dave, I'm trying very hard not to let any of this interfere with what you guys have happening with Spectrum. It's like she was waiting for someone to clarify our relationship with Kinder and then she unloaded her thoughts." Marsha Harbaugh testified that she "told [Cooper] that he did not need to work through Spectrum, that it was [Home Depot's] interest to buy direct and that if they had the products I was interested in at the right prices and the financials worked, then I would buy from them directly." M. Harbaugh depo at 18. She agreed that Home Depot had been trying to reduce suppliers/vendors, but she changed her mind once she saw how great the products from Uttermost were, and decided she would add Uttermost as a vendor/supplier. M. Harbaugh depo at 19.

84.   On March 21, 2004 Carolyn Kinder responded to Cooper's email on the issue of potential portable (lamp) sales to Home Depot. (stipulated) AX-194. She wrote, "I almost 'broke my ankle while cartwheeling around the airport' after the first reading of this fantastic letter.......... It's like the sun breaking out from behind the clouds after 9 months of fog and rain... Mac, please know how happy we would be if you could manage this relationship direct and clean with her... we will follow what ever schedule she needs and will attend any

meeting anywhere that will facilitate this happening... .... 'hope I've made myself clear.'" Mike Toups responded to Mac that he agreed with Carolyn, stating, "Our desire of course has been to see this business pass through Uttermost. It's just so hard to get a straight answer as to who does what or who works for who at HD (?). I'm glad you made the decision to talk to Marsha first, as it seems she is trying to mark out her own territory. We had very good conversations with Marsha in China and she definitely likes the product. I'm glad she has warmed up to Uttermost-direct and we played up your new, high volume factory that could be dedicated to there [sic] product. The way the relationship was explained to the HD people was that Uttermost has the license for Kinder designed lamps except for the few lamps that tied to the fixed lighting collections that Spectrum has presented to HD. If HD is not open to new vendors, Spectrum and Uttermost may enter discussions for a sub-license from Uttermost to Spectrum for Kinder lamps. But based on your recent conversation, I would say let's continue to pursue HD direct and give Marsha the full-court press at April Market. It's easier and cleaner (and our desire) to have Uttermost sell direct to HD.... We're glad the HD situation seems to be falling into place. We'll let you take the lead on this and just let us know what you need." Cooper responded to Carolyn by email. AX-242. He wrote, "If I could do a cartwheel, I might have given it a try Friday after this call. It did feel very positive about her desire for your lamp designs as well as the prospects of Uttermost becoming a HD lamp vendor. Thanks for being such a good friend to Uttermost through all of this."

85.    In April 2004, Home Depot (Expo) began buying Uttermost lamps.  (stipulated)

86.    On April 1, 2004, Uttermost and Carolyn Kinder, Inc. signed a contract for Carolyn Kinder, Inc. to design portables and wall décor for Uttermost.  (stipulated) AX-226

87.    On April 14, 2004, Cooper emailed Marsha Harbaugh to ask whether she would be at High Point and to tell her that Lee Nemeth had purchased lamps for Expo. AX-195. Harbaugh replied that she was too busy to attend and asked Cooper to contact her in about a month. Carolyn then asked "how this is going to flow" and "what the next step is," to which Harbaugh responded, "Carolyn, If we like your designs from Uttermost and you have a proprietary relationship with them, we will buy directly from Uttermost. The next step is to review the line. I can not do it for a few weeks." On April 27, Mac responded that CKI and Uttermost were "ready to meet when and where you are" and then said he would call her in a few days.

88.    On April 20, 2004, Kryza emailed Carolyn Kinder about samples. AX-521. She noted that they needed to "get the balance of the first 3 collection samples to our new resin factory so that they can finalize them for your review. Right now Ted and Morgan are working on the samples for the directors meeting, and making the product for the new Po's that we received from THD. We don't want to pull them from working on all of this to make another set of samples to send to the factory. We are asking that you let us pick up the samples that are in your showroom so that we can get them to our factory quickly so that they can finalize the

sample process and start to make these items in production.  As you know our orders from THD are continuing to increase in volume and we must get this factory up to speed so that they can take some of the pressure off Verona and Unicon.  Let me know if this is ok and we will get another set of samples to your office when the PO's for THD are completed."

89.    On April 22, 2004, Dave Voth emailed Pat Kryza.  AX-521.  He wrote, "Per our conversation earlier today, we are happy to accomidate [sic] and help Spectrum to facilitate any orders for THD that are upcoming.  We are glad to hear of the success of the products. It is surprising however that it is not quicker to pull the samples directly from production from Verona and Unicon.  As we discussed, to release the samples please forward a note confirming our conversation regarding Verona and Unicon's capacity issues (?) and the commitmtment [sic] on behalf of Spectrum to replace our samples in the showroom in a timely fashion.  As you know we went to much time and expense to set up the showroom for the previous THD review.   The samples also are required for Carolyn's review and coordination on new product development and expansion of the existing collections." Kryza responded on April 23, "David, Even though Verona and Unicon can't supply us with all of the samples that we need to produce samples so that we can move forward to grow the business I'm not sending a letter to Chi requesting permission to pick up samples.  We will work out a way to get the samples made so that we do not hold up our customer's orders. As for getting approval on the finishes, read the contract Dave you must go to the approved factory and verify the design and finish.  I will be at the factory on the 26th to see what they have been able to produce.  I would like to [see] Cindy there so that she can report back to Carolyn the findings.  If the finishes are not to either of our liking I will make arrangements for Ted and Morgan to get finishers to the factory so that they can teach them the correct process. I must know when Carolyn is going to arrive in China and what day she can look at the finishes. I will not hold up our orders."  David Voth then responded on April 24, "Pat, 1. We discussed you sending a courtesy email regarding the information you communicated to me about Verona and Unicon's capacity problems and the need to move samples to a new factory.   As part of our discussed protocal [sic], we are supposed to keep written communications.  I still have not received anything.  I don't understand what the issue is? 2. We obviously have no intention nor have we ever had any intention to hold up our client's orders.  In fact, we have done everything we can possibly do to facilitate getting quality product to THD. 3. We certainly understand the contract regarding our development and sample approval responsibilities. We have shown this time and again, each time Spectrum changes factories. 4. Our staff is in a position [to] approve finishes at an existing factory that can produce these finishes previously approved by Carolyn, i.e. Verona and Unicon.  We have never been taken to this new factory nor do we know its skill sets.  Don't you think it is a wise decision to have Carolyn approve the finishes? As you know, she plans to return to China next week."

90.    On April 29, 2004, Cooper emailed Mike Toups.  AX-196; AX-516.  He informed Toups that Marsha Harbaugh was still "buried in work" and couldn't confirm an appointment date. However, he stated, "When we do meet, she agreed to meet in our showroom in Atlanta as

I requested. She did ask what your agenda was for the 5/11 meeting, and I said that I assume it only concerns fixed lighting since the meeting is with Jeff. I didn't elaborate on this. She said that if it's only fixed, it has nothing to do with her, but if any portables are involved, she needs to review the product. She also said that our meeting on portables is separate from Jeff's meeting on fixed. This is clearly a sensitive point, the line of responsibilities between fixed and portables. I told her I'd check with you guys to see if anything else is on your agenda besides fixed lighting. What do you want me to tell her about your agenda?" Toups responded, "Our meeting with Jeff and Mark Huffman is geared to (1) talk about our new retail store and (2) how we continue to work within our Spectrum relationship. We plan to direct the conversation to THD buying lamps directly from Uttermost. Let's discuss this further in the morning before you call Marsha." AX-26.

91.    On April 19, 2004, Mike Toups emailed Pat Kryza. AX-201. He wrote, "Pat, We still have not received Spectrums [sic] draft of the 'protocol' procedure – which we all agreed in China was good to establish in writing. Based on recent conversations – please include the following points of clarification for the protocol: 1.. CKI has the final say in design. 2.. Design samples will be created to establish the 'design element' for each new collection; this may consist of 2-6 pieces, exceptions to be agreed to by both parties. 3.. Once the 'design element' is established – drawings for the entire collection will be submitted to spectrum for approval to create samples. 4.. If Spectrum requests changes, changes must be approved by CKI. 5.. If an impasse is met between Spectrum and CKI regarding changes to designs, CKI reserves the right to withdraw the collection. 6.. CKI will try to work using existing tooling where applicable and minimize costs as it can while still maintaining the integrity of the design. 7.. Spectrum will share cost information related to tooling, parts costs, labor with limited CKI personnel with a need-to-know. 8.. Once samples in works, CKI has the right to 'tweak' samples until they meet CKI's approval/standard. 9.. CKI staff will work directly with factory personnel regarding samples. 10.. For information or if day-to-day problems or issues arise, please contact the FL office for resolution or information – primary informational contact: Kim Barnes; primarily relationship contact: David Voth. Carolyn and I are also available for contact at any time. On all issues please copy Dave, Carolyn and myself and on day-to-day issues please copy Kim, Winston and Cindy. We will direct our primary day-to-day contact to you. 11. CKI China staff not to be directed by Spectrum and vice versa; requests to be directed as outlined above. 12.. Once orders are placed based on the CKI approved sample, no changes will be made to the sample. Please let me know if this meets your understanding. Once the protocol is formalized, we should make it an addendum to the agreement."

92.    Pat Kryza testified that "somewhere in all of this documentation and in my computer there was a draft of a protocol pulled together between Ray Lively and myself." Tr. 312. However, she agreed it was never attached to the DSA. The DSA contained the CAD drawing and the color chip attachments, but no step-by-step protocol. Tr. 312. However, Kryza testified that "we sat down and it was verbally discussed." Tr. 304; 270. She testified that she explained the protocol to CKI before the contract was signed, and that the protocol

incorporated what Home Depot expected. Tr. 304-05, 311. Further, Spectrum's protocol did not change from the development of the first three design families. Tr. 312. Mike Barnes testified that he did not know if there was ever a step-by-step listing of the process that CKI should follow. M. Barnes depo. at 214. When asked if he ever provided CKI with a written product development protocol, he stated that his product development protocol was that CKI should send folders with fourteen drawings and then Carolyn would go to the factories and work with the factories to develop the product. M. Barnes depo at 213-14. Barnes testified that he asked CKI for the folders with the design drawings. M. Barnes depo at 213:22-23.

93.     In April 2004, CKI and Spectrum employees exchanged emails concerning the antler collection designs. AX-430. Mike Toups emailed Carolyn Kinder that Pat Kryza said "we need to do a 'scaled down' version of the antler collection for THD. The existing designs are fine for World Imports and Depot Expo, but THD needs something smaller and less expensive. Jeff has requested these drawings by Friday. Please let us know what you can do to accommodate this request." Cindy Luo responded that "Max at Unicon will bring some horns to our office tomorrow morning so that Carolyn can work with them to break the horns in scale down and arrange them together on the floor, then Unicon's draft man (our PH designers are in holiday for Easter) can draft them accordingly, Carolyn already had some sketches. We think this is the better way rather than to make the sample according to the drawings since horns are something like uneven and natural thing and samples won't in the same way as drawing." On April 10, Cindy Luo emailed Mike Toups "the rough drawings for the smaller sized antler collections." She noted that they were drawn according to Carolyn's instruction after the meeting with Max, but not finally approved, so Cindy did not copy the email to Pat. She further noted that Carolyn would meet Max again the next day to finalize the drawing. On April 15 and 16, Kryza and Carolyn Kinder discussed a possible redesign for the Antler fan to reduce the height. Kryza had suggested incorporating the horns around the light kit or housing to reduce the height, and Kinder stated that a smaller horn was available, and that she could supply more designs, but the one with the horns on top was the most appealing. On April 16, Cindy Luo sent pictures to Carolyn asking which horn she would prefer to use on the ceiling fan. Kryza then wrote Carolyn Kinder that, once she decided which horn to use, to get the drawing with the dimensions on it to Spectrum so that they could show it to Greg for Home Depot's approval. On April 17, Kim Barnes of CKI wrote Pat Kryza that "Cindy sent us a revised drawing with the right horns, so all that awaits is for Carolyn's approval on the drawing, and I should have that to you on Monday." Kryza responded, "The longer it takes to make a decision the greater the opportunity is that we are going to lose this item. Or not have it ready for the meeting on the 27th of April. Today is the 18th how do we expect KOF to make this fan, and photograph it and have it to us on the 23rd so that we can do our presentation and get it to THD?"

94.     In May 2004, Spectrum hired Dave Simpson (formerly with CKI) as an in house designer. (stipulated) Pat Kryza testified that David Voth at CKI suggested that Spectrum hire Dave Simpson to assist with designing. Tr. 295. However, Kinder was unhappy that Spectrum had hired Simpson without consulting her. AX 15. Kryza testified that, at the time, Home

Depot had purchased six collections from Spectrum and wanted to have smaller pieces within those collections, but Spectrum could not get the additional designs from Carolyn. Tr. 296.  She testified that Carolyn was supposed to do the additional designs, but instead Dave Simpson did them for Home Depot.  Tr. 296.

95.   On April 26, 2004, Mike Toups sent an email to Pat Kryza, with copies to Carolyn Kinder, David Voth, Winston Wong, Liz Barnes, and Mike Barnes. AX-430.[13]  He wrote, "Pat, We were surprised to learn that your new in-house designer was our former employee, Dave Simpson.   While Dave is a good designer (trained by Carolyn), this may make for complications in dealing within the same factories together - especially for the lighting showroom business.  For as many times as we communicate (almost daily), it was surprising for us not to learn of Spectrum's decision to hire Dave until Dave showed up with you in China to begin working this week.  Based on the recent email below, you even had a chance to bring it up last week, but seemed to be hiding this fact from us."  Toups further wrote, "Regarding your request for designs by May 1, please note that Kinder has fulfilled all of its obligations for designs from the date of the agreement through the end of the 4th quarter of '04.  We have already submitted 10 collections (San Marino, Tropics, West Indies, Sedona, Mazatlan, Vienna, Antler, Providence, Lotus and Coronado).   That is five quarters of collections submitted according to the agreement (2 per quarter).  We are however planning to submit additional designs early this Summer for THD review scheduled for later this Fall. This of course assumes Spectrum will have resolved all of its issues with its manufacturers. This schedule is based on dates we previously discussed and agreed to which allows adequate time for the factories to produce samples for the Fall meeting.  Dave Voth and Carolyn will be in China together at the end of this week.  Please discuss with them your plans for Dave Simpson and your plans to resolve the open issues with the manufacturers to determine how we all move forward together.   We of course want to make sure we both serve THD to the fullest extent possible."

96.   On May 1, 2004, Kryza emailed Carolyn Kinder, with copies to Voth, Toups, Luo, and others, stating that she "just reviewed the Product Family list of items that our contract states will be included in each of the collections that are submitted to SCI. I have attached a spread sheet that shows each of the collections and what items we still need to have design cad drawings sent to us to finalize these collections.  The Coronado, Providence, and Lotus drawings that I have identified as having are only sketch drawings.  I'm not sure if Kim or Cindy has the final drawings that show the actual dimensions for each of the items, shade size and fabrication, and the finish, but if they do I would appreciate them sending this information to us.  If this has not been completed I would like to get all of the missing designs and information this week.  When we met in your office on April 12th we had agreed that we would have the completed design drawing by 5/1/04.  In order for us to proceed with getting the samples made I must present Michael with all of this information for his approval...."  AX-6.  Voth responded, "We definitely need to talk regarding the continued

_____
[13]The Court notes that the April 26, 2004 date on this email conflicts with the parties' stipulated fact that Spectrum hired Dave Simpson in May 2004.

miss communication [sic].  We did discuss the submission of new designs when we were back in CKI's Fl. Office – the deadline date was not 5/1 – per a confirming email to you then and your review of the notes – so instead of demanding per email ... let's talk...  It is in our collective best interest and the most important interest of THD for us to work this out together with out all of the implied BS – lets just get it done – together ...."

97.   On May 2, 2004, Carolyn Kinder emailed Voth to thank him for the "hand-on responses to the Spectrum team."  AX-6.  She stated, "There are several points that need to be re-clarified as we push to go forward on collections for them.  1.  The Providence, Lotus, and Coronado are all 'original' collections, and should be presented with our name.  Until all existing issues are resolved, we are NOT ready to put our name on these collections and give Spectrum the exclusive right to market them.  THD has passed them up, so these three collections have only the future that Spectrum can provide through the embryo lighting distribution division now launching.  Correctly leveed start-up tooling, plus marketing, etc, will drive costs to a damaging level on these, at this small volume.  These 3 are not available at this time.  This conversation has been a part of past dialog with Liz and Michael and myself.  I think it is still wise at this time.  2.  The collections that we are eager to re-design/adjust, and help launch, are the existing ones that Kaiyan, or David Lo, or President, [or other resources we can suggest] can offer.  We can re-design/adjust, and take a sourcing fee/design fee as we change them.  That is the only way that we can keep our future 'clear' until we know who we are dealing with, in fixed lighting.  Although this may seem a small effort, it is powerful and quick and easy to manage.  Costing is known, no tooling, etc. to confuse the value and look.  In doing this we also accept the responsibilities of bringing together a capable maker, and a capable customer, respectively.  3. The total historical performance of our company with Spectrum should be stated in some clear format, so all can see that we have met the requirements of our contract as far as THD is concerned.  4.  If Spectrum wants to add [be 'covered up' with saleable lighting] collections for them to sell asap, these should be quantified in advance, to us, by Spectrum.  We ALL need to know how many different collections, times skus, and how deep they will order from each of them.  We can then negotiate 'for/with' Spectrum and the factories in intelligent good faith.  With each resource, we know they will be trusting in our ability to bring stable and solid 'design adjustment.' 5.  We will start again to submit more designs for Spectrum to present to THD, when all issues between Spectrum and the vendors we have brought to the table so far are solved to everyone's satisfaction.  We need to have this in writing from both parties, because this has been too vague and conflicting to go forward until it is clear."

98.   On May 10, 2004, Spectrum sent a letter to CKI on procedures and the relationship of the two parties.  (stipulated) AX 15.  In the letter, Spectrum noted the "misunderstandings regarding our procedures and relationship."  Barnes wrote, "Under our written Agreement CKI is bound to deliver Design Documentation ... and assist in implementing Spectrum's product development protocol.  In that regard, I am appreciative of your commitment to attempt to work using the existing tooling so as to minimize costs.  Cost is king with customers, and minimizing it is also the key to increasing sales.  I also understand and agree

with you that neither Spectrum's nor CKI's staff have any authority over one another. Likewise, I would appreciate that instructions CKI personnel may wish to make to Spectrum's factories be done only through and/or with the approval of Spectrum's production and quality control staff."   CKI responded that "Spectrum must provide competent staff to receive instructions, understand the design requirements deal with the factories. ... As we have both acknowledged, Spectrum's product development and manufacturing shortcomings were a significant issue over the course of the first year of our relationship."  Barnes further wrote, "Each of the factories with whom we have dealt to produce products or samples based on CKI designs has complained about the incessant changes made to the Designs, even after the Designs have been accepted by our primary customer, The Home Depot.  We look to you to deliver Design Documentation to Spectrum that may then be reviewed and approved by our customer.  My long experience with Home Depot, both as a buyer and as a vendor, is that Home Depot often requests modifications. Any such requests are based on their proven track record of what sells, and at what price point.  Therefore, though Design Documentation delivered to Spectrum should essentially be in final form, we should always be open to reasonable suggestions of our customer...." CKI responded that it was "surprised by these comments," noting that CKI had brought Spectrum and the two factory partners together.  CKI further stated, "As you know, you cannot recoup costs for rejected samples so we try to minimize this by maximizing our effort in each piece we do.  We want to make our position perfectly clear ... until the sample meets our expectations; it is not considered accepted by us or releasable to be shown to the client. Until we can accept your execution of the Design Documentation and our required hands-on working with the samples and finishes which give the final effect, the sample is not considered complete.  Therefore your term 'changes' does not apply.  We are of course always open to reasonable suggestions from both qualified Spectrum personnel and the client."  Spectrum further asserted its position that Design Documentation must be reliable to avoid unforeseen expenses.  Spectrum asserted that "CKI must have completed its unilateral 'tweaking' before we present design concepts to the Home Depot and, indeed, before Design Documentation is presented to Spectrum.  Once the Design has been approved by The Home Depot, they consider it final."  CKI responded that "a certain amount of R&D cost goes into each collection" and that CKI had had to "absorb a significant amount of costs over the past year because of Spectrum's inexperience to accomplish our designs and the need to educate five factories."  CKI further stated that it was "unrealistic to expect a new design to always turn out perfectly from the first attempt.  Allowing for necessary adjustments is usually the only way to consistently produce a quality and saleable result.... We agree that once the CKI approved sample has been accepted by THD it will not be changed."  Barnes also stated that Spectrum had not received Design Documentation for the current quarter, to which CKI responded that it had "consistently over performed through every quarterly design period."  CKI stated it had submitted 10 collections, "which per the agreement takes us through the 4th quarter of '04.  We are however, working on additional collections for the July review meeting."  When Barnes emphasized the need to meet Home Depot's requests in a timely manner, CKI stated that its responsibility was "to maintain the integrity of the design and to translate it into a saleable product to the consumer" and that

CKI would "not be contained by false parameters that undermine this." CKI again complained that Spectrum did not have sufficient China support/personnel and was glad that Spectrum had "now made the commitment to catch up with us with your own China office and staff led by Pat." CKI further complained that Spectrum's hiring Dave Simpson had placed CKI and Spectrum in a "competitive situation." Last, CKI wrote, "If you feel the need to maintain your rigid stance for product development, we believe this is not in the best interest of our relationship or of THD's customers. This stance will force us to go back to THD and respectfully bow out of the relationship. Let's communicate better and make this work."

99.     On May 19, 2004, CKI and Spectrum discussed contract compliance issues in a conference call. (stipulated) The parties then exchanged several follow-up emails. AX-186. On May 19, Mike Toups emails Mike Barnes regarding "communications." AX-188. He stated, "I think we will both agree we need to do a better job communicating with one another. This email addresses two points we discussed: (1) our concerns regarding the contract, and (2) dates for delivery of drawings for the July THD meeting. (1) CKI concerns regarding the contract are related to our ability and freedom to design product and Spectrum's ability to provide 'expertise' to support and accomplish CKI designs. Our concerns have been well documented over the course of the first year of our relationship. We feel that Spectrum has taken steps to improve its presence in China, but much of this has been through our support (i.e. – the introduction of factory partners, support by our China Staff and use of our showroom). Our design methodology is a hands-on approach to working with the factory. We need to understand everything that goes into the product so we can balance maximizing the design effect and limiting design costs. We need to know all of the costs, including material costs and tooling costs. Our product is successful because we always design to costs, which vary by manufacturer, procedures, tooling, etc. We also need to know what the customer is ordering – therefore what is successful, to build understanding of where to go with future design direction. We have agreed to share this information in the past (you confirmed as recently as our last meeting in China), but it always seems to come up as an issue or we simply have not been informed as to what is happening at the THD level. We know THD is price sensitive and we want our products to sell - as you do too. We have always taken this approach as a product developer because it is the clearest path to get the best samples we can deliver to the customer in a reasonable timeframe and at a reasonable price. We want your support and cooperation and that of the manufacturers, and need for you to better understand our cost-sensitive product development methodology – it's what we do and how we work. We cannot be responsibly productive without it, and it continues to be a requirement to our working together. We want to work with you all as partners to serve our mutual client. We came into this relationship through THD and we will maintain a direct relationship with THD. If asked a direct question, we will give a direct response – we would ask no less from you. Below are some examples from our Agreement that we believe drive the points for better 'cooperation' between our two parties; CKI's need to be hands-on involved to 'match' Design to Product; and our need for solid factory support for 'suitable manufacturing' including quality standards, competitive pricing, production capacity and on-

time delivery. Our concern has been that we have been blocked from following our proven design methodology, to follow a more rigid and unproductive system; yet we are still accountable to the same high design standards that people have come to expect from CKI. Again, it comes back to better communications from us to you and you back to us." Toups then cited, with underlining and comments, to page 1, paragraph 4 of the DSA, which states that "both parties hereto will need to cooperate"; page 2, item 2, which states, with his comments, that "CKI will lend services to implement Spectrum's product development protocol. The purpose of such protocol is to produce samples, and eventually Products, that match the Designs. Matching is to include, but not be limited to, the design specifications for appearance, materials, and finish. The work necessary by CKI to complete the samples may include, but not be limited to: supervision of the sample production process, in-factory personnel assistance, coordinating and tracking of sample orders, and preparation of design and technical information summaries. (Technical information summaries – costing being the dominant factor in how to proceed)"; and page 4, Item 7 Design Documentation, paragraph 3, which states, "Spectrum shall provide engineering expertise, as necessary, to meet the requirements for suitable manufacturing of the submitted CKI designs." Toups then turned to CKI's second concern, writing, "(2) Drawings for samples for the July THD design meeting are currently in works and when Carolyn returns to China next week she can begin to review the drawings for 3 (possibly 4) new collections. Spectrum should expect to receive these drawings within two weeks of her return to China which is the week of June 7th."

100.   Mike Barnes responded to Toups's email on May 24. AX-186. He agreed that better communication was "the key for making our venture successful." He then stated, "First of all, Spectrum's understanding of the meaning of 'technical information summaries' in our Agreement is quite distinct from your concept that it somehow includes all pricing information. While we want our designers to be generally aware of cost-effectiveness, we would not limit or encourage any of them to 'design to cost.' It is Spectrum's and the factories' job to cost production of the Designs, and should any Design require further attention in that regard we would indicate so. That is how we have always worked with our designers. While Spectrum is happy and excited to be involved in this venture with CKI, CKI's job is firstly to design and then to assist in the sample/product development protocol. The Home Depot suggested Spectrum take charge of manufacturing your designs because they know us to be quite competent in this area; as they know Carolyn to be an excellent designer. I also want to assure you that your claim that Spectrum's development protocol being 'rigid' is not the case. We will gladly make worthwhile changes and, indeed, do whatever it reasonably takes to accomplish our mutual goal, but that would not include directly financing CKI's design process. We can appreciate your 'hands-on approach to working with the factory,' but the fact remains that the primary to deliverable to Spectrum in our Agreement is the Design Documentation. Spectrum cannot afford, nor does our Agreement call upon us, to pay for CKI's pre-Design Documentation work. When the Design Documentation is submitted to Spectrum, any further tweaks to the Designs themselves should be responsive to the needs of our primary customer and/or to production realities. Again, Spectrum will let you know if such post Design Documentation redesign

is requested. Otherwise we object to a Design being revised from what is submitted in the Design Documentation. Once the Design Documentation is submitted, CKI's duty is to assist in production samples of same, not to continue unilateral tweaking, which costs us time, money and customer relation's [sic] issues. Let me make sure you understand that I am not saying CKI can never make changes to the designs, but I ask that you not do so without including Spectrum in the process. If Spectrum approves a design, that means Home Depot has also approved the design. Make Spectrum a partner in your changes, and Spectrum will keep Home Depot in the loop, which benefits us all." Barnes then complained about the fact that Spectrum had spent a lot of money on excessive tooling, freight, and travel expenses and that CKI had been unprepared for three separate meetings with Home Depot. Barnes then stated, "It is also important to emphasize the importance of the Design Documentation submissions being timed to allow us all enough time to properly present the samples to The Home Depot. Our next presentation to them is scheduled for July 20. The sooner CKI can get this quarter's Design Documentation to us, the better chance we have of actually having a successful meeting with The Home Depot. Therefore, we would request the three or four families you mentioned come sooner rather than later." Barnes then noted that Carolyn had suggested that it would be "okay if we decided Spectrum and CKI couldn't work together," and stated that "Spectrum has no intention of terminating our Agreement, nor to relinquish it." He ended the letter by stating, "We can all do well if we meet our customer's expectations. CKI is to submit Design Documentation and assist in sample production. Spectrum is to produce and distribute the resulting production. If we can each stick to our role, and go the extra mile to accommodate each other's unexpected issues, we have a real good chance of **making serious money**. So let's do it." (Emphasis in original.)

101.    Toups responded to Barnes's email on May 28, 2004. AX-186. He stated, "It's good to keep this dialog going and I totally agree with the closing paragraph of your letter. However with that being said, I think we are both operating under different interpretations of the Agreement. We have operated in the reality of getting the job done to the best of our ability given the circumstances we have had to work under during the past 16 months. We seem to have done something right and the product has been successfully accepted by THD. We will therefore continue to operate under the precedence that has been established. We too have expended a considerable amount of time and money to get to this point. We too have frustrations working together, but we both share a common goal. At this point, we plan to continue to work together for our mutual benefit. We will work harder to make Spectrum our partner in 'changes', and if changes are required, we hope that you appreciate we are doing this to give THD the best product possible. As issues come up, please share your concerns or frustrations ... just pick up the phone or drop an email. We will do the same and hopefully this closer communications [sic] will make us more successful. As an example, Carolyn expressed her concern that the finish on the antlers that were shipped to you prior to her review was 'dark, muddy, cheap-looking and one-dimensional.' She felt like we (CKI and Spectrum) could have presented a better product had CKI been kept more involved. Close-up digital photography can usually spot many of these problems if Carolyn is not physically there to review the product. We formally request that CKI design samples not be

shown to THD unless CKI has signed-off on them. I'm sure you and THD would agree.... Carolyn and our staff are working on the next round of collections and I'll try to get you a more firm delivery date after this weekend."

102.    Eric Williams confirmed that Spectrum's product development protocol was designed to meet the needs of Home Depot, and focused on having enough time to develop samples or presentations for sales review meetings with Home Depot. Tr. 373-375. Spectrum would provide certain deadlines and timelines to CKI for meetings with Home Depot, but in 2004 CKI failed to provide Design Documentation on a timely basis under Spectrum's protocol. Tr. 375. CKI instead chose to "continue to operate under the precedence that has been established," which was its own design development protocol and involved CKI working mainly "hands-on" in the factory to change the product and designs as many times as necessary until CKI was satisfied. CKI believed Spectrum's protocol to be too rigid and did not want to follow it.

103.    On June 4, 2004, Kim Barnes of CKI emailed Carolyn Kinder stating, "I know we owe a few new collections to Spectrum, and I wondered what your current timing on this is? Do we have a date of when we'll have some sketches/drawings to them?" AX-516. Mike Toups then emailed Winston Wong at the China factory asking, "What's the status on the new collections for Spectrum?" AX-516. Winston replied, "I pushed Carolyn on this and she replied me they were 80% done as always. As you know the left 20% always takes 80% of her time. I hope she will stay in office on Sunday so she could get some done. I will have Adonis and Lope work with her." AX-516. Toups responded, "The old 80:20 rule always applies. thanks for staying after her on this." AX-516.

104.    On June 10, 2004, Cooper emailed Kinder, Voth and Toups regarding "product development." AX-219. He wanted to know where CKI was "on the 10/04 introduction." He also noted that Lee Nemeth had resigned from Expo, but that Uttermost had "huge orders in production now for Expo, and a big line up with lots of planned ads."

105.    On June 16, 2004, Derek Hanes of Uttermost emailed Winston Wong, David Voth, and Mike Toups asking to see fixed lighting that Uttermost could present to Costco. AX-37. He wrote, "I would like to see photos of anything available (anything that Home Depot, or other Licensee's did not pick). A rough digital image is fine initially. If nothing is available I understand from Mac that I'll need to wait 6 months to a year for Uttermost fixed lighting designs." Toups responded, "We have some photos to share with you – good designs and priced competitively. I plan to come up after the end of the month and I'll bring a set to share with you and Mac. I am currently in China." In August, Derek forwarded these emails to Kim Barnes at CKI, stating he was "still interested in seeing some photos of fixed lighting that I can offer to Costco. Can you help me with this? Also, Mac wants to know if we can introduce some Fixed Lighting at the January 2005 Markets." Kim Barnes then forwarded these emails to Carolyn Kinder, who responded to Mac and Derek that "[t]his is a big subject only because of the issues that it could lead to down stream ..." She then asked if she could

supply them "with product that could be nameless."

106.     On June 17, 2004, Pat Kryza emailed Dave Voth, with copies to Mike Toups, Kinder, Liz Barnes, and C.Lopez.  AX-118.  She wrote, "Today is the 17th and I still have not received the designs that were promised to me on 5/1, 5/28, 5/31, 6/4, 6/5, 6/6, 6/7, 6/10, 6/11.  I know that you keep telling me that the corrections that keep being made make all the difference in the collections and I fully understand what you are telling me.  It's just that there has to be a finish line on paper design so that we can move forward to the next stage.  Carolyn has stated many times that even during the initial sample stage there are changes to be made.  We have reached the critical stage in the process of our Protocol for having samples made from Cad Design Drawings.  As you know our Protocol states that it takes 45 days to prepare a sample.  If we received the designs today and Mike approved them tomorrow we would only have 2 ½ to 3 weeks max to get the samples ready.  This is not enough time for the factories to get the correct materials, give the materials time to cure before finishes are applied (if necessary), tool up (if necessary), and get glass let alone any changes that will be necessary.  The factories must supply us with all spec information, costing, and all of the other information that THD requires at the time of the review.  All of this then must be put into a full presentation that will be given to THD so that they can make a decision on what designs they want to put into their stores.  In December I remember very well Carolyn stating that she was embarrassed showing THD the presentation that you and I along with your staff spent 15 straight hours putting together and then running to catch a plane...."

107.     On June 18, 2004, Kim Barnes of CKI emailed Pat Kryza to ask, "Have you approved the drawings you did receive, or are you waiting to get the remaining drawings for each group to approve them all in one fell swoop?"  AX-117.  Pat responded, "Kim, As the contract states there are 14 items that are to be made in each collection.  Spectrum should receive all of the designs for each collection.  Mike and Liz have reviewed the few designs that were sent to us there are 2 options on the island light, and the 9 Lt Chandelier which is great, but we must receive the portables, ceiling fans, vanities, and other items that were missing.  I need to know when we will get these drawings.  Also how many collections will we receive?  I also need to know when we will receive the story board for each collection that I asked for yesterday.  Please see that I have the answers by Monday so that I can discuss what direction we will take and what else I need to prepare for this meeting."  The designs that CKI submitted to Kryza in June were part of the Madrid design collection.

108.     Spectrum/CKI had a meeting with Home Depot buyers to show designs in Atlanta on July 20, 2004.  Tr. 33; PX-3002.  Carolyn had not been available to work with Spectrum on designs for the meeting.  Tr. 35.  Spectrum had created its own designs and made samples for the meeting.  Tr. 34.  Kim Barnes brought designs from CKI on the morning of the meeting.  Tr. 34.  These designs were hand drawn and Carolyn brought in some parts and pieces to show finishes, but she did not have samples.  Tr. 34.  The meeting was not successful.  Tr. 35.  Home Depot buyers informed Spectrum that they wanted to see samples

with finishes at further meetings.  Tr. 35.  At the meeting, Home Depot buyers reviewed drawings from CKI in the Manhattan, Monterrey, Santorini, Austria, Portofino, Madison, Meridian, and Madrid collections, and some Verona Factory designs in CAD format and some Spectrum designs.  PX-3002; AX-119.  Home Depot thought the Madison collection was too similar to the Vienna collection.  AX-516.  Home Depot thought the Manhattan collection was too similar to the West Indies collection.  AX-516.  Home Depot wanted CKI to "be consistent with finials and take the knobs off using clear hammered glass" on the Monterrey collection.  AX-516.

109.  On July 26, 2004, CKI gave clients notice of the termination of the employment of David Toups and Mike Voth. (stipulated)

110.  The contract on which Michael Barnes' signature appears indicates that Section 6 of the Agreement has been changed.  The words "unless CKI is specifically authorized by Home Depot" have been struck, and Michael Barnes's initials appear beside those words.  CKI received this version of the agreement sometime around August 2004. (stipulated) The exact date of Mike Barnes's signature and change is unknown, though the change was made sometime between March 2, 2004 and August 2004.  Tr. 362, 368-369; M. Barnes depo at 79.  At his deposition, Mike Barnes stated, "the deal that I agreed to was the one that I signed and I lined through."  M. Barnes depo at 96:7-8.  Spectrum sent a copy of the altered contract to CKI in August 2004.  M. Barnes depo at 96:15.  No one at CKI ever agreed to the change made by Mike Barnes.  M. Barnes depo at 96-97.  Mike Barnes did not recall ever telling Home Depot about the change he made to the contract.  M. Barnes depo at 118.  Mike Barnes testified that he would have accepted the contract even without the change he made.  M. Barnes depo at 247:9-12.

111.  In August 2004, Cooper and Kinder discussed fixed lighting.  AX-37.  Cooper wrote, "As for the Uttermost line, I don't know how big fixed Ltg could get or how quickly, but I do know that we have taken a huge chunk of market share in portables in just over 2 yrs, and we're currently selling many, or most, of the target retailers of fixed lighting (Lamps Plus, Georgia Ltg, Expo, The Great Indoors, Ltg One, Home Depot soon, etc., etc.) These retailers haven't been afraid to buy portable lighting from us, and I don't think they'll be afraid to buy fixed.  We certainly won't have the experience and breadth of line in fixed lighting like the major players, but what we would have is a more fresh line, better priced, and coordinated with better designed/value portables and mirrors.  If our designs and values are better, I think we can take significant market share."

112.  On August 20, 2004, Kryza emailed Kinder about "future collections."  AX-525.  She wrote, "I look forward to seeing you in Chang An shortly so that we can review the collections and make sure that we are on target for the meeting.  Kim had asked me how many collections we need from you for October 1st.  As you know Spectrum values every collection that you can get to us.  These collections will be used for the next HD meeting.  We have had great success with everything that you have given to us so far and you can see that it is finally

paying off....   So to answers [sic] Kim's question there is no limit to the number of collections that we would like to have from Carolyn.  Our contract states 2 per quarter, but Carolyn has never let us down and has always rallied to give us enough designs for great presentations to HD.  I have been working with our factory and we have increased the number of carvers and finishers so that we can produce 100 new designs a month...."

113.   In September 2004, Mac Cooper at Uttermost gave Ray Woolson's name to Carolyn Kinder as a potential financial officer for her company, CKI.  (stipulated)

114.   In September 2004, Ray Woolson started as a management consultant to CKI on financial issues.  (stipulated)  CKI/Kinder did not instruct Woolson regarding the confidentiality clause of the CKI/Spectrum DSA.  Tr. 949, 991.

115.   On September 24, 2004, Cooper emailed Kinder to let her know about his meeting with Home Depot.  AX-108.  He told her that the meeting went "very good" and that Marsha agreed to buy lamps.  Kinder responded, "We won!!!!!!!!  Congradulations!!![sic]"

116.   In October 2004, Spectrum made its final (to date) royalty payment to CKI.  The royalty payment related to product sales made by Spectrum in September 2004.  (stipulated) Tr. 993.

117.   On October 1 or 6, 2004, Cindy Luo of CKI gave Pat Kryza some hand drawn designs for the Athena, Prism, Fluted Scrolls, Rustic, Scroll, Simple Iron Forged, Simple Shapes, Thick Long Leaves, and Simple Line with Slope collections.  PX-3002; Tr. 178; AX-516.  According to Kryza, these were hand drawn sketches by Adonis and Lope, two draftsmen who worked for CKI in China.  PX-3002.

118.   On October 10, 2004, Spectrum met with Home Depot at Spectrum's China showroom.  PX-3002; Tr. 36.  Home Depot reviewed the collections submitted on October 1 or 6.  PX-3002.  Carolyn Kinder was not actively involved in preparing samples for the meeting.  Tr. 36.  Skip Teeters, Rick Hammer, Jeff Lee, and Greg St. John were there from Home Depot and its affiliates Expo and World Imports.  Tr. 36.  This meeting was not successful.  Tr. 384; AX-115, AX-116.  However, Home Depot did pick some items.  AX-518.

119.   On October 11, 2004, Kim Barnes of CKI emailed Liz Barnes and Pat Kryza regarding the meeting with Home Depot.  AX-518.  She wrote, "So did HD have a lot of changes to the samples?  How did everything go? Did they take any of the new drawings?"  Kryza responded, "The meeting did not go well at all.  We have issues that we must discuss with Carolyn.  Liz and I want to talk to her sometime tomorrow daytime our time.  Please give us a phone number where we can reach her and a time that she will be available so that we can review all of the issues."  AX-518.

120.   After the meeting, Mike Barnes planned a conference call for October 20 to discuss the meeting, and asked that people be able to answer the following Home Depot comments: "1.

Not Original Fresh Designs; 2. Designs are not to scale or consistent within the collection; 3. Looks are tired and redundant; 4. Finishes are too close to original designs." AX-518.

121.   In October 2004, Cooper and Kinder exchanged emails on a variety of subjects, including fixed lighting. AX-38. Cooper wrote, "Fixed Lighting – still very interested in moving in this direction, but whenever we do, the items must be great since it will initially be such a small line. Please let us know what you are comfortable developing in this category. Possibly 5 collections annually?" Kinder responded, "This is also under serious scrutiny, and we will open this to discussion too." Cooper then wrote, "This really has nothing to do with this point, but the meeting yesterday with Marsha in China went well. We were hoping to get 4 lamps in all HD stores right away and the rest of the product by September. She verbally agreed to add 5 now!"

122.   On October 24, 2004, Kryza emailed Liz and Michael Barnes with information about "Kinder in High Point." AX-526. She wrote, "here's the story from Winston," and then discussed Kinder's legal problems with Voss and Toups and her work for other clients. She also said, "Mac had a good show he had Grace the other designer start to design portables for this show. Apparently Carolyn was Pissed, but he only had 30 new items from her. Mac is going into hardwire and wanted Carolyn to design for him, but she apparently said that she couldn't for the same reason she can't design just portables for us."

123.   On October 28, 2004, Cooper emailed Kinder and complained that her product development for 10/04 was "obviously very last minute on the lamps, and didn't make it on accessories and mirrors." AX-39. Cooper then asked Kinder for her thoughts on fixed lighting, stating, "I think the timing is right for the introduction of some collections based on best selling portable lamps."

124.   In November or December 2004, Pat Kryza emailed Kim Barnes and Carolyn Kinder regarding designs. AX-516. She wrote, "As promised here is a list of collects [sic] that you said you would rework and then the 2005 due dates for new designs in the format we that we talked about. Cad with clippings and color swatches attached." She then talked about how the Madison, Monterrey, and Manhattan collections needed to be redesigned per Home Depot's instructions. She further wrote, "Designs that were given to us in October. I showed you the collections that Cindy had given to us that Mike has requested we receive in the cad format with your design as an inset and color swatches." The email then lists a 2005 Design Schedule of February 1st, May 1st, August 1st, and December 1st. It continues, "If you need anything else please let me know. I also let Eric know that you did not receive the copy of the contract. Eric please resend and copy Kim Barnes so that we make sure it is received." AX-516; AX-518. At some later point, Pat emailed Carolyn, stating, "I spoke with Michael and Liz last night regarding the designs that we received from Summer yesterday. These are the redesigns of the collections that you supplied to us on 10/06. 1. First the original collections that we received on 10/06 were not in Cad form. In our contract it states that all designs will be in Cad form for review and approval by Mike Barnes. This is the only way

that we will accept designs going forward since it all goes back to the contract. 2. When Liz and I got the design sketches on 10/06 we did not show them to Mike because they were in the wrong format. (Not Cad Drawings). I arranged for all of us to meet at the Verona showroom so that we could review THD changes on their selections from our October meeting, and to sit down with Carolyn, Ted, and the Verona Cad designers so to that we could review these collections, pick one item per collection that we wanted revised to Carolyn's satisfaction and then put it into Cad so that we could get the designs to Mike for approval. Let me just add that it is not the factory's responsibility to take the designs and convert them to Cad. They did this as a courtesy to keep the designs moving and to generate future sales and production. 3. ... I will no longer waste my time reviewing designs that do not follow the contract which is in Cad form. Therefore I suggest that Kinder International take the above designs and the one's [sic] that I still haven't received and convert them to Cad format as described in the contract and also illustrated in the contract. These designs were due to SCI on 10/1/04 in Cad format. I will give you until 12/31/04 to get these collections in the proper format. We are due our next group of collections on 2/1/05 which must be in the Cad format. 4. Since we can't start to make samples until we receive the Cad designs and have them approved we are now once again falling behind schedule. All this will cause is poor samples again, that THD does not want to see, and loss of income for everyone concerned. We have had this discussion several times and all I can say is that somewhere along the line I have failed to make you understand what is in the Contract and what is expected so that we can generate business. Since we are at a standstill and can't make any samples to generate future business until we receive the designs in the correct format it has been suggested that we hold back commission checks until we receive the designs in the proper format. Carolyn, I would like to hear from you or meet you to discuss this issue. I need to let our San Antonio office know when we will receive the designs in the correct format so that they will know when to release the November check."

125.    On November 1, 2004, Kryza emailed Ted and Morgan at Verona stating, "I had breakfast with Carolyn and we want to setup a day that we can meet to review the changes for the HD Austria, and her new collections that we just received." AX-518. They made plans to meet at Verona on the 11th. AX-518.

126.    On November 9, 2004, Uttermost discussed the challenges of the fixed wire lighting market with Carolyn Kinder.  (stipulated) AX-41; AX-518.  Cooper wrote, "Fixed Ltg will be a challenge. We already sell most of the largest lighting retailers and this will actually be an easier area to have some quick success. Our relationships are strong at Lamps Plus, Georgia Ltg, Expo, Lighting One, The Great Indoors, Costco, etc.  Not sure about Jeff Lee at HD. Marsha and Mark Huffman like us, but Jeff likes Spectrum, so no idea here. As far as smaller lighting stores, some of our reps will be challenged to cover this channel well. We're doing two things to help here. First, we're close to hiring a top Sales Executive from the Lighting store side of the industry.  She is extremely well connected, talented, and knowledgeable where we are weakest. Second, where our reps don't have the ability to cover their Ltg stores with both knowledge and persistence, we'll insist on sub-reps from the

Lighting side of the business."

127.     On November 12, 2004, Ray Lively of Spectrum received copyright registrations for a "San Marino Design Outdoor Wall Sconce," a "San Marino Design Table Lamp," a "San Marino Design Wall Sconce," a "Tropics Design Flush Mount," a "Tropics Design Island Light," a "Tropics Design Table Lamp," and a "West Indies Design Pendant," AX-87; AX-88; AX-89;AX-90; AX-91; AX-92; AX-93; AX-261; AX-262.

128.     On December 6, 2004, Kryza emailed Joanne at Verona asking for the "copies of the designs that Carolyn had redrawn for the Austria and the Meridian once your cad drawers finished them." AX-527. She also wrote, "Carolyn had also reviewed the other collections with Ted and I and you were going to take one item per collection and have the cad drawing completed so that I could forward it to Mike for approval for the sample to be made. I don't have these either. When can I expect them." Later that day, Summer of Verona emailed Pat with the "attached drawing we have finished." Kryza then emailed Liz Barnes, Ray Lively, and copied Mike Barnes. AX-527. She wrote, "Attached are the redesigns from the collections that Carolyn gave us in October to meet her commitment for the 4th quarter. There are still more to come and I will get them to you for your review. I have told the factory back in November that they were not to start any samples until Michael approved the designs or changed them to meet his needs for future collections."

129.     Sometime around December 12, Pat Kryza emailed Kinder to confirm that they were meeting in Hong Kong on the 15th. AX-518. She also wrote, "I just wanted to let you know that I had the meeting with World Imports and they have picked up all of the revised Austria and Meridian items for the June 2005 Dallas Market. As soon as we get the final list from them I will forward it to Kim so that she can get the items in your system." On December 13, Kryza wrote to Kinder, "Ted and Morgan have made your changes and HD has accepted them. As I said once I get the final list from them I will forward to Kim. This should be sometime in January." AX-518.

130.     On December 13, Cindy Luo emailed Kim Barnes and Carolyn Kinder regarding Spectrum designs. AX-518. She wrote, "now we have 7 collections converting to CAD by Wucad [who worked for CKI], all these 7 collections are approved by Carolyn in handdrawing and we submitted to Spectrum (we have 9 collections total, 2 are already in CAD version) on Oct, now they want the CAD drawing. Wucad is working on this and will finish converting by the end of this week. but to be sure, will show to Carolyn one more time after convert to CAD."

131.     On December 14, 2004, Kim Barnes emailed Kinder, Luo, and Wong regarding Spectrum designs. AX-516. She wrote, "Thought I better bring up that we will owe drawings to Spectrum on January 1st, as per our contract.....better have Adonis and Lope get going on doing some drawings based on your direction on designs for lighting....." AX-516.

132.   On December 24, 2004, Kim Barnes emailed Cindy Luo with copies to Winston Wong, Raymond Lei, Carolyn Kinder and Kathleen Dowdy regarding Spectrum. AX-518. She wrote, "I talked with Pat Kryza today to verify what was needed. So pretty much there is three 'overall' projects needed for Spectrum - * Pat needs CAD drawings of groups submitted to her back in October - Fluted, Rustic, Scroll, Simple Iron Forge, Simple Shape, Slope, Thick Long Leaves, Prism, and Athena. Cindy, you had already submitted these CAD drawings to me, and I had printed them out for Carolyn and sent them to Carolyn in a fedex package. Yes, all the cad drawings are in Carolyn's hand, will check with her for comments once she gets back to China. * Carolyn to rework the Madison (spiral) collection and the Manhattan (ball & cuff) collection, as per Pat's notes below. Will find out the drawings and pictures for these two groups for Carolyn's review and ready for her review in China. possibly will do a composite for her. * Drawings of new design groups are due to Spectrum by February 1st. (Pat had changed the date from 1/1 to 2/1, so that gives us another month). Do you know how many collections they need for the new designs. please adv."

133.   On December 24, 2004, Uttermost and Carolyn Kinder discussed the impact of the CKI/Spectrum Design Services Agreement contract on Uttermost's potential sale of Carolyn Kinder designed fixed wire lighting products. (stipulated) On December 24, 2004, Kinder emailed Cooper about fixed lighting. He informed her that he had just hired Maria Scutaro in a Sales Executive position. He then stated, "We need to have more conversations about fixed lighting, but I think most of the key players are lined up and the obstacles are surmountable." AX-42; AX-448. She wrote, "I am glad you are so positive on this, but I think there is one last glitch in this plan we discussed to open up hard wire for you. I need to make triple sure that the current contract that is in place with Home Depot, via Spectrum, will not be compromised. It would hurt you as much as us if we alienated this retailer by incurring their wrath if they think we have the potential to hurt or exclude them in any way here... Pulling this off will require kid gloves and tact, Let's keep this plan confidential until we are sure they will be 'OK' with it, or want to suggest something we haven't thought of... After the holidays I will focus on this and may need to work with you on how to get their blessing on this new avenue 'for them'..." Cooper responded, "Yes, let us know how your contract reads with Spectrum and then we can discuss how to approach this with HD and what our game plan should be. We will certainly keep this quiet except for a handful of reps who have been involved in discussions on fixed for months."

134.   On December 24, 2004, Luo sent to Kinder an email of designs that CKI had prepared for Spectrum. AX-407. This email was not sent to anyone at Uttermost (stipulated at trial). Carolyn responded, "I will focus on this when I return to China, but the key tool will be the spread sheet that shows all the collections arranged as they were at the beginning with the types of fixtures listed vertically and the collection names horizontally across the top, so all items can be compared to prevent them from getting too close to each other ... and new ones added as they develop."

135.   In January 2005, Maria Scutaro joined Uttermost to work on lighting products/promote the

sale of lighting products.  (stipulated)

136.  On January 20, 2005, Spectrum, CKI, and Home Depot's World Imports met in Spectrum's Hong Kong showroom.  PX-3002.  Home Depot World Imports buyers reviewed samples from the Austria and Meridian collections.  PX-3002.

137.  On January 23, 2005 Carolyn Kinder wrote to Uttermost to discuss CKI's design commitments to Spectrum. (stipulated) AX-28, AX-29.  She wrote, "[t]he real issues on the subject of fixed lighting are tangled in the potential conflicts that might become a problem when it comes to my pre-existing commitments to the Home Depot lighting buyers and their various loyalties.  I have asked Ray to reread the contracts with Spectrum, and re-evaluate the results so far with them.  That is still in progress.  Spectrum opened up their new lighting showroom right around the corner from you on the 10th floor at the Dallas show, and the new buyer from Home Depot Canada was there as their guest...  I believe that Home Depot will be a force in fixed lighting as the future develops, and don't want to trigger any 'black-listing' with a 'stumble' here, for you or for me, as this could spill over into the development of your JV plan to provide them with lamps, though I know your relationship with Marsha is strong, as things stand today.  The suggestion at our last meeting in Rocky Mount was to offer Home Depot [through Spectrum] the requested collections as scheduled, and Spectrum could market the un-selected collections they developed into the fixed lighting field, but without my name.  Spectrum has 'signed on' a full team of specialist reps [they say..] and are preparing to push hard into this arena with their Tiffany product, and a variety of looks from their designers, but are very serious about also using the collections that I have contributed via the off-fall from the Home Depot buyers, Jeff Lee, and Greg St. John.  Currently, the main stores are still in the endless testing period, and the results are promising, but inconclusive... enough to create respect, but not enough to cause me to abandon all other opportunity and follow only them.  World Import is the main user of this product, along with Expo, each is active, but not as we had hoped if the collections were picked up by the main Home Depot chain.  The few that did make it there did ok, but the testing process is slow.  I know that it will take a particularly strong well trained sales team for Uttermost to really establish this category of product, and the marketing needs to be first class, to move into this field in a major way, as we did with the portables....  next step after weighing and weighing the issues, is to try to get HD to 'like the idea' of your entering this arena..., or at least not hateing [sic] it..."  Cooper responded that he would hold off making any changes regarding the Hung Sing factory "at least until we decide where we're going on fixed lighting."  AX-29. He also stated that he had not discussed fixed lighting with Wolfgang, since Uttermost was "trying to not promote rumors here that we might get into fixed."  He further stated that Uttermost was "very comfortable with Marsha" and that she had given them orders on the first three lamps for all stores with "many more to come."

138.  On January 28, 2005 CKI sent Spectrum a message noting the lack of sales of CKI designed products. (stipulated) AX-113.  Kinder wrote, "Cindy prepared a spreadsheet recent[ly] that followed the original one we did for the first 3 collections.  It showed the various categories'

drawings, and photos of all the samples that have been developed from each of the 18 or so collections now in your hands.  The 're-dos' and buyer requests weren't shown but it was a struggle to get all this on a single spread of paper as is.  As I understand it 1. These unused or re-designed items from the original accepted collections by Home Depot's high end format retailers are in limbo until HD finalizes its testing, then they may be added, but chances are slim.  The majority of these designs actually selected and brought into these stores are considered unsuitable for the main Home Depot [high volume] store format, but they may eventually be acceptable if they sell/test well, and are reduced in size/price.  2. The later collections selected are in a holding-while-testing pattern until the 'high end/low volume format' stores prove they should be purchased in more broad selections, if selected.  There is no current plan to put them in the current main Home Depot store chain beyond the special order kiosk area.  A new volume-store format, Think Big, is a possibility in the future, but still unclear.  3.  The collections that are 'not selected' by HD have in some instances been brought into the new Spectrum/10th Ave distribution company, such as the antler collection, the Madrid, and some fans.  I saw your nice display, and know you were pleased with your first show even if a first show is usually more about exposure than actual writing of orders ... we all know that everything must start somewhere.  I have confidence that with a realistic amount of time you can build your new business and I applaud the effort you have and will put into this...but we all know how long it takes to make a new start-up cash flow, for you, and all that are downstream. 4. A quality problem Pat mentioned with planning[?] had made you decide to pull the future business into your factory 'Kindlight', and there are no orders for Ted and Morgan, and that relationship is in a downward spiral.  I talked to them at the Dallas show and they say there are no orders.  I understand this is your call.  We seem to be losing momentum, even though we submitted 10 collections _____? and a few more after that...  I realize the main reason we were united is to develop for the various Home Depot companies, but I'm looking at diminishing return on an incredible amount of saleable work, still tied up in their holding bin and the loss of a maker[s] that I had confidence in, that is a key part of what makes the hands-on development of lighting that could be something special a productive experience.  Certainly there are other makers than Ted and Morgan, but their passion was a unique part of the experience, and its loss will be felt.  I myself have had some setbacks, and hope to complete the process of bringing in the next COO to return to a normal functioning company, hopefully in the next 2 weeks.  Your invitation to spend some time in review of the current results of our cooperation is a good idea.  This could be the first task that I and the new COO tackle as soon as this person is finalized.  Until we can get that accomplished, I would like to pause in the development of more drawings so we can get a fresh perspective on exactly what is the healthiest 'next step' for all of us.  We can review the current numbers you have, your inside knowledge of what is a realistic expectation of all the undeveloped or unaccepted or unpurchased skus, and get to some mutual 'higher ground' and more productive future direction, for all of us."

139.    On February 10, 2005, Cooper emailed Carolyn Kinder about fixed lighting.  AX-446.  He wrote, "Fixed lighting for our line.  I've pretty much covered our thoughts on Fixed Ltg in previous emails, and we know that it would be a huge undertaking to be a successful Fixed

Ltg vendor. Despite this, I think it would be a big mistake to not give this a big effort and see how successful it can be. The challenge and the potential are both very large, but I think we can pull together all the players to make this very successful. If you are fully behind this and we are fully behind this, it could become a huge business. Have you thought about this further and reviewed your current contracts?"

140.    On February 28, 2005, Pat Kryza emailed Carolyn Kinder regarding designs that were owed. AX-112. Kryza told Carolyn that she was in China and wanted to talk. She wrote, "it is important that we discuss how we are going to move forward with all of the designs that are owed to us and the designs that you said you wanted to rework from the showroom in HK. I talked to Mike again this morning and he wants to know what your intentions are and when we will receive the designs." Carolyn Kinder responded to Kryza's email that same day. AX-530. She noted that Mike Barnes had "called last week threatening lawsuits, etc. It saddens me to hear this..." She stated that Spectrum had not been communicating with them any comments, checks, or word on any successes, so it "surprised me that all this is important to you all." She added, "If you are facing a deadline with THD and need something, you know from the past that I'm always glad to get something to you asap, as the last time when I came down personally and brought/presented 8 or 9 collections.... I'm not sure what you want if our work [is it 18 collections now...?] isn't selling, but I'll be glad as always to get something to you.... do you know what you want? ... I haven't talked to Ted and Morgan in a while, but in the last exchange they said there was no business from you all. Who is the maker of choice ... only Kindlight, or are there additional resources? If you are alive and active out there then give us some positive news... It's hard to imagine that there's still an interest after such a long period of no return, but we are game if you are..."

141.    Kryza met with Carolyn Kinder in China in March 2005 because Carolyn wanted to discuss why she was not receiving her royalties. Tr. 45. Kryza informed her that she was not getting royalties because Spectrum was not getting its designs. Tr. 45. Kinder gave Kryza hand drawings of the Twisting and Crystal Contemporary collections. PX-3002; AX-119.

142.    In March 2005, Home Depot "rolled out" the San Marino items, meaning that it offered them for sale to all 1800+ Home Depot stores, instead of just the Home Depot Expo stores. (stipulated)

143.    On March 2, 2005 Uttermost sent a message to Carolyn Kinder about potential fixed wire designs for Uttermost. (stipulated)

144.    On March 9, 2005, Carolyn Kinder sent an email to Kryza entitled "'Spectrum, going forward', Pat, your thoughts?" AX-111. The email was addressed to Michael and Liz Barnes, but sent to Pat Kryza. Kinder wrote, "Today I had a meeting with Pat to discuss a variety of issues that need to be seriously addressed. She is a wise choice for this type of conversation, and also a trusted friend. She did a good job of representing your interests. I gave Pat a few collections for her to show to the buyer from Home Depot. I also gave her

52

our current spread sheets on what we are aware of as a sales number for items sold, and how they compared to each other.  Another sheet showed the total collections, and selections that we are aware of from our past design work that are for the Home Depot companies.  It was a big sheet.  We reviewed it, and all the reasons that we still aren't seeing much income in light of the effort from so many of us...  Our review of the total commitment and investment CKI has made in the past several years in the Spectrum company was a good conversation. It gave me a chance to let the Spectrum company, through Pat, know that it seems that our cultures are causing us to drift apart.  I shared with her my disappointment in the way the communications between the companies has all but disappeared, and all that seems to be left is threats to cancel contracts, with demands for more work from us.  The contract issue is easy.  If you wish to cancel, then we wish it too.  Since you have already breached it, the legal binding is voided.  But we all know that one can't make a contract substitute for a desire to support and interface with one another, especially in the field of intellectual property ... such as design.  If you would like more work from us to help you manage the flow of sales to your main customer, you need to tell us what you want, and we will try as usual, to get something into your hands ... even if, as in the past, it calls for us to bundle up and travel, do the presentation for you, and join in when ever it is in your best interest for us to do so.  What's missing is the *reason* to do so ... if you are not selling, then why do you want more ..?  According to Pat there are some sales, but the structure of your customer is changing.  We don't hold you responsible for that, but it impacts our company as well as yours.  She brought up the intent to grow out side of THD.  This is not a new subject.  I wish you well.  I would like to propose the following relationship going forward between your company and ours to define our commitment to you and this new company.  If we can straighten out the current problems of lack of communication, cooperation, etc., then we will offer the following plan.  We will continue to offer collections to you for THD . If you chose to actually develop the samples, and THD chooses these, we will support you and help get these altered, etc, so they can be purchased by them.  If they are not purchased by them, since you and the factory have gone to effort and expense to try to make them happen, you should have the chance to sell them yourself to recoup your investment.  If the designs are purchased and eventually dropped by THD you can sell these through your new business, and can activate unchosen skus from that collection, and color options.  If the designs are not developed as samples for THD then they will be returned to us.  We will be working with another company eventually for the category of fixed lighting, but the agreement with them will recognize this special arrangement for Spectrum.  Please let us know your thoughts."

145.  Kryza forwarded Kinder's letter to Mike and Liz Barnes on March 9, 2004.  AX-532.  She wrote, "Here are Carolyn's notes from our meeting today.  One of Carolyn's major complaints was the fact that they are not getting any sales history or know what items are selling or being discontinued.  As I reviewed her spreadsheets today I know that her information is not accurate due to Spectrum Creations not furnishing her the sales history. ...  I will send you pictures of the 2 collections that Carolyn gave me today in the next 2 e-mails."

53

146. On March 9, 2005, Kinder responded to Cooper's email regarding fixed lighting. AX-30; AX-51; AX-447. Cooper asked if she had "any new thoughts on Fixed Ltg. at Uttermost." He also stated, "My thought on fixed lighting is still that we should proceed with a strong introduction of around 150 pieces for the Dallas '06 show. The introduction needs to be planned well in advance with great sales tools, an extremely refined initial introduction, set up well in a renovated part of our showroom, etc., and be ready to ship right after mkt. What are your thoughts here?" Kinder began by stating that she still wanted to "see this come to pass" for several reasons, including their past success with lighting, brand awareness, "the opportunity to organize and deliver another category with the design freedom of our current relationship," and "the manpower that will be necessary for my company is now coming on board, and will make this new division much easier for us to handle." She then listed her concerns for "start-up" and "long term issues," including: "1. My current relationship with the Home Depot is important, but it is too narrow a base to build a future on, and if we lose that in this process then this is still the better long term move for us in this company. Spectrum is dependent to some extent on what we have agreed to bring to them, and I don't want to damage their sales, or lose the confidence of the Home Depot buying team by dropping this relationship, which they engineered. I had a meeting this morning with Spectrum Asia VP, and broke the news that we would be changing our stance with them, but not abandoning them. I will get back to you on this subject as it happens, but it is now in progress." Cooper responded, "Carolyn, I certainly don't know all of the likely ramifications of Uttermost selling Kinder fixed ltg, but I do know that we are a respected and a desirable vendor to Marsha and Mark Huffman at Home Depot. I don't see why Mark Huffman would be upset by this, unless we underpriced Uttermost/Kinder product that looked similar to Spectrum/Kinder product that is in HD. I don't know the effect of this on Spectrum, but we certainly would not 'go after' Spectrum in any way."

147. On March 10, 2005, CKI sent a demand to Spectrum for past due royalty amounts. (stipulated) AX-534.

148. On March 14, 1005, Uttermost circulated internal messages on possible fixed wire lighting products to be designed by Carolyn Kinder, Inc. (stipulated) AX-516. Mac Cooper emailed Maria Scutaro regarding "fixed wire." AX-516. He wrote, "Carolyn and I are still discussing. She has been focused on some last minute mirrors for our Hpt introduction as well as some structure changes in her company. She's hired 2 new executives to support her in China, and her Chinese office manager just left her company. As soon as the dust settles from these adjustments, we'll resolve the FW opportunity. I feel fairly certain she'll join us and she definitely wants to. She just doesn't want to hurt her Home Depot opportunity and is being cautious. Confidentially, she has little respect for Spectrum, the vendor to HD, but her contract for HD FW is with Spectrum. Also, this HD program is probably not super successful at this point. After more than a yr, it's still only 'special order' product at HD rather than 'in stock', making the retail prices not great at HD. She's fairly frustrated with the lack of progress. It is a regular program in Expo, but the real target (and pricing) all along was for HD. My guess is that Kinder and Spectrum are making slim margins as Expo

and HD special order is probably not enough business to justify all their time and costs.  As for lamps, Carolyn is exclusive with Uttermost with the exception of a small number of Austin lamps, and up to 12? lamps at HD that coordinate with a FW group." Maria Scutaro wrote to Mac Cooper, "I strongly believe that we can make Carolyn Kinder very big in fixed wire so I hope we can work out all the details to get this moving at some point."

149.   On March 15, 2005, Spectrum wrote to CKI to request designs. (stipulated)

150.   On March 22, 2005, CKI sent a second notice/demand to Spectrum demanding the unpaid royalty amounts.  (stipulated) AX-534.

151.   On March 23, 2005, Spectrum's attorney, Ed Einstein sent a letter to CKI to inform CKI that Spectrum was withholding royalty payments and that Spectrum was not terminating the DSA.  AX 17.  Mr. Einstein stated that CKI was in breach of the agreement by being in arrears on Design Documentation.  Mr. Einstein also stated that Home Depot did not seem interested in the designs, perhaps because CKI had been sending "recycled designs" and "spending little time on the designs intended for Spectrum."  Mr. Einstein also claimed that CKI could not design fixed lighting for any other customers under the terms of the DSA. (stipulated)

152.   On March 23, 2005, CKI responded to Ed Einstein's letter on the issue of royalty payments being withheld by Spectrum.  (stipulated)

153.   On March 29, 2005 CKI sent a letter to Spectrum demanding the unpaid royalty payments. (stipulated) AX-18; AX-517.  CKI denied that it was in default on design deliverables stating, "CKI provided ten(10) families at the outset. This was way beyond the two (2) families required per the contract.  Since that time, CKI has provided eight additional families to Spectrum.  The total of eighteen (18) families far exceeds the total ten (10) required by the contract (two at the outset and 2 per quarter starting in the first quarter of 2004).  Additionally, CKI just recently provided drawings for another two (2) families. There has never been any attempt to revise the minimum of two per quarter.  In fact, CKI has actually been performing ahead of schedule by delivering more than the minimum required to date.  In working against the future obligations, CKI has tried to accelerate the development of product and sales for Spectrum.  In summary, we believe that we are well ahead of the agreement in terms of deliverables.  It is our hope that you will cure your payment default so that we may continue to provide designs for Spectrum."

154.   On March 29, 2005, Pat sent an email to Mike and Liz Barnes regarding "CKI collections." AX-536.  She wrote, "Mike, I have listed all of the collections that we have received from Carolyn through the October 04 meeting.  In October she gave me 8 more collections which we never developed.  All of that information I sent to SA so I can't put it down on paper. The 2 New collections that she gave me in March I have added to the sheet since I have all of the paperwork."

155.   On April 2, 2005, Kinder responded to an email from Cooper inquiring about her "development plans on fixed lighting." AX-60.  Kinder wrote, "The subject is clouded only by the pre-existing commitment to Spectrum, and the matching commitment through them back to us, from THD...... but we are struggling over the current unethical moves on the part of Spectrum, and that keeps underlining in red, that this is not going to be a solid thing for the future.  Currently, I have told them we will continue to supply 2 collections to them every quarter to be shown only to THD.  If they only show the drawings to the buyers, they will revert back to us if not selected by be developed by THD.  If Spectrum actually develops the samples to show THD, then even if THD doesn't buy them, they can sell them [but without my name] to recover their development costs, that they invested to push our work.  The Canadian Home Depots opporate [sic] almost as a separate company ... and have now established a strong buying program with Spectrum, so I don't want to destroy something they have built and are depending on...  If THD retires a group, or pieces, Spectrum can then have those also, and even offer option colors, add back items from that group that were originally developed but not selected from that group by THD, etc, but still, always without the name.  Though Spectrum is trying to diversify away from total dependency on THD, they are no match to what you could do, and I relish the thought of what could happen if we could really spread our wings in that catagory [sic], as we did with the portables.  I have no way of knowing how the current struggle with Spectrum will be resolved, but Ray is able to talk directly to you, so you can have information for your planning purposes.  The above caviot [sic] is the strongest possible scenario that could co-exist as we go forward.  We have give [sic] official notice to cancel the current contract.  The offer to follow the above plan is extended as a replacement if they agree to our requests.  No one wants a legal struggle."

156.   On April 7, 2005, Mac Cooper emailed several recipients at Uttermost about fixed lighting.  AX-43.  He wrote, "I called Ray on the way home today for a clarification on the Fixed Ltg situation.  The situation between Spectrum and Kinder is getting ugly.  Some disappoints on sales (don't know specifics, might be certain items), some returns from HD to Spectrum, no royalty pmts since October, poor communications, no trust, not sharing sales info, etc.  Apparently Ray 'threatened' to turn them over to a collection attorney and Spectrum responded with a lawyer letter stating lack of performance on Kinder's part.  Per Ray, the contract calls for 2 collections per quarter (or 10 to date) and they have submitted 26 collections.  Kinder put Spectrum on notice several wks ago to terminate their contract (1 ½ yrs to go on contract) and offered a very limited contract in return.  The limited contract would not really interfer [sic] with us/kinder on fixed at all except at HD.  Spectrum has 60 days from notice to respond and pay up, or the original contract is terminated.  I asked Ray about the original contract, and he doesn't think even this contract would effect [sic] any lighting we do with Kinder, other than at HD.  Ray also thinks CK is ready to get started with us on fixed, she's just wanting to get this Spectrum situation resolved so it doesn't all get more complicated.  I told Ray that we intend to move in at least one significant new direction for '06, and if this doesn't start moving quickly, we will look at all options.  He was going to relay to Kinder and totally agreed that Utt fixed is their best opportunity.  We'll formally

meet in Hpt on this."

157.    On April 7, 2005, CKI sent a letter to Spectrum demanding royalty payments and giving
        notice of termination of the Design Services Agreement. (stipulated) Tr. 128, 148-49, AX
        19; AX-517.  Carolyn Kinder and Ray Woolson were involved in the decision to send the
        termination letter, and Kinder made the final decision to do so. Tr. 889.  At the time Kinder
        decided to terminate the DSA, she knew Cooper wanted to sell fixed wire lighting to Home
        Depot, and she could make more money selling fixed wire to Home Depot through Uttermost
        than through Spectrum because Uttermost paid a higher royalty.  Kinder depo at 70.

158.    On April 8, 2005, Ray Woolson sent Mike Barnes an email forwarding a letter from Carolyn
        concerning CKI's performance on design deliverables.  AX-537.  He wrote, "CKI is well
        ahead of the minimum design deliverables required by the agreement."  Mike Barnes then
        emailed Pat Kryza and Liz Barnes and others, stating, "All I want to review are 2 families
        (drawings) per quarter as the contract calls for.  I also want at least 1 sample of each drawing
        approved by CKI and Spectrum.  Cathy is working on this and will need your help Pat and
        Liz.  When this is completed then we can determine if CKI is within their contract.  When
        will this be completed?" AX-537.  On April 11, Pat Kryza emailed Mike Barnes, stating that
        she "sent a recap to everyone going back to the first 3 designs."  In addition, she had "just
        found the folder in HK [Hong Kong] with the collections that [Carolyn] gave [her] in
        October."  These additional collections were not on the recap, so Kryza stated she would get
        it to Cathy so that they could "finalize the project."  AX-537.

159.    On April 22, 2005, Ray Woolson emailed Pat Kryza, noting that neither Mike nor Liz Barnes
        had responded to his April 8 email, and asking whether Pat "might have any insight here
        regarding payment and/or our contract."  AX-538.  Kryza forwarded this email to Mike
        Barnes, stating that she had not responded to Ray Woolson because "Cathy is working on the
        project and then you were going through Ed."  She also stated that Carolyn would be back
        in China and that she (Pat) would talk to her.  AX-538.  Mike Barnes forwarded these emails
        to Cathy, stating, "I need an update on this now.  Liz and Pat should be assisting you since
        they are the ones who have been working with CKI.  Have Pat review what auditing that you
        have completed, tomorrow.  Pat, CKI is your responsibility, I instructed Cathy to show me
        all 28 drawings per quarter (2 families) approved in writing by Spectrum as per the contract.
        I also wish to see those samples.  Ray Woolson has stated that CKI is within the contract.
        I ask you Pat, are they?  Please help Cathy complete this report so that we can respond to Ray
        by Tuesday, thanks."  AX-538.  Pat responded that Mike had "all of her documentation and
        when [her] board burned out in [her] computer all of the information that [she] had
        somewhere in the computer [she] just [couldn't] find it."  She also stated that "[a]s for the
        original samples the only ones that I know Carolyn signed off on were the first 3 collections
        and then on the Tropics Cindy Lau and I signed off on the vanities, and the exterior items
        because Carolyn was out of the country."  Kryza continued, "You know that the next three
        collections she only was at the factory 2 or 3 times and Ted, Morgan and I picked the finishes
        and figured out what the design was to look like.  She never signed off on the items.  For the

last meeting in October she was at the factory once and didn't see the samples until one week before they were to ship to HK and wanted to make all kind of changes. I called Liz immediately and we said we were going to ship as is and then the factory could start to work on the second set of samples that they had in the factory and bring over the changes for the meeting which they did. Carolyn didn't even attend that meeting and when we asked her to send us a CD with a presentation for the items that we were showing to THD she sent a CD talking about the new collections that she had just given to us on October 1st not the ones we were presenting to THD." AX-538.

160.    On April 21, 2005, Cooper emailed Kinder. AX-55. He wrote, "Fixed wire. Sales force, showrooms, warehouse, and management will be ready for a blockbuster January introduction in Dallas, LV, and Atl. We're expanding showrooms as quickly as possible, including Hpt. We hope to carry our portable success story over to fixed wire using great products at better prices than lighting stores pay now, better sales and marketing materials, and strong shipping performance." Kinder responded, "We are looking forward to the launch."

161.    On April 26, 2005 Spectrum sent a letter to CKI stating it rejected CKI's termination of the DSA. (stipulated) AX-20; AX-257. In the letter, Mike Barnes stated that "CKI has not submitted any Design Documentation since September 1, 2004, putting [CKI] in default ... for at least the last two full quarters." Furthermore, "CKI has not supplied the required drawings for each of the 14 family members for most of the designs submitted." Finally, "Spectrum has had to work out finishes without the assistance of CKI, CKI has not properly coordinated with our CAD department and, it has been pointed out to us that, some of the designs you have submitted are older CKI designs rather than the new and original designs that the contract, and our customer, assumes." Barnes then reminded Kinder of the contract's confidentiality clause and accused her of communicating "untoward information" about Spectrum to The Home Depot. Barnes promised to pay Kinder, and asked Kinder to supply the Design Documentation for the past two quarters and the present quarter as soon as possible.

162.    On May 11, 2005, Kryza emailed Kim Barnes that they were "trying to arrange a conference call with Carolyn and Ray." AX-517. Ray then emailed Carolyn and Kim Barnes, "Hmmm....I still don't see any mention of the money??? Spectrum is now over six months past due. Carolyn, after we get the numbers, let's talk before the call. Given how Michael Barnes has acted throughout this whole thing, it would likely be a major benefit to let the contract lapse and sell HD through Mac." AX-517.

163.    On May 13, 2005, Spectrum sent a letter to CKI offering to pay the past due royalty amounts under certain conditions. (stipulated) Mike Barnes stated that CKI owed Spectrum eight design families through the current quarter, and offered to pay 1/8 of the commissions due in exchange for each new design family submitted. AX-21. Kinder testified that she "wasn't interested in doing that" because she "wanted to have a clean, proper relationship or not have

a relationship." Tr. 891. CKI did not accept the conditions set forth in Spectrum's May 13, 2005 letter and Spectrum did not pay the accrued royalty amounts to CKI prior to June 6, 2005. (stipulated)

164.   Kinder testified that Uttermost played no role in her decision to terminate the Spectrum contract, and that it would have been physically possible and "great" for her company to do design work for both Spectrum and Uttermost at the same time. Tr. 891. The Court finds this testimony to be credible. Although the possibility of designing fixed wire for Uttermost was attractive to Kinder and likely played some role in her decision, the Court finds that Uttermost played no active or direct role in influencing Kinder's decision to terminate the Spectrum contract. Rather, CKI decided to terminate the contract due to conflicts between Spectrum and CKI and Spectrum's failure to pay royalties.

165.   On May 26 and 27, 2005, Cooper and Woolson exchanged emails regarding payment of CKI's China office fees. AX-53. During the exchange, Woolson wrote, "The China office support from CKI will likely be higher as we start this new category [fixed wire lighting]. Also, CKI is trying to clear the decks with two other clients to really dedicate itself to doing fixed lighting with you." Cooper responded, "Ray, don't answer if you don't want to, but your email made me wonder... You mention 'clear the deck with two clients', is this Spectrum and Magnussen?" Woolson answered, "Spectrum and Seagull Lighting both are fixed lighting clients of Carolyn's."

166.   June 6, 2005 was 60 days from the date of CKI's April 7, 2005 notice to Spectrum of termination for nonpayment of royalty amounts. (stipulated) The contract terminated on June 6, 2005. Tr. 149. Carolyn Kinder testified that Uttermost had no involvement during the 60-day cure period in her decision to continue with termination of the contract. Tr. 894. However, Uttermost and CKI did discuss going forward with fixed wire during the 60-day cure period of the DSA.

167.   Spectrum did not pay the accrued royalty amounts to CKI prior to June 6, 2005. (stipulated)

168.   Spectrum has not paid the accrued royalty amounts to CKI for the period of October 2004 through the date of trial. (stipulated) Tr. 128

169.   Spectrum never sent notice of contract termination to CKI for the Design Services Agreement. (stipulated)

170.   Spectrum did not terminate the Design Services Agreement with CKI. (stipulated)

171.   On June 10, 2005, Cooper wrote Scutaro that "Jeff Lee of Home Depot is no longer in the HD Ltg business per Greg St. John. This is great for us, Jeff wasn't on our side and he has his 'buddy's' [sic] that he likes to give his business to. Greg will probably be taking over FW at HD." AX-57.

172.  CKI began working on fixed wire lighting design for Uttermost in later summer 2005.  Tr. 895.  On June 22, 2005 Uttermost met with Carolyn Kinder, Inc. to discuss designing fixed wire lighting products.  (stipulated)

173.  On June 24, 2005, Scutaro emailed Cooper about the meeting.  AX-70.  She wrote, "All in all I am worried about product, I don't think that just taking things that Home Depot and Spectrum passed on will give us a great line and some of what she showed me was exactly that.  I think I gave her a lot of design direction during the walk and I know she did absorb that.  My biggest fear came when Carolyn said that we would not see product in August.  This was not what we agreed to in High Point and the thought of not seeing product before it comes into the US terrifies me.  So Yes I think a trip to China in September is in order.  While I think Carolyn is talented, FW is a different animal and I need to know that she can design it and deliver it and I need to see it."

174.  On July 26, 2005, Spectrum filed suit against CKI in District Court, Bexar County, Texas for breach of the DSA.  (stipulated)[14]  The contract attached to Plaintiff's original petition was the same as the one signed by Voth on December 2, 2003, and included the complete language of Paragraph 6, although some of the commission numbers in paragraph 3 had been blocked out for confidentiality purposes.  In addition, Plaintiff's original petition stated that the contract was finalized and signed in early December 2003.

175.  On September 20, 2005, Scutaro emailed Cooper about Kinder and Spectrum.  AX-49.  Scutaro wrote, "Just wanted to fill you in on a conversation I had with Carolyn last night.  I called her to tell her that I would be sending her my spreadsheets, etc.  In any event we began talking about the sales effort and our plans.  When I told her that I would like to speak to Brad at Expo and preview the line to him she got a little nervous.  She told me to be careful about mentioning who designed the product to Expo and THD because of the problems with Spectrum.  I told her that if there was specific language that I needed to avoid that she needed to have her lawyers explain this to us carefully and soon.  She said she would have Cynthia contact us.  Carolyn basically said she does not want it getting back to Spectrum, at this time, that she is designing FW for us.  This made me a little nervous, once we tell the sales force next month, the word will be 'out' - I don't want to run into any legal issues with Spectrum.  Is there anything we can do to find out where they and we stand on this issue or should I just email CKI and remind her to have Cynthia call us ASAP?"  Cooper responded, "We probably should remind her to have Cynthia call us as a starting point.  You're right, Spectrum will know about this effort as soon as we tell our sales force, so it won't be a secret to Spectrum much longer.  If I need to, I can call Ray and get his opinion.  Want to give Cynthia a few days to get back to us, and if she doesn't, I'll call Ray Thursday."

176.  On September 21, 2005, Cooper emailed Ray Woolson to follow-up.  He wrote, "As you

---

[14]CKI had previously filed suit against Spectrum in Florida, but that suit was dismissed because the contract contained a Texas forum selection clause.  Tr. 429.

know, we are going into the Fixed Wire business in a very significant way. Once we announce this to reps in a month or so, everyone will quickly know what we are doing and who is doing the design work. Home Depot and Spectrum will also know within a month or two. Maria was telling Carolyn that she wanted to present this to Home Depot Expo before our introduction, maybe in November or so. Carolyn immediately became concerned and indicated that we might shouldn't tell Expo about this due to her situation with Spectrum/Home Depot. My concern is that Spectrum and HD will know soon, whether we tell them or not. Do you think we have anything to worry about as far as the Kinder/Spectrum relationship? I typically wouldn't worry much about this, but because the publicity and investment will be so big on our part, I don't want to take a chance on an embararassement [sic]. Do we have any significant risk here? Does Spectrum have any grounds to fight this new Uttermost/Kinder FW relationship? Or is the concern only related to sales to a Home Depot company? Sorry to bother you with this, but I'm guessing you can give the best opinion here. Please direct me to someone else if appropriate." Woolson responded, "Hi Mac, Hmmm... It is an open issue that remains to be seen. Even though we terminated the Spectrum design agreement (formally) way back in April, Spectrum will likely try to block us on HD sales. They are trying to assert that the agreement is still in place (no way in my opinion and I don't see how we could lose that one). Knowing Michael Barnes, he will try to put up an even bigger stink and try to block others. I don't think he can block us from other stores even if the contract is deemed valid, but that is my opinion from reading the document. Cynthia Lopez Beverage, an attorney, is handling the whole thing for Carolyn. You should probably address your questions below to her for her legal opinion on the matter...."

177.    On September 21, 2005, Cooper emailed Kinder. AX-58; AX-252. He wrote, "We're having planning meeting regarding our Expo business for '06 tomorrow, in preparation for our annual planning meeting in Atlanta in a few wks. You had mentioned to Maria some concerns related to us selling lighting to Expo. What are you thinking as far as us selling your FW designs to Expo. Brad, the Expo Lighting Global Merchant is our good friend, and it should be pretty easy to sell him." Kinder responded on September 23, stating, "Can't remember what was said to Maria....sigh. The relationship with Spectrum has deteriorated since Ray and I canceled our contract with them. They are trying to damage us, as if they were somehow informed of your launch and my connection with it. they may think of a way to blemish something because of the relationship they too have with Expo.... I don't remember mentioning this to Maria though. I hope you are able to sell to them. I don't think I know Brad, but I do know Greg St. John.... Certainly they are a prestigious account... good luck!" Cooper stated, "Maria just said that she mentioned showing the Lighting to Brad (Expo Lighting buyer) before our January introduction, and she thought you seemed concerned since they are a Home Depot company. If you don't see any problem with this, we'll proceed with this and tell Brad about this later in October in November, so he'll be ready to buy in the Spring. As far as showing Greg (Home Depot), not sure when we should show this to him, but we'll make sure he sees it by Dallas anyway. Again, just let us know if we should be concerned about Spectrum." Kinder responded on September 24, stating "I

don't know if there is any thing that Spectrum can do that would impact this customer.  At one time there was a strong personal relationship between Jeff Lee and Michael Barnes, but Jeff's change of roles, and just the actuality of the past product performance will be a more valid floor for this next exposure of the product."  Cooper responded on September 25, stating, "The first preview to Expo and a few other key accounts would be to get their first thoughts, hopefully to get them to 'buy into the program' early, and to show them the respect of a first look.  Yes, we'll keep you updated when this happens.  Most likely, Maria will present to Brad of Expo, along with Jim Kelley.  Not sure about presenting to Greg St. John.  Our preference at retailers like Home Depot and Costco would be to do exclusive product for them, and not take our in-line items."  Cooper then asked if all samples would be completed, to which Kinder replied, "All fw first samples should be complete and in photography."

178.   In October 2005, Uttermost first discussed their CKI-designed fixed lighting with Brad Wiesner of Home Depot Expo.

179.   On November 4, 2005, Cooper emailed Scutaro regarding the conflicts between Scutaro and Kinder in developing fixed wire lighting.  AX-46.  Cooper acknowledged that Kinder was not as familiar with fixed lighting as with portables, but stated that he and Scutaro had been too involved in the design details and suggested that they give Kinder more leeway in the development, but retain the final say on whether designs were accepted.  Scutaro responded that Kinder did not know enough about fixed lighting and was too dependent on the factories.  Cooper stated that one reason he had been successful working with Kinder was that he knew how to work with her better than other companies did.

180.   On December 22, 2005, Uttermost sent a message to Carolyn Kinder to discuss the issue of selling fixed wire products to Home Depot in light of the CKI/Spectrum contract. (stipulated) PX-145.  Cooper informed CKI personnel that Brad Wiesner from Expo was interested in ordering some pieces, but stated, "Big Concern however.   Someone (Spectrum???) told Brad two weeks ago that he (and HD) can't buy Kinder FW from anyone other than Spectrum.  Brad is going to ask his legal team, but we need to get back to Brad on this as soon as we can as he is ready to move on adding the new FW."  PX-145.  Cynthia Beverage, CKI's attorney, emailed Cooper to tell him that Spectrum was "grasping at straws."  She stated that she "would like to show you and Home Depot's legal team the language in the agreement CKI terminated on which Spectrum is basing this weak claim." PX-145.  On December 23, 2005, CKI (Cynthia Beverage) emailed Mac Cooper a copy of the DSA with the royalty amounts blacked out.  Tr. 1118; PX-146.  She also informed Cooper about the Spectrum/CKI claims and they discussed "cutting Spectrum off on their Kinder designs.".  PX-145; PX-146.  On December 23, 2005, Scutaro emailed Cooper stating, "I don't think it is a good idea for anyone other than you or me to call Brad about this.  From what I am understanding of Cynthia's email Kinder believes they have a clear cut case, but Spectrum is still fighting it and they are still in court."  PX-149.

181.    Expo buyers were shown CKI-designed fixed wire in December 2005.  Tr. 1055.

182.    On January 6, 2006, Scutaro emailed Cooper that Brad Wiesner liked the samples and wanted to order.  PX-147.  Cooper responded that "[t]his is great news.  I hope this means that they aren't worried about Spectrum.  I'm not worried about potential liability to HD or Uttermost, but am worried that Expo might would delay.  If Brad doesn't bring this up again, it's okay with me to not bring up unless we learn something new."  Scutaro responded, "Brad did not mention Spectrum and I am happy to stay quiet.  Knowing Brad he checked it out with his legal people and they think it is OK."  PX-147.  On January 7, 2006, Cooper emailed Scutaro that "Cynthia has been talking to the HD legal team and has probably explained their situation to HD.  This might have relieved some concerns.  Kinder is going to serve notice to Spectrum to withdrawal [sic] all Kinder designs from Spectrum, and is hoping Greg St. John will move the current Spectrum/Kinder purchasing to Utt (confidential)."  PX-147.

183.    In January 2006, Uttermost agreed to retroactively increase the China office fees paid to Kinder by $10,000 per month for 2005 (for a total of $120,000) "[b]ecause of the large effort made to introduce Uttermost into the fixed wire business."  AX-230; Tr. 1071.  Uttermost also agreed to increase the office fees to $15,000 per month for the first six months of 2006.

184.    On January 12, 2006, Maria Scutaro emailed Brad Weisner of Home Depot Expo to discuss Uttermost fixed wire.  AX-313.  Uttermost has sold fixed wire to Expo, but not to Home Depot.  Tr. 1029.  Cooper testified that Uttermost had not tried to sell fixed wire to Home Depot.  Tr. 1031.  Uttermost has sold Kinder-designed lamps to both Home Depot and Expo.  Tr. 1031.  Cooper testified that Uttermost had not offered to sell a fixed wire product to any Home Depot company before he understood that the Spectrum/CKI DSA was terminated.  Tr. 1031.

185.    Kinder testified that she did have a role (i.e., "was instrumental") in helping Uttermost get into fixed-wire sales with Home Depot entities.  Tr. 943, 946.  She stated that she had experience with Home Depot and they were familiar with her design reputation.  Tr. 943-44.

186.    On March 9, 2006, Spectrum filed an Amended Complaint and added Uttermost as a defendant.  *See* docket no. 77.  Though the Amended Complaint continued to assert that the Design and Services Agreement was finally signed on December 2, 2003, the copy of the Agreement attached to the Amended Complaint was the one with Michael Barnes's signature and his alterations to paragraph 6.  Michael Barnes and Pat Kryza took the position in their depositions that the document with the handwritten change was the operative agreement between the parties.  M. Barnes depo at 23.

187.    On March 14, 2006, Kinder emailed Cooper.  AX-64.  She stated, "I also want to let you know how sorry I am that this lawsuit is now laying [sic] at your doorstep too.  I just hate it. I know that Ray is passing to you all that we are feeling, doing, fighting, preparing, etc., to get this crazyness [sic] to stop.  Although this too will pass, I will apologize forever, we were

so unlucky that we were paired this way with Spectrum by such a well intended Jeff Lee."

188.   On May 1, 2006, Carolyn Kinder sent a letter to Mike Barnes regarding a possible meeting in San Antonio to resolve the dispute.  AX 293.  In that letter, Kinder wrote, "As we have previously notified you, any and all licenses previously extended to Spectrum with respect to any of CKI's designs have been cancelled and terminated.  This termination includes any and all licenses to sell products that incorporate any and all of CKI's designs.  Moreover, we also notified you that CKI does not agree to any extension of any license to Spectrum under Section 10 of the referenced agreement or otherwise."  She further noted that, "the termination of Spectrum's license will directly impact third parties, including The Home Depot, which are currently selling products based on CKI's designs.  This includes taking action on some items such as the San Marino, Sedona, and Tropics fans for which Spectrum has never accounted for royalties to CKI and are not even included on the unpaid royalty reports that Spectrum has produced in the lawsuit."  AX 293.  Kinder suggested that the parties meet on May 8 or 9 with their attorneys to see "if there is a possibility of resolving this dispute and reaching an agreement that would include new royalty/license agreement to Spectrum for the products currently being sold."

189.   On May 3, 2006, Kinder wrote Mike and Liz Barnes to cancel settlement talks.  AX460.  She also wrote, "As we have previously notified you, all licenses previously extended to Spectrum with respect to any of CKI's designs have been cancelled and terminated.  This termination includes any and all licenses to sell products that incorporate any and all of CKI's designs."

190.   Between May and July 2006, Spectrum employees and Mike Barnes worked on a plan to select certain Uttermost products and have their designer, Dave Simpson, "reverse-engineer" or alter them and then sell them through Spectrum's lighting showroom.   Tr. 215-23.  Spectrum took some initial steps in this plan (selecting products), but eventually abandoned the plan.

191.   Spectrum continued to sell CKI-designed lighting products to Home Depot after October 2004 and up to the date of trial.  Tr. 322.

192.   On September 1, 2006, Bob Kinder hand delivered to Maria Scutaro a CD of all designs CKI had submitted to Spectrum.  AX-401, AX-440. Scutaro had requested the designs from Bob Kinder.

193.   Spectrum obtained a copyright registration for the West Indies design on October 25, 2006.  AX-99.

194.   During discovery in this case, Spectrum posed Interrogatory No. 6 to CKI, which asked CKI to "list all Design Documentations you have delivered to Plaintiff and state with respect to each Design the number of items delivered per family and the dates such designs were

64

delivered to Plaintiff." In its Supplemental Response to Interrogatory No. 6, CKI listed twenty nine families which CKI alleges were submitted to Spectrum under the Agreement. For each collection, CKI listed, by Bates Number, every design CKI allegedly gave Spectrum. (stipulated) *See* AX-24. Kryza testified that she/Spectrum did not receive many of the designs listed by CKI in its response. PX-1220. The Court finds Kryza's testimony to be credible and that Spectrum did not receive the designs indicated by Kryza (and also by Anders).

195. Home Depot was under no contractual obligation to purchase any products from Spectrum. (stipulated) If Home Depot decided to select a particular design family, Home Depot was under no contractual obligation to purchase any particular items included with that specific design family from Spectrum. (stipulated) If Home Depot decided to purchase any particular items included with a specific design family from Spectrum, Home Depot was under no contractual obligation to purchase any amount or quantity of those particular items included with that specific design family from Spectrum. (stipulated)

196. With respect to CKI lighting designs accepted by Home Depot, Home Depot selected different products or items from each CKI design family that it ultimately approved. (stipulated)

197. Decorative lighting products are offered in a market that is subject to changing market conditions. (stipulated)

198. When Home Depot Expo buyers purchased lighting fixtures from Uttermost in 2006, the buyers did not consider any relationship between Kinder and Spectrum and were not aware of the DSA. Brad Wiesner depo. at 29-30. The buyers were aware that Carolyn Kinder had designed the lighting fixtures for Uttermost that were purchased. Wiesner depo at 31. Wiesner asked Uttermost whether there were "any issues" with Expo purchasing fixtures from Uttermost," and Uttermost said, "no." Wiesner depo at 31. Wiesner did not deal with CKI or Kinder in making the purchases, only with Uttermost. Wiesner depo at 31.

### III. CONCLUSIONS OF LAW & ANALYSIS

## A. CHOICE OF LAW

1. The Agreement contains a Florida choice-of-law provision that states, "All matters arising under or affecting the interpretation, form, validity, and performance of this Agreement shall be decided under the laws of the State of Florida, not including those provisions related to conflict of laws, with venue for any dispute located exclusively in the courts located in Bexar County, Texas." This provision is prima facie valid and enforceable unless shown to be unreasonable, and will be enforced as long as the law chosen by the parties has a reasonable relationship with the parties and the chosen state, and is not contrary to a fundamental policy of Texas. *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995). If the

choice-of-law provision does not address the entirety of the parties' relationship, the Court must return to Texas choice-of-law rules to determine what law applies. However, the Court concludes that the choice-of-law provision dictates that Florida law be applied to all contract and tort claims between Spectrum and CKI because it broadly governs "all matters arising under or affecting the ... performance of this Agreement." *See Composiflex, Inc. v. Advanced Cardiovascular Sys., Inc.*, 795 F. Supp. 151, 157 (W.D. Pa. 1992); *Sylvax v. Unique Paving Materials Corp.*, No. 90 Civ. 4680, 1991 WL 183354 (S.D.N.Y. Sept. 11, 1991); *see also Caton v. Leach Corp.*, 896 F.2d 939, 943 & n.3 (5th Cir. 1990) (comparing narrow and broad choice of law clauses).[15]

2.   Although the parties dispute the validity of the written contract, no party challenges the validity of the choice-of-law provision, assuming the contract to be valid. Therefore, Florida law governs "all matters arising under or affecting the interpretation, form, validity, and performance of [the] Agreement." Although the choice-of-law provision states that all matters affecting the validity of the Agreement be decided under Florida law, it would seem to put the cart before the horse to utilize the Agreement's choice-of-law provision to determine whether there was even a contract. *See Computer Sales Int'l v. Lycos, Inc.*, 2005 WL 3307507 (D. Mass. 2005) ("Particularly where a claim 'concerns the validity of the *formation* of the contract, it cannot be categorized as one involving the rights or obligations under the contract,' and therefore is not subject to the contract's choice-of-law provision."). However, the Court need not decide whether Texas or Florida law governs the issue of whether a contract was formed because the result under either state's law would be the same.

3.   The choice-of-law provision in the DSA does not apply to the claims between Spectrum and Uttermost. This case was originally removed on the basis of diversity jurisdiction. In a diversity action, the Court must apply Texas choice-of-law rules to determine which law applies to the tort claims. *Caton v. Leach Corp.*, 896 F.2d 939, 942 (5th Cir. 1990). Under Texas law, except for those contract cases in which the parties have agreed to a valid choice-of-law clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue. *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1413 (5th Cir. 1995). Spectrum sued Uttermost on the basis of federal question jurisdiction under the Copyright Act and the Court has supplemental jurisdiction over the tort claims. A court exercising jurisdiction supplemental to its federal question jurisdiction applies the choice-of-law rules of the forum state. *In re Combustion, Inc.*, 960 F. Supp. 1056, 1059 (W.D. La.1997). Accordingly, regardless of the basis of the Court's jurisdiction, the Court must apply Texas's choice-of-law rules to determine which state's law applies to the state-law claims between Spectrum and Uttermost in this case.

---

[15]The Court notes that it applied Texas law to Spectrum's motion for partial summary judgment on CKI's tort claims. The parties' briefing utilized only Texas law, *see* docket numbers 253, 261, 263, and the Court had not yet construed the choice-of-law clause in the DSA. However, the Court would have reached the same result under Florida law, so the use of Texas law was not material or prejudicial.

4.    Texas applies the "most significant relationship" test of section 145 of the Restatement to choice-of-law issues in tort claims. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979). Section 145 states: "(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6. (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include; (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. RESTATEMENT (SECOND) OF CONFLICTS § 145. The Court must evaluate these contacts according to their relative importance with respect to the particular issue. *Id.* Under the most-significant-relationship test, the Court concludes that Texas law should apply to the tort claims asserted between Spectrum against Uttermost.

## B. EXISTENCE OF A WRITTEN CONTRACT

1.    "Mutual assent is an absolute condition precedent to the formation of a contract. Absent mutual assent, neither the contract nor any of its provisions come into existence." *David v. Richman*, 568 So.2d 922, 924 (Fla. 1990). "A subsequent difference as to the construction of the contract does not affect the validity of the contract or indicate the minds of the parties did not meet with respect thereto." *Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.*, 302 So.2d 404, 408 (Fla. 1974); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 20 cmt. b ("Almost never are all the connotations of a bargain exactly identical for both parties; it is enough that there is a core of common meaning sufficient to determine their performances with reasonable certainty or to give a reasonably certain basis for an appropriate legal remedy. But material differences of meaning are a standard cause of contract disputes, and the decision of such disputes necessarily requires interpretation of the language and other conduct of the parties in light of the circumstances.").

2.    An objective test is used to determine whether a contract is enforceable. *King v. Bray*, 867 So.2d 1224, 1227 (Fla. Dist. Ct. App. 2004). "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs – not on the parties having meant the same thing but on their having said the same thing." *Blackhawk*, 302 So.2d at 407; *In re Hudgins*, 188 B.R. 938, 942 (E.D. Tex. Bankr. 1995) ("The determination of whether there was a meeting of the minds must be based on objective standards of what the parties said and did and not on their alleged subjective states of mind.").

3.    "Generally, it is enough that the party against whom the contract is sought to be enforced signs it." *Dodge of Winter Park, Inc. v. Morley*, 756 So.2d 1085, 1085 (Fla. Dist. Ct. App. 2000). "Except where a signed contract is required by statute, or where the parties intend that the contract shall not be binding until it is signed, parties may become bound by contract even though they do not sign it." *James Register Constr. Co. v. Bobby Hancock Acoustics,*

*Inc.*, 535 So.2d 339, 340 (Fla. Dist. Ct. App. 1988). "The absence of a signature on a contract does not necessarily destroy its validity." *ABB Kraftwerke AG v. Brownsville Barge & Crane*, 115 S.W.3d 287, 29 (Tex. App.–Corpus Christi 2003, pet. denied). "As long as the parties give their consent to the terms of the contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract, signatures are not a required factor in the making of a valid contract." *Id.*; *see also Alcoa v. Hydrochem Industrial Servs., Inc.*, No. 13-02-00531-CV, 2005 WL 608232 (Tex. App.–Corpus Christi 2005, pet. denied). The question of whether a written contract must be signed to be binding is a question of the parties' intent. *In re Bunzl*, 155 S.W.3d 202, 209 (Tex. App.–El Paso 2004, orig. proceeding); *see also Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 410 (5th Cir. 1996). "An unsigned agreement all the terms of which are embodied in a writing, unconditionally assented to by both parties, is a written contract." *Simmons & Simmons Constr. Co. v. Rea*, 286 S.W.2d 415, 418 (Tex. 1955).

4.    The manifestation of mutual assent leading to the formation of a contract ordinarily takes the form of an offer by one party followed by an acceptance by the other party. RESTATEMENT (SECOND) OF CONTRACTS § 22(1). Spectrum's act of sending the "final" version of the contract for CKI's signature may be construed as an offer, which CKI accepted by signing the document and returning it to Spectrum. It is undisputed that Voth had authority to sign the DSA and bind CKI. Accordingly, under this view, the parties entered into a binding written contract on December 2, 2003.

5.    Alternatively, CKI's signing of the DSA and returning it to Spectrum was an offer, and Spectrum accepted the offer via its conduct and objective manifestations of assent rather than by signing, and Spectrum's signature was not a condition precedent to the formation of a valid contract. *See Hearthsire Braeswood Plaza L.P. v. Bill Kelly Co.*, 849 S.W.2d 380, 392 (Tex. App.–Houston [14th Dist.] 1993, writ denid) ("If one party signs, the other may accept by his acts, conduct or acquiescence in the terms of the contract."). Under this view, the parties entered into a binding written contract on December 2, 2003.

6.    Alternatively, the parties negotiated over a long period of time and intended the final result of the negotiation to be embodied in a written contract. Though the parties contemplated a writing, they did not intend that Spectrum's signature was a condition precedent to the formation of a binding contract. CKI never stated or manifested an intent not to be bound until Spectrum signed the contract. *Skinner v. Haugseth*, 426 So.2d 1127, 1131 (Fla. Dist. Ct. App. 1983) ("[A] contract not signed by all of the parties, but otherwise valid, may be upheld against a signing party, unless the nature or the wording of the contract indicates that his signature was conditioned upon all other parties signing the contract, or he can prove by parol evidence that when he signed the contract he made it known to the other parties who now seek to sustain the contract that he only intended to be bound if all parties had signed it."); *see also See Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1304 n.12 (11th Cir. 2007) (applying *Skinner v. Haugseth* in copyright contract action); *Hunter v. Tartan Constr. Co.*, 522 So.2d 77 (Fla. Dist. Ct. App. 1988) (following the rule of *Skinner v. Haugseth* to

affirm trial court's finding that guaranty was not conditioned upon all parties' signatures); C.J.S. Contracts § 75 ("It should be assumed that all parties who signed an agreement are bound by it unless it affirmatively appears that they did not intend to be bound unless the others also signed."). Although there was a signature block for both Spectrum and CKI, and Williams testified that he thought Barnes would sign the agreement, the Court may look to all the circumstances to determine the parties' intent. *See Ampex Credit Corp. v. Bateman*, 554 F.2d 750, 752 (5th Cir. 1977) ("While blank [signature] spaces in the text of a contract may be read to manifest an intent to require such a precondition, they do not preclude the [fact finder] from looking to the circumstances surrounding the execution of the contract to ascertain the mutual intent of the parties."). Looking to all the circumstances, the Court concludes that the parties did not view Spectrum's signature as a condition precedent to the formation of a binding contract. There is some evidence that Spectrum viewed CKI's signature as a condition precedent to the formation of a binding contract, but there is no persuasive evidence that CKI viewed Spectrum's signature as a condition precedent. The fact that Williams, an employee of Spectrum, thought Barnes would sign the agreement does not make Barnes's signature a condition precedent or preclude Spectrum from accepting/manifesting its assent in other ways.

7.   Both parties objectively manifested their intent to be bound by the contract that was sent by Spectrum and signed by Voth on December 2, 2003. CKI manifested its assent and accepted the contract by signing the contract on December 2, 2003. Spectrum manifested its assent by so indicating to CKI via Williams's email, authorized by Barnes, that Spectrum agreed to all terms therein, publicizing the fact that CKI had signed the agreement both in-house and to Home Depot, representing to CKI and Home Depot that an agreement was in effect, and performing under the contract. *See H.W. Gay Enterprises, Inc. v. John Hall Electrical Contracting*, 792 So.2d 580, 581 (Fla. Dist. Ct. App. 2001) (noting that the parties' assent to the term of a written contract signed only by one party was established by their words and conduct, and "[t]he evidence of such a course of dealing supports the trial court's finding that the parties 'agreed to be bound to the written but unsigned agreement'").

8.   After December 2, 2003, both parties acknowledged that a contract was in place and performed under the contract. The fact that CKI proceeded to act as though a contract was in place and began to fulfill its obligations under the contract even though it had not received a copy of the contract signed by Spectrum further supports the conclusion that CKI did not view Spectrum's signature as a condition precedent to the formation of a binding contract. *See Sosa v. Shearform Mfg.*, 784 So. 2d 609, 610 (Fla. Dist. Ct. App. 2001) ("Even if parties do not sign a contract, they may be bound by the provisions of the contract, if the evidence supports that they acted as if the provisions of the contract were in force."); *see also Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So.2d 500, 503 (Fla. Dist. Ct. App. 2003) ("A contract is binding, despite the fact that one party did not sign the contract, where both parties have performed under the contract."); *James Register Constr. Co. v. Bobby Hancock Acoustics, Inc.*, 535 So.2d 339, 340 (Fla. Dist. Ct. App. 1988) (finding a contract where the parties acted as if the unsigned contract was in force); *cf. Wetzel v. Sullivan, King & Sabom,*

*P.C.*, 745 S.W.2d 78 (Tex. App.–Houston [1st. Dist.] 1988, no writ) ("Ratification occurs when a party recognizes the validity of a contract by acting under it, performing under it, and affirmatively acknowledging it."). CKI never took the position that the December 2, 2003 contract it signed was not binding until this litigation ensued.

9.      The Court rejects CKI's position that there was no meeting of the minds because Barnes altered the Agreement and then signed it some time after March 2004, and thus the parties never agreed to the same contract. The parties created a binding written contract on December 2, 2003 by their objective manifestations of assent. Any subjective reservations on the part of Michael Barnes at that time did not alter that fact. *See Gendzier v. Bielecki*, 97 So. 2d 604, 609 (Fla. 1957) ("[E]vidence of the unilateral secret intent of a party to a written instrument is in and of itself immaterial to the actual creation of a contract."). Further, any secret actions taken by Michael Barnes after March 2004 to alter the contract were simply ineffective, and are not evidence that Michael Barnes did not objectively manifest his assent to the terms of the contract presented on December 2. Although Barnes may have wished that the altered contract governed the parties' relationship, CKI is incorrect to assert that Spectrum has only asserted that the altered contract governed their relationship, given that Spectrum attached the un-altered version of the contract to its original petition. And even if Spectrum had consistently asserted only that the altered version governed after Barnes altered the contract, that position would not somehow un-do the contract that was formed by a mutual manifestation of assent on December 2, 2003.

10.     Although CKI is correct that the alteration by Barnes of a material aspect of the agreement could have been a rejection of the offer and a counteroffer, *see Racing Properties, L.P. v. Baldwin*, 885 So. 2d 881, 883 (Fla. Dist. Ct. App. 2004), that rule is inapplicable where, as here, a binding contract was made, and then one party attempted to unilaterally alter the document months later. Such an alteration does not then reject or "undo" the contract, but is merely ineffective.

11.     Texas's statute of frauds provides that an agreement is not enforceable unless in writing and "signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him." TEX. BUS. & COM. CODE § 26.01. Florida's statute of frauds provides that "[n]o action shall be brought ... upon any agreement that is not to be performed within the space of 1 year from the making thereof ...unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged therewith or by some other person by her or him thereunto lawfully authorized." FLA. STAT. ANN. § 725.01. Under Florida law, the statute of frauds is satisfied if the party to be charged signed the contract. *White v. Syfrett*, 955 So.2d 1110, 1114 (Fla. Dist. Ct. App. 2006); *Rohlfing v. Tomorrow Realty & Auction Co., Inc.*, 528 So.2d 463, 465 (Fla. Dist. Ct. App. 1988). Under Texas law, the statute of frauds is satisfied if the "person to be charged" or someone lawfully authorized to sign for him or her has signed the document. In this case, it is undisputed that Voth was authorized to sign on behalf of CKI. Thus, while the fact that the statute of frauds applies to this contract

suggests that the parties may have intended that both parties sign the agreement in order to be able to enforce it at a later date if necessary, it is not conclusive evidence that the parties intended both parties' signatures to be a condition precedent to the formation of a binding contract. Looking to all the circumstances, the Court maintains its conclusion that Spectrum's signature was not a condition precedent to the formation of a binding contract.

12.    Similarly, CKI argues that the parties must have intended both parties' signature to be a condition precedent because Spectrum desired an exclusive license, which must be in writing and signed by the licensor. However, Section 204(a) of the Copyright Act requires only that the transfer of ownership be in writing and signed by the owner of the rights: "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). "[S]ection 204(a) does not expressly require that the transferee of the copyright interest sign the instrument of conveyance ..." *Johnson v. Tuff-N-Rumble Management, Inc.*, No. Civ. A. 99-1374, 2000 WL 1145748 at *7 (E.D. La. Aug. 14, 2000). Thus, the Copyright Act's requirement of a signed writing is evidence that Spectrum may have wanted CKI's signature on a writing, but is not evidence that CKI required Spectrum's signature as a condition precedent to the formation of a binding contract.

13.    Under both Texas and Florida law, the Court concludes that the contract signed by David Voth on December 2, 2003 (AX-59) is a binding written contract effective December 2, 2003.

14.    CKI's request for a declaratory judgment that no written contract is in effect between Spectrum and CKI is denied. CKI's alternative request for a declaratory judgment that, if there is a written contract between CKI and Spectrum, it is the December 2, 2003 version signed by David Voth, is granted.

## C. SCOPE OF CONTRACT – 2003 DESIGNS

1.    The parties dispute whether the DSA covers designs submitted before December 2, 2003. CKI requests a declaratory judgment that the first ten sets of designs, which were all initially submitted to Spectrum before December 2, 2003, are not covered by the DSA. The Court concludes that the DSA was intended to, and does, cover all design collections submitted by CKI to Spectrum during the course of their relationship. Accordingly, the Court denies CKI's request for a declaratory judgment that the first ten sets of designs are not governed by the DSA.

2.    As noted in the fact findings, when contract negotiations were not going well and it appeared that a final agreement governing the parties' entire relationship might not be reached, the parties discussed having a separate agreement for at least the first three collections.

However, a final comprehensive agreement was reached, rendering the need for a separate agreement that covered the initial collections unnecessary.

3.    Pat Kryza testified that the 2003 designs were intended to be covered by the DSA.  Tr. 137. The Court finds this to be credible and supported by the language of the DSA and the evidence submitted at trial.  The "Deliverables" section provides that "CKI shall initially provide Design Documentations, including finishes for at least two (2) families of products. Thereafter, CKI shall provide such documentation for designs that are candidates to be Designs as reasonably ... requested ....").  The reference to the "initial" production includes all designs submitted before the December 2, 2003 effective date of the contract, and the "thereafter" production clause refers to designs produced quarterly beginning in the first quarter of 2004.  CKI intended that the designs submitted in 2003 would be governed by the DSA.  *See* AX-430 (Toups asserts that all ten design collections submitted in 2003 satisfy the contract); AX-15 (CKI's assertion that the first ten collections submitted satisfy deliverables through 2004); AX-517 (Kinder letter stating that the total of eighteen collections "far exceeds the total ten (10) required by the contract (two at the outset and 2 per quarter starting in the first quarter of 2004)).

4.    Uttermost points out that even early versions of the draft agreement contained the same language regarding initial production, and yet the parties discussed a separate agreement to cover the first three collections.  Uttermost argues that this evidence means that the DSA was not viewed by the parties as covering, nor was it intended to cover, the first three collections. The Court disagrees.  As noted above, the Court concludes that the parties intended the DSA to be comprehensive and to cover all designs submitted by CKI to Spectrum.  When it appeared that they might never reach an agreement on the DSA, they contemplated (or at least CKI proposed) a separate agreement to cover the first three collections, which were already in the production process.  However, when the parties were able to reach agreement on the comprehensive DSA, no separate agreement was needed regarding the first three collections, and thus none was ever made.  Similarly, the Court rejects the argument that the DSA covered only designs submitted after December 2, 2003, and that some separate oral agreement covered the other designs.  Rather, the DSA itself is comprehensive and covers all designs submitted by CKI to Spectrum.

## D. TERMINATION OF DSA

1.    CKI's failure to provide Design Documentation and design assistance was a material breach under the DSA that would have permitted Spectrum to terminate the contract.  DSA § 11. However, Spectrum did not terminate the contract, and instead insisted that CKI perform. Tr. 146, 320.  Spectrum ceased paying royalties while continuing to insist that CKI perform under the contract.  Tr. 147, 321.  Spectrum's failure to pay royalties was therefore an unexcused material breach for which CKI was entitled to terminate the contract under DSA § 11.  CKI terminated the DSA in accordance with its terms.  Accordingly, the contract

terminated on June 6, 2005 and CKI was not obligated to render any performance after that date.

## E. BREACH OF CONTRACT, SPECTRUM VS. CKI

### 1. Contract Construction Principles

1.   Because of the choice-of-law provision in the DSA, Florida law governs the construction of the DSA.  "The polestar guiding the court in the construction of a written contract is the intent of the parties."  *Ockeechobee Landfill, Inc. v. Republic Services of Fla., Ltd.*, 931 So.2d 942, 944-45 (Fla. Dist. Ct. App. 2006); *Bombardier Capital Inc v. Progressive Mktg. Group, Inc.*, 801 So.2d 131, 134 (Fla. Dist. Ct. App. 2001). "In the event that the language of a contract is clear and unambiguous, the court will enforce such contract according to its terms." *Avatar Dev. Corp. v. De Pani Constr., Inc*., 834 So.2d 873, 876 n. 2 (Fla. Dist. Ct. App. 2002). Only where a contract is ambiguous, *i.e.*, it is susceptible to more than one reasonable interpretation, can a court resort to the rules of construction and extrinsic evidence to discern the parties' intent.  *See Miller v. Kase*, 789 So.2d 1095, 1097-98 (Fla. Dist. Ct. App. 2001); *Royal Cont'l Hotels, Inc. v. Broward Vending, Inc*., 404 So.2d 782, 784 (Fla. Dist. Ct. App. 1981).

2.   When the terms of a contract are ambiguous and susceptible to different interpretations, parol evidence is admissible to "explain, clarify, or elucidate" the ambiguous term.  *Castillo v. State Farm Florida Ins. Co.*, __ So.2d. ___, 2007 WL 3005974 (Fla. Dist. Ct. App. 2007). Whether an ambiguity exists in a contract is a question of law.  *Torwest, inc. v. Killilea*, 942 So.2d 1019, 1020 (Fla. Dist. Ct. App. 2006).[16]

_____

[16] The Court will not apply the construe-against-the-drafter principle in this case for the reasons explained in *DSL Internet Corp. v. TigerDirect, Inc.*, 907 So. 2d 1203, 1205 (Fla. Dist. Ct. App. 2005):

> Florida law requires that a contract be interpreted against the drafter when the contract contains ambiguous terms.  *See Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 942 (Fla.1979). The construction-against-the-drafter principle is a rule of last resort and is inapplicable when there is evidence of the parties' intent at the time they entered into the contract. *See Child v. Child*, 474 So.2d 299 (Fla. Dist. Ct. App. 1985). *See also The School Bd. v. Great Am. Ins. Co.*, 807 So.2d 750, 752 (Fla. Dist. Ct. App. 2002). Parol evidence is admissible to determine the meaning of ambiguous terms through the parties' own statements and conduct. *See Berry v. Teves*, 752 So.2d 112, 114 (Fla. Dist. Ct. App. 2000); *First Capital Income and Growth Funds, Ltd.-Series XII v. Baumann*, 616 So.2d 163, 165 (Fla. Dist. Ct. App.1993).

In addition, although there is some evidence that Spectrum drafted the contract with the assistance of an attorney, it is undisputed that this was a heavily negotiated contract, and it is not clear which party was responsible for the inclusion of much of the language contained therein.

**2. Breach of Contract – failure to provide "d" designs & Design Documentation and failure to lend services to produce samples and manufacture products**

1. Spectrum contends that CKI breached the contract by completely failing to provide designs (conceptual drawings) for the first half of 2004, failing to provide Design Documentation, and failing to work with Spectrum to timely produce samples for Home Depot to review.

2. Spectrum argues that "[c]entral to the construction of this contract is the fact that CKI's duties with regard to designs, Designs, and Design Documentation had to be completed at least in time to show the Designs to Home Depot" and "[w]hatever construction the Court gives the contract, it is clear that CKI failed to do this."

3. Spectrum testified at trial that CKI's initial obligation was to provide two sets of designs, which means conceptual drawings, which would then be accepted by Spectrum for development or rejected. Tr. 75, 79, 101, 270, 302, 307, 315. This was not disputed.

4. Based on the language of the DSA and the evidence presented at trial, the Court construes the DSA to require CKI to initially provide Spectrum with conceptual drawings for at least fourteen different Products within a Family (though these did not necessarily have to be the fourteen products listed in § 7 of the DSA). *See* DSA §§ 7,8 (requiring CKI to provide Design Documentation for designs that are candidates to be Designs, and Design Documentation includes conceptual drawings for each of the "14+ Products that compose a Family"); § 7 (noting that a Product Family "may include, but are [sic] not limited to" the fourteen individual Products listed); Tr. 307.[17] Then, if Spectrum accepted the designs for development as Designs, CKI was obligated to provide the additional Design Documentation, which includes the design finishes and instructions suitable for Spectrum's factories, along with color step panels developed in-factory identifying the finish color process. CKI was then also obligated to provide finish direction and in-factory instructions

_____

[17] Section 8 of the DSA requires CKI to provide "such documentation" for designs that are candidates to be Designs. "Such documentation" can only be construed by referring to the prior sentence, which states that CKI will provide Design Documentation. However, based on the evidence at trial, the only portion of the Design Documentation that would be submitted at the "d" design stage would be the conceptual drawings. Thus, the Court construes § 8 to mean that CKI must provide conceptual drawings when it requires CKI to provide "such documentation for designs that are candidates to be Designs." Section 7 indicates that a Product Family, which is defined only as a "suite of Products" in the Agreement's introductory section, need not necessarily include the fourteen specifically listed Products, but it also indicates that a Family was intended to include at least fourteen products. The first and second sentences of § 7 must be read together. Reading them together, "14+ Products ... compose a Family" and a Family may include, but is not limited to, the fourteen listed Individual Products. Thus, while a Family need not include the fourteen listed products, it did need to include fourteen or more products. Thus, when section 8 states that Design Documentation needs to be submitted for "14+ Products," it means that CKI has to submit "d" designs (conceptual drawings) for at least fourteen Products in a Family.

to deliver the desirable finished product for the manufacture of Products utilizing the Designs. A Design was intended to cover a Product Family, which includes "14+ Products," but did not have to include all fourteen products listed in § 7 (and Spectrum could not accept more portable SKU's than fixed lighting SKU's). *See* DSA § 7 (noting each Design shall cover a Product Family, and that "14+ Products" compose a Family, which may include, but is not limited to the listed Products); § 7 ("The number of portable SKU's shall not exceed the number of fixed lighting SKU's accepted per Family.").

5.   The DSA does not specify what constitutes acceptance of a design by Spectrum for development as a Design. The evidence shows that Spectrum intended that Mike Barnes and/or Liz Barnes would review the conceptual drawings and initial the drawings to indicate acceptance. Tr. 176, 179; AX-538; M. Barnes depot at 93.[18]  This occurred with regard to certain designs. However, Kryza testified that this was not always possible because designs (conceptual drawings) were given to Spectrum shortly before meetings, and that Spectrum was forced to accept them on the spot in order to have something to present to Home Depot. Tr. 327. She testified that all such designs submitted were accepted by Spectrum on the date Spectrum received them. Tr. 103-04. However, as pointed out by Uttermost, Kryza also gave conflicting testimony regarding the Thick Long Leaves collection, which was submitted by CKI in October 2004.[19]  This collection was submitted to Home Depot for selection at the October 2004 meeting, and the evidence indicates that, if Spectrum showed the designs to Home Depot, it had accepted the designs for development as Designs. Tr. 105 (Kryza testified that they accepted designs to show them to Home Depot, and if they did not accept them, they would not have anything to show Home Depot), 107. Thus, the Court concludes that Spectrum accepted it at least at that time, regardless of whether it never actually developed the design as a Design.

6.   The Court finds that Spectrum accepted all designs submitted in 2003 and 2004 for development as Designs, thus triggering CKI's contractual obligations to provide the full Design Documentation for each. However, the Court finds that Spectrum did not accept and has not accepted the Twisting and Crystal Contemporary designs because there is no evidence that Spectrum showed these designs to Home Depot or that it made or communicated any decision to develop these designs to CKI. Thus, CKI was not obligated to provide the full Design Documentation to Spectrum for these designs.

7.   For each set of Designs, CKI was obligated to submit Design Documentation, which should include: (1) the conceptual drawings "similar in context as previously submitted"[20]; (2)

---

[18]Home Depot did not have to accept a design for it to be an accepted Design. Tr. 107.

[19]She testified that Spectrum accepted it but never developed it. Tr. 250. She also agreed with her prior affidavit that they never accepted or rejected it. Tr. 251. She stated that Spectrum never had the opportunity to accept or reject the design. Tr. 251. And she agreed that Spectrum has not accepted the Thick Long Leaves collection. Tr. 252.

[20]The Court finds the language "similar in context as previously submitted" to be ambiguous and virtually nonsensical. Based on the evidence, the Court construes this language to mean that the

design finishes; (3) instructions suitable for Spectrum's factories (including working closely with Spectrum's CAD Department); and (4) color step panels developed in-factory identifying the finish color process.  DSA § 7; Tr. 102.

8.  In addition to Design Documentation, CKI would also be contractually obligated to provide for the Designs "reasonable design assistance for manufacturing," including: (1) "finish" direction and (2) in-factory instructions as deemed necessary to deliver the desirable finished product for the manufacture of Products utilizing the Designs.  DSA §§ 7, 11.

9.  CKI was also contractually obligated to "lend services to implement Spectrum's product development protocol," the purpose of which "is to produce samples, and eventually Products, that match the Designs."  DSA § 2.  "Matching is to include, but not be limited to, the design specifications for appearance, materials, and finish."  DSA § 2.  "The work necessary by CKI to complete the samples may include, but not be limited to: supervision of the sample production process, in-factory personnel assistance, coordinating and tracking of sample orders, and preparation of design and technical information summaries."  DSA § 2.

10.  The DSA requires CKI to provide the conceptual drawings (i.e., the Design Documentation for designs that are candidates to be Designs) for each of the 14+ Products in a Family "as reasonably requested by Spectrum and or by Spectrum's customer, Home Depot, for the term of this agreement" ("a minimum of two (2) Families per quarter and up to as many collections as mutually agreed upon by both parties for that particular period of time and based on the ability of Spectrum to fully facilitate and materially direct all product development support requested by CKI").  The Court concludes that CKI was obligated to supply Spectrum with a minimum of two sets of designs (conceptual drawings for 14+ Products in a Family) per quarter, beginning with the first quarter of 2004.  Under the plain language of the DSA, CKI was obligated to supply a minimum of two per quarter, but could provide more.  Thus, when CKI provided more than two designs in a quarter, the excess designs did not apply to future quarters, and CKI was still obligated to supply two designs for the next quarter absent an agreement between the parties stating otherwise.

11.  Spectrum contends that CKI failed to provide new designs (conceptual drawings) for the first two quarters of 2004.  CKI argues that it provided sufficient sets of designs under the DSA, based on Kryza's testimony and the conclusions of Spectrum's expert, Robert Anders.[21]

_____

full/complete Design Documentation for an accepted Design would include the initial conceptual drawing submitted as a design, and that "similar in context as previously submitted" means simply that the conceptual drawing would be the same or similar to what had been previously submitted, perhaps with any requested or proposed changes.

[21]Anders concluded that CKI submitted the San Marino, Tropics, West Indies, Coronado, Providence, and Lotus collections for the second quarter of 2003 (before the DSA was effective); the Mazatlan design for the first quarter of 2004; the Antler, Vienna, and Sedona designs in the second quarter of 2004; the Santorini, Meridian, Austria, Madison, Manhattan, Madrid, Monterrey,

12. The Court finds that CKI submitted the Tropics, West Indies, San Marino, Antler, Sedona, Mazatlan, Vienna, Providence, Lotus, and Coronado collections in 2003, Tr. 135, and that these would all have counted towards CKI's "initial" production under § 8. However, Spectrum agreed to credit the Providence, Lotus, and Coronado collections to the first quarter 2004 design requirement. AX-200; Tr. 135-36. The Court finds that CKI submitted the Madrid design collection (though incomplete) in June 2004, so it is applied to the second quarter of 2004. AX-117. The Court finds that CKI submitted the Manhattan, Monterrey, Santorini, Austria, Portofino, Madison, and Meridian collections in the third quarter of 2004. The Court finds that CKI submitted the Athena, Prism, Fluted, Rustic, Scroll, Simple Iron Forged, Simple Shape, Thick Long Leaves, and Simple Line with Slope in the fourth quarter of 2004. The Court further finds that CKI submitted the Twisting and Crystal Contemporary designs in the first quarter of 2005. Accordingly, the Court finds that CKI failed to provide one set of designs (conceptual drawings for the 14+ Products that compose a Family) in the second quarter of 2004.

13. In addition, CKI did not provide conceptual drawings for "14+ Products" for all designs submitted. In other words, even when CKI submitted designs to meet its obligations in a quarter, the designs submitted were often incomplete.

14. Spectrum contends that CKI provided Design Documentation for the West Indies, San Marino, Tropics, Vienna, and Madrid collections and that these were complete collections. PX-3017. Spectrum contends that Kinder failed to produce Design Documentation beyond the initial "d" designs for the remaining collections.

15. Spectrum further asserts that "CKI was obligated to provide Design Documentation for the accepted Designs for two families per quarter." However, the court construes the DSA to require only that CKI provide the Design Documentation for "designs that are candidates to be Designs," which means "conceptual drawings," at the rate of two or more per quarter. Once the designs were accepted by Spectrum for development as Designs, CKI had a duty to provide "Design Documentation," which would include the "conceptual drawings, similar in context as previously submitted, design finishes and instructions suitable for Spectrum's factories ..., and color step panels developed in-factory identifying the finish color process," but there is no express contractual requirement that CKI produce all of the Design Documentation within the quarter. The only contractual language that could impose such a time constraint is CKI's agreement to lend services to implement Spectrum's design protocol. However, Spectrum produced no evidence that its protocol required that CKI submit complete Design Documentation within a quarter.

---

and Portofino designs for the third quarter of 2004; the Rustic, Scroll, Simple Iron Forge, Simple Line with Little Slope, Simple Shape, Thick Long Leaves, Prism, and Athena for the fourth quarter of 2004; the Twisting design for the first quarter of 2005; and the Fluted and Crystal Contemporary designs for the second quarter of 2005.

16.     In addition, Spectrum asserts that "CAD drawings were included in the required documentation." However, the language of the DSA indicates that CKI did not have a contractual obligation to produce CAD drawings for Spectrum. *See also* Tr. 119-20. Rather, CKI had an obligation to prepare design and technical information summaries (Agrmt. § 2) and to work closely with Spectrum's CAD Department to develop instructions suitable for Spectrum's factories. The evidence indicates that CKI (via Dave Simpson) did work with Spectrum's CAD department at least at first, and then the parties agreed to switch to using the factories' CAD departments. However, the evidence also indicates that CKI did not prepare design and technical information summaries and failed to work closely with Spectrum's CAD Department to develop instructions suitable for Spectrum's factories, in violation of Section 2 of the DSA.

17.     Nevertheless, the Court concludes that CKI failed to provide Design Documentation for certain designs accepted for development as Designs. (For example, CKI did not provide Design Documentation for the Thick Long Leaves collection, and Spectrum did not develop the Thick Long Leaves design collection because it lacked the information from CKI to do so. Tr. 531.)

18.     CKI also failed to "lend services to implement Spectrum's product development protocol" under Section 2 and failed to lend "reasonable design assistance for manufacturing" as required by section 7 (as paraphrased in section 11). The DSA states that the purpose of Spectrum's design protocol was to produce samples, and eventually Products, that match the Designs. Spectrum's protocol had been developed by Spectrum to best meet the needs of Home Depot, Spectrum's primary customer, and required that the complete Design Documentation and samples be available for presentation to Home Depot. Tr. 352, 374. Though Spectrum's protocol was not expressly written down for CKI, it was explained to CKI before the DSA was signed. Tr. 305, 311. A draft contract with the attachments (CAD drawings and a sample color chip panel) was sent to CKI in November 2003. Tr. 355. During 2003, CKI tried to follow Spectrum's protocol; it gave Spectrum design concepts, created Design Documentation, created samples, selected finishes, and assisted in the design process. This was what Spectrum expected going forward, and why it included the obligation for CKI to lend services to implement Spectrum's product development protocol in the DSA. Tr. 353, 360-61. In addition, because the protocol was essentially what Home Depot expected and what had been followed during 2003, both CKI and Spectrum understood the protocol as it was followed in 2003, and it did not change after that. Tr. 332-33. CKI was aware that Home Depot wanted to view samples at the presentation meetings. Tr. 273-74. Spectrum would give CKI deadlines and scheduled meeting dates with Home Depot buyers, and would describe when documentation was needed, but CKI failed to provide the Design Documentation on a timely basis consistent with the protocol. Tr. 375. CKI also failed to help develop samples from items requested by Home Depot in late 2003 during March 2004. Tr. 28-29. Kinder only visited factories twice from July to October 2004, and did not help develop samples requested by Home Depot from design drawings

submitted in the July 2004 meeting.  Tr. 33-35.  Kinder admitted that she was not present at the China factories.  Tr. 885.

### 3. breach of confidentiality clause

1.  Spectrum further contends that CKI breached the confidentiality clause of the contract.  As noted by Spectrum, the "provisions of this Section 16 [the confidentiality clause] will survive termination of [the DSA]."  Spectrum argues that CKI's giving confidential information to Uttermost would have been inappropriate before, during, and after the filing of this lawsuit.

2.  Confidentiality agreements are subject to Florida's statute governing restraints of trade or commerce.  FLA. STAT. ANN. § 542.335; *Henao v. Professional Shoe Repair, Inc.*, 929 So. 2d 723, 726 (Fla. Dist. Ct. App. 2006) ("[T]he term 'restrictive covenants' [in section 542.335] includes *all* contractual restrictions upon competition, such as noncompetition/nonsolicitation agreements, confidentiality agreements, exclusive dealing agreements, and all other contractual restrains of trade.") (emphasis in original).  Section 542.335 provides that "enforcement of contracts that restrict or prohibit competition during or after the term of the restrictive covenants, so long as such contracts are reasonable in time, area, and line of business, is not prohibited."  Section 542.335(1).  However, "a court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought."  *Id.* 542.335(1)(a).  Because CKI signed the DSA, that requirement is satisfied.

3.  A party seeking enforcement of a restrictive covenant must prove the existence of one or more legitimate business interests justifying the restrictive covenant.  *Id.* § 542.335(1)(b).  Any restrictive covenant not supported by a legitimate business interest is unlawful and is void and unenforceable.  *Id.* § 542.335(1)(b).  Legitimate business interests include trade secrets and valuable confidential or professional information that does not otherwise qualify as trade secrets.  *Id.* § 542.335(1)(b).  Courts must construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement.  *Id.* 542.335(h).  A court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract.  *Id.*

### a. CKI's disclosure of AX-119 design spreadsheet to Uttermost in September 2006

4.  Spectrum argues that CKI's transfer of AX-119, the spreadsheet prepared by CKI depicting designs CKI submitted to Spectrum, to Uttermost in September 2006 was a breach of § 16.

5.  It is undisputed that Bob Kinder gave Maria Scutaro a cd that contained a copy of AX-119, at Maria Scutaro's request, in September 2006.  It is also undisputed that Spectrum never gave permission for CKI to give the designs to Uttermost and would have objected had it

known of the transfer.  Tr. 81.  Spectrum argues that CKI's giving Uttermost the confidential designs was therefore a breach of § 16.

6.   Under the DSA, both parties agreed "to maintain any designs being considered as Designs and accepted in a timely manner" confidential except for the inclusion of Home Depot in the selection process.  DSA § 16.  Spectrum argues that all designs were accepted in a timely manner under section 16, and thus all designs submitted by CKI to Spectrum and accepted were subject to the confidentiality clause.  The Court reads the "accepted in a timely manner" language to relate to the twelve-month period in the non-compete clause.  Section 6 contains the only time period from which the confidentiality clause's "in a timely manner" may be determined.  Thus, after the twelve-month period, a design that had not yet been accepted for development as a Design is no longer subject to the confidentiality clause of paragraph 6. However, any design being considered for development as a Design and any design accepted in a timely manner by Spectrum is subject to the confidentiality clause, and CKI was under a contractual duty to maintain the design as confidential (presumably until it was made public via marketing or sales).  Uttermost contends that only "designs being considered as Designs" are confidential under the DSA, and since no designs were under consideration by Spectrum in September 2006, there was no breach of the confidentiality clause.  However, the plain language of section 16 makes clear that designs being considered as Designs *and accepted in a timely manner* are confidential, and thus all accepted designs must be kept confidential. As noted, the Court finds that all designs submitted were accepted in a timely manner for purposes of Section 16 except for Twisting and Crystal Contemporary.   Therefore, designs/Designs shown in AX-119 would be confidential under § 16 (at least to the extent they had not been made public through commercialization, etc.).

7.   CKI argues that, at the time it disclosed the designs to Uttermost, Spectrum had already disclosed the design spreadsheet to Uttermost through discovery (though it was marked confidential and subject to the protective order) and Uttermost was already a party to the litigation accused of copying Spectrum's designs.  CKI contends that the parties have an absolute privilege to disclose otherwise confidential or proprietary trade secret information to other litigants during the course of litigation. CKI further argues that Spectrum's assertion that CKI's actions violated the protective order is a "red herring" because Scutaro, who did not sign the protective order, only looked at the spreadsheet briefly and then sent it to Mac Cooper, who did sign the protective order.  Thus, CKI argues, this is at most a technical violation, and Spectrum never asserted this as a cause of action.

8.   Spectrum amended its interrogatory responses to include Uttermost's possession of the design spreadsheet when asked to identify the designs that CKI had allegedly given Uttermost in violation of the DSA.

9.   Uttermost argues that "Spectrum's amended discovery responses do not reference the novel claim that a technical violation of a protective order is actionable in a civil case."  Spectrum asserted at trial that this claim deals with both a violation of the protective order and a

violation of the DSA. Tr. 562. The Court concludes that Spectrum's claim of a technical violation of the protective order is not meritorious. The spreadsheet was CKI's document, created by CKI and produced to Spectrum during discovery. The fact that Spectrum later produced the same document through discovery and marked it confidential under the protective order is irrelevant. The document that CKI provided to Scutaro was not one that it received from Spectrum through discovery; as noted, CKI created the document. Therefore, Kinder's giving the document to Scutaro was not a violation of the protective order, which is designed to protect documents produced during discovery by one party from being used or disclosed by the receiving parties. If one party produces its own document in discovery, the fact that another party marks it confidential under a protective order would not prevent the producing party from using or disclosing its own document (assuming no other confidentiality constraints), and such use would not violate the protective order.

10.     CKI and Uttermost contend that their actions were privileged. Both Texas and Florida recognize a litigation privilege. Under Florida law, "absolute immunity must be afforded to any act occurring during the course of a judicial proceeding, regardless of whether the act involves a defamatory statement or other tortious behavior ... so long as the act has some relation to the proceeding." *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. US. Fire Ins. Co.*, 639 So.2d 606, 608 (Fla. 1994); *see also Echevarria, McCalla, Raymer, Barrett & Frappier v. Cole*, 950 So. 2d 380 (Fla. 2007). Texas courts have held that communications made during the course of a judicial proceeding are absolutely immune from an action for defamation. *James v. Brown*, 637 S.W.2d 914 (Tex. 1984). However, the Texas Supreme Court "has never held that this privilege bars all civil causes of action arising from communications made during the course of a judicial proceeding." *Tulloch v. JP Morgan Chase & Co.*, 2006 WL 197009 (S.D. Tex. 2006) (making an *Erie* guess that the Texas Supreme Court would not extend the absolute privilege to claims that are not based on defamatory statements and do not seek "defamation damages").

11.     All parties cite to *IBP, Inc. v. Klumpe*, 101 S.W.3d 461, 475 (Tex. App.–Amarillo 2001, pet. denied), in support of their positions. In *Klumpe*, the court of appeals considered the scope of the litigation privilege in relation to the disclosure of trade secret information. In response to a deposition notice with a subpoena deuces tecum, Klumpe produced certain crewing guides owned by his employer, IBP, to his attorney, who then faxed the guides to opposing counsel. IBP sued Klumpe and his attorney for various torts, including misappropriation of trade secrets and tortious interference with contractual and confidential relationships between Klumpe and IBP. The court recognized that "[c]ommunications made in connection with and related to judicial proceedings are absolutely privileged and cannot serve as the basis of a civil action for damages for libel or slander ... [n]or can such communications in connection with judicial proceedings be the basis for any other tort action based upon disclosure of the contents of the communications, even if the legislature has statutorily provided that the contents are privileged and that civil damages are recoverable in the event of unauthorized disclosure of the contents." *Klumpe*, 101 S.W.3d at 470-71. The court disagreed, however, with the defendants' position that Texas law does, or should, grant

81

absolute immunity from civil liability for all acts by any party, witness, or other person so long as the acts have some relation to a judicial proceeding; rather, the issue must be determined according to the facts of each case. *Id.* at 471-72. The court held that Klumpe's and his lawyer's disclosure of the trade-secret crewing guides was privileged because the furnishing and faxing of the documents were communications of and disclosures of information by a witness under subpoena in litigation, and thus the absolute privilege as to claims based on communications by participants in the discovery process applied. *Id.* at 473-74. The Court did note, however, that there were fact issues regarding whether Klumpe could have legally taken the guides from IBP, and held that summary judgment should not have been granted as to any cause of action based on that allegedly illegal taking.

12. *Klumpe* is easily distinguished from the present case. In *Klumpe*, Klumpe produced the documents in response to a deposition subpoena, and thus the disclosure was clearly part of the discovery process in the case. In this case, Kinder's production of the cd to Scutaro was not a part of the discovery process. The fact that the document had been produced by CKI and Spectrum in discovery is not relevant to the issue of whether the disclosure was a violation of the confidentiality clause of the DSA because Kinder's production of the cd to Scutaro was outside of the discovery process. Scutaro asked Kinder for the design spreadsheet, which was created by CKI and not received by CKI through discovery, and Kinder gave it to her; there was no discovery request of any sort and the production/disclosure was not "subject to discovery." Further, while Cooper was subject to the protective order, Scutaro undisputably was not, and she did see the designs in violation of the confidentiality clause. Thus, *Klumpe* does not preclude liability, and Texas law would also seem to preclude a finding of immunity or privilege for Kinder's act of giving the confidential designs to Scutaro. Thus, under Texas law, the Court concludes that there was a technical breach of section 16.

13. Under Florida law, the litigation privilege recognized by the Florida Supreme Court is broad. However, the action must have "some relation" to the litigation. The Court did not expressly define the limits of this "relation." But it did make clear the purpose of the privilege: "Just as participants in litigation must be free to engage in unhindered communication, so too must those participants be free to use their best judgment in prosecuting or defending a lawsuit without fear of having to defend their actions in a subsequent civil action for misconduct." *Levin*, 639 So. 2d at 608. "Thus, the determination of whether to apply the litigation privilege is properly focused on the purpose and timing of the misconduct, *i.e.*, whether the conduct was in furtherance of the party's defense or prosecution of the lawsuit." *Clough Marketing Svcs., Inc. v. Main Line Corp.*, 2007 WL 1430404 (N.D. Ga. 2007). The Court concludes that the disclosure of the cd of designs was not in furtherance of either defendant's defense of the lawsuit. Accordingly, the Court finds that the privilege does not apply under Florida law and that there was a technical breach of section 16.

14. CKI argues that the disclosure of the cd is not actionable because, by September 2006, Spectrum itself had already disclosed the designs to Uttermost as part of the discovery in this

case.  The Court rejects that argument.  Spectrum provided the designs to Uttermost as part of the discovery, but marked the designs confidential and provided them subject to the protective order.  Surely such production does not then exempt the designs from disclosure to others outside the discovery process and not subject to the protective order.

15.     Thus, the Court concludes that the disclosure was not a violation of the protective order, but it was a technical breach of section 16 of the DSA.

### b. CKI's disclosure of the DSA to Uttermost

16.     Spectrum further argues that CKI breached its confidentiality duties by giving a copy of the DSA to Cooper in December 2004.  Spectrum argues that the contract itself has confidential information such as royalty rates, the design procedure, the non-compete clause, and the deliverables clause, which would allow a competitor such as Uttermost to steal Spectrum's business with Home Depot.  Tr. 83-84.

17.     The Court finds that Cooper received a copy of the DSA in December 2005, not December 2004 as asserted by Spectrum.  By that time, Spectrum had already made the DSA public by attaching it to its state-court petition.  Accordingly, production of the identical contract by CKI to Uttermost/Cooper was not a violation of the confidentiality clause.  *See Southwest Research Institute v. Keraplast Tech., Ltd.*, 103 S.W.3d 478, 482 (Tex. App.–San Antonio 2003, no pet.).  Moreover, nothing in the DSA is "information provided by Spectrum" that CKI would be prevented from disclosing.  The only information contained in the DSA itself that CKI is precluded from disclosing is the "compensation between [CKI and Spectrum] hereunder."

18.     The copy of the DSA that CKI gave Uttermost had the royalty amounts blacked out, and thus CKI did not violate section 16.

### c. CKI's discussions of the contract and the CKI/Spectrum relationship

19.     Spectrum argues that CKI breached the confidentiality clause by discussing the contract and the CKI/Spectrum relationship with Uttermost.  CKI points out that Kryza could not identify any instance in which CKI had disclosed the information specifically designated as confidential by the DSA – royalty rates, cost information, or sales data.  Tr. 152-54.  Eric Williams concurred that CKI had not shared cost information.  Tr. 419.  CKI further points out that the evidence at trial "shows that the only information CKI disclosed to Uttermost consisted solely of general references to problems between CKI and Spectrum, and that CKI had sent Spectrum a notice of contract termination."  CKI argues that this type of information is not covered by the DSA's confidentiality clause and "there is no caselaw to support the argument that a general discussion of this nature constitutes a disclosure of proprietary information."  CKI argues that nothing that CKI and Uttermost discussed constituted proprietary information used in Spectrum's business.  CKI further contends that Spectrum

failed to submit any evidence to establish that any injury resulted from the disclosure of any such general discussions about the status of the CKI/Spectrum Agreement.  CKI argues that Spectrum has shown no link between any alleged disclosure and any harm to Spectrum and that Spectrum has not shown that CKI or Uttermost attempted to make use of any information that Spectrum asserts is confidential or a trade secret.

20.    The DSA's confidentiality clause prohibits CKI from disclosing "certain information provided by Spectrum, including, but not limited to, sales information, cost information, and production volume, pursuant to this Agreement." DSA § 16.  There is no evidence regarding why the parties chose to go with this confidentiality clause over the more detailed clause that had been included in the draft agreements.  To the extent CKI primarily argues that the information disclosed is not a trade secret, that argument fails because the DSA precludes disclosure of confidential information, which is a broader category than trade secrets.  Protection of valuable confidential or professional information that does not otherwise qualify as trade secrets is a legitimate business interest that will support a confidentiality clause under Florida law.  Thus, a confidentiality clause may restrict disclosure of valuable confidential or professional information that does not otherwise qualify as trade secrets.  By its own terms, however, the DSA precludes CKI from disclosing only "certain information provided by" Spectrum pursuant to the Agreement.  It specifically identifies only "sales information, cost information, and production volume," though it states it is "not limited to" that information.

21.    The evidence shows that CKI disclosed the following information to Uttermost: (1) Spectrum opened a new lighting showroom around the corner from Uttermost and the new buyer from Home Depot Canada was there as their guest, Tr. 959, AX-28; (2) "The suggestions at our last meeting in Rocky Mount was to offer Home Depot [through Spectrum] the requested collections as scheduled, and Spectrum could market the un-selected collections they developed into the fixed lighting field, but without my name. Spectrum has 'signed on' a full team of specialist reps [they say..] and are preparing to push hard into this arena with their Tiffany product, and a variety of looks from their designers, but are very serious about also using the collections that I have contributed via the off-fall from the Home Depot buyers [i.e., designs not selected by Home Depot]." Tr. 966-69; AX-28; (3) "Currently, the main stores [Home Depot] are still in the endless testing period, and the results are promising, but inconclusive ... enough to create respect, but not enough to cause me to abandon all other opportunity and follow only them.  World Import is the main user of this product, along with Expo, each is active, but not as we had hoped if the collections were picked up by the main Home Depot chain.  The few that did make it there did ok, but the testing process is slow." AX-28; (4) that Kinder met with Spectrum's Asia VP (Kryza) and broke the news that CKI would be "changing their stance" with them, but not abandoning them, Tr. 963-65; (5) that CKI was "struggling over the current unethical moves on the part of Spectrum, and that keeps underlining in red, that this is not going to be a solid thing for the future" and that Kinder had "told them [CKI] will continue to supply 2 collections to them every quarter to be shown only to THD" and that, if only drawings were shown and not selected by HD, the

designs would revert back, but that if Spectrum developed samples, Spectrum could sell them without Kinder's name if HD did not accept them, AX-60, Tr. 968; (6) "Spectrum is trying to diversify away from total dependency on THD" and CKI had given official notice to cancel the current contract and the more limited plan was offered as a replacement to try to avoid a legal struggle, AX-60; (7) Woolson told Cooper that there was a fixed wire agreement between Spectrum and CKI, that it prevented CKI from doing fixed wire for Home Depot, that there was a problem with the contract, that there had been payment default, and that CKI gave notice of termination, Tr. 1002; (8) Woolson told Cooper that the "situation between Spectrum and Kinder is getting ugly. Some disappoints on sales (don't know specifics, might be certain items), some returns from HD to Spectrum, no royalty pmts since October, poor communications, no trust, not sharing sales info, etc. Apparently Ray 'threatened' to turn them over to a collection attorney and Spectrum responded with a lawyer letter stating lack of performance on Kinder's part. Per Ray, the contract calls for 2 collections per quarter (or 10 to date) and they have submitted 26 collections. Kinder put Spectrum on notice several wks ago to terminate their contract (1 ½ yrs to go on contract) and offered a very limited contract in return. The limited contract would not really interfere with us/kinder on fixed at all except at HD. Spectrum has 60 days from notice to respond and pay up, or the original contract is terminated. I asked Ray about the original contract, and he doesn't think even this contract would effect [sic] any lighting we do with Kinder, other than HD." AX-43.

22.    As noted, CKI is restricted from disclosing only valuable confidential or professional information provided by Spectrum. Accordingly, most of the information listed in the above paragraph is not within the scope of the confidentiality clause because it was not provided by Spectrum (rather, it was information already within CKI's knowledge, such as the fact that CKI told Spectrum it would be "changing its stance," CKI's offer for a more limited arrangement, the fact that Spectrum had ceased making royalty payments, that the relationship between CKI and Spectrum was having difficulties, and, as discussed above, information contained in the contract itself (other than compensation, which the parties expressly agreed to keep confidential)).

23.    Thus, the only information disclosed by CKI that could fall within the scope of the confidentiality clause is: (1) that Spectrum opened a showroom around the corner from Uttermost; (2) that the Home Depot Canada buyer was there as Spectrum's guest; (3) that "Spectrum has signed on a full team of specialist reps [they say..] and are preparing to push hard into this arena with their Tiffany product, and a variety of looks from their designers, but are very serious about also using the collections that I have contributed via the off-fall from the Home Depot buyers" (i.e., designs not selected by Home Depot); (4) "Currently, the main stores [Home Depot] are still in the endless testing period, and the results are promising, but inconclusive ... enough to create respect, but not enough to cause me to abandon all other opportunity and follow only them. World Import is the main user of this product, along with Expo, each is active, but not as we had hoped if the collections were picked up by the main Home Depot chain. The few that did make it there did ok, but the

testing process is slow."; (5) "Spectrum is trying to diversify away from total dependency on THD"; and (6) "Some disappoints on sales (don't know specifics, might be certain items), some returns from HD to Spectrum."

24.     With regard to the information that Spectrum opened a showroom around the corner from Uttermost, the Court concludes that this information is not confidential information under the DSA.  This information would be public knowledge, and is not sufficiently like the information designated as confidential in the DSA (sales and cost information and production volume) to fall within the clause.  Further, Spectrum has not shown that this is valuable confidential or professional information that would warrant protection under Florida law.

25.     With regard to the fact that the Home Depot Canada buyer was at the showroom as Spectrum's guest, the Court finds that Spectrum failed to show that this was valuable confidential or professional information that would warrant protection under Florida law. Uttermost already knew that Home Depot was Spectrum's primary customer, so it would be no secret that Home Depot buyers were visiting Spectrum's showroom.

26.     The information that Spectrum had signed on a full team of specialist reps and was preparing to "push hard" into fixed lighting with their Tiffany product and a variety of looks from its own designers and from CKI and that Spectrum was trying to diversify away from total dependency on Home Depot, though not specifically included in the final version of the confidentiality clause, is the type of information that the parties contemplated keeping confidential during negotiations.  The draft agreement specifically listed "the goals and objectives of the other party" as confidential information.  Cooper testified that information concerning its own plan to go into fixed wire was confidential and would be valuable confidential information.  However, Spectrum offered no evidence at trial that its plans to "push hard" into fixed lighting and to diversify from Home Depot was valuable confidential or professional information, and thus this claim fails.

27.     With regard to the status of CKI/Spectrum designs in Home Depot, sales and production volume is listed in the confidentiality clause.  However, the Court construes the clause, which creates different confidentiality obligations for CKI and Spectrum, to prevent disclosure of each party's own confidential information that would be disclosed to the other in the course of their relationship.  The Court does not construe the clause to prevent disclosure by CKI of the status of its own sales (even if through Spectrum) to its other business partners.  Accordingly, the Court finds no violation of the confidentiality clause.

28.     For the reasons explained above, the Court concludes that Spectrum has failed to show that CKI breached the confidentiality clause of the DSA by discussing the contract and various aspects of the CKI/Spectrum relationship with Uttermost.

### 4. breach of duty to negotiate in good faith

1.  Spectrum contends that CKI breached the duty to negotiate in good faith contained in Section 10 ("Both parties agree to negotiate in good faith to try to resolve any concerns."). Spectrum asserts that Uttermost's constant pressure, which was fueled by the receipt of confidential information, motivated CKI to breach the duty to negotiate in good faith. Spectrum argues that there is no evidence that CKI ever made any attempt to negotiate with Spectrum about the conflicts between them in 2004 and 2005.

2.  CKI argues that the only evidence in the record reflects that CKI did not accept Spectrum's post-breach offer to partially pay CKI its earned share of the amounts that Spectrum had already received from Home Depot for the sale of CKI-designed products. CKI argues that it rejected this partial payment plan because it believed it had fully performed and was entitled to full payment of the withheld royalties.

3.  CKI believed that it had fully performed under the contract and was entitled to royalties, (even if erroneously so) and it was not a breach of the duty to negotiate in good faith to reject Spectrum's offer for partial payment and go forward with termination.

4.  The Court finds that CKI did not breach the duty to negotiate in good faith and Spectrum shall take nothing on this claim.

### 5. breach of the non-compete clause

1.  Spectrum contends that CKI violated the non-compete provision of the DSA contained in Section 6 ("CKI commits ... to not design or knowingly permit any <u>hard-wired lighting product</u> made from CKI designs to be sold to Home Depot, directly or indirectly, other than through and by Spectrum as provided in this Agreement, unless CKI is specifically authorized by Home Depot or unless Spectrum has not accepted the specifically submitted design, within twelve months of originally receiving submission of said design from CKI, as a Design for Product(s)."). It is undisputed that "Home Depot" as used in the DSA includes Home Depot and its related companies. Under this clause, CKI is precluded from knowingly permitting any Kinder-designed hard-wired lighting product to be sold to Home Depot and its related companies unless (1) the design is submitted to Spectrum and not accepted as a Design within twelve months or (2) Home Depot and/or its related companies "specifically authorizes" it. The Agreement does not specify or define what would be required for such "specific authorization."

2.  Under Florida law, noncompetition agreements are governed by Florida Statutes § 542.335. A party seeking enforcement of a restrictive covenant must plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant. *Id.* 542.335(1)(b). Legitimate business interests include a substantial relationship with specific prospective or existing customers. *Id.* 542.335(1)(b)(3).

3.    Spectrum argues that the non-compete provision extends to the entire design family, not just the fixed-wire components of a design family.  Spectrum argues that "[t]he only reasonable interpretation of Section 6 of the contract is that CKI was obligated to not design any product that she submitted to Spectrum, and not to allow any products made from Spectrum's designs to be sold to Home Depot, other than through Spectrum."  Spectrum argues that Section 6 must be read in conjunction with Section 7, which lists the fourteen different items in a family, including both portable and fixed wire lighting products.  Thus, Spectrum argues, CKI and Spectrum intended the non-compete clause to extend to all of the designs CKI gave Spectrum under the contract, including the four lamps listed therein that make up part of the fixed wire families.  However, Spectrum's construction conflicts with the plain language of the DSA, and the Court therefore rejects this construction.  By its plain language, the DSA's non-compete language restricts CKI only with regard to "hard-wired lighting products."  Furthermore, it was made clear during the contract negotiations that CKI would not agree to preclude its other licensees (or at least Uttermost) from selling Kinder-designed portables to Home Depot.[22]  Spectrum conflates the non-compete clause with its desire for and contractual right to exclusive designs. Simply because Spectrum received the right to certain exclusive designs on portables under the DSA does not mean that CKI agreed to a non-compete clause that included portables when the plain language of the clause includes only fixed wire.  Spectrum is correct that CKI would not be permitted to design portables for Spectrum and then permit those same designs to be sold to Home Depot other than through Spectrum, but this is because CKI agreed to give Spectrum the right to these designs on an exclusive basis, not because of the noncompete agreement.  CKI could provide different designs for portables to other manufacturers for sale to Home Depot with no restrictions in the DSA (assuming no copyright violations).

4.    The non-compete clause is expressly limited to fixed-wire lighting products.

5.    CKI and Uttermost contend that the non-compete term set out in section 6 does not survive termination of the contract, which occurred on June 6, 2005.  The Court agrees.  Because the non-compete is not within the "grant of rights" in the DSA and does not expressly state any rights granted on behalf of Spectrum, the Court does not construe the noncompete as being within the "rights" granted to Spectrum that would survive termination of the Agreement under section 10. Accordingly, the non-compete clause terminated on June 6, 2005.  CKI did not permit any CKI-designed hard-wired lighting products to be sold to Home Depot until after that date.  Accordingly, no "specific authorization" was required from Home Depot.

6.    Spectrum argues that CKI breached the non-compete clause by designing fixed wire lighting for Uttermost to sell to Home Depot entities.  Because the noncompete expressly precludes only the sale of fixed wire products to Home Depot, even if CKI designed fixed wire for Uttermost before the contract terminated, that would not breach the DSA because CKI did

---

[22]Spectrum's assertion that "[n]othing in the contract or the record shows intent by either party to carve portable lamps out of the non-compete clause" is clearly erroneous.

not knowingly permit the sale of any CKI-designed products to Home Depot before the contract terminated.

7.      Accordingly, the Court finds that CKI did not breach the non-compete because it did not knowingly permit any hard-wired lighting product made from CKI designs to be sold to Home Depot before June 6, 2005.  Tr. 628.  Therefore, Spectrum shall take nothing on this claim.

8.      The Court also grants Uttermost's request for a declaratory judgment that CKI can design products for Uttermost and is not restricted by the DSA from selling fixtures to Home Depot.

## F. BREACH OF CONTRACT, CKI VS. SPECTRUM

1.      CKI argues that Spectrum breached the DSA by failing to pay royalties and that Spectrum is liable to CKI for the full amount of the unpaid royalties.

2.      It is undisputed that Spectrum ceased paying royalties in October 2004.  Spectrum's failure to pay royalties was not excused, as explained above.  Spectrum is liable to CKI for all royalties due under the DSA, which governs all designs/Designs

3.      CKI's request for a declaratory judgment that Spectrum breached the written contract by failing to pay royalties is granted.  CKI's request for an accounting is granted.

4.      CKI also prevails on its breach of contract claim, and the Court awards CKI its royalties due under the DSA.

5.      CKI's alternative claims that Spectrum breached an oral or implied contract and for unjust enrichment are denied because the claims are predicated on a finding of no written contract.

## G. CKI'S ATTEMPTED TERMINATION/RESCISSION OF SPECTRUM'S LICENSES

1.      CKI argues that Spectrum's license to make, display, and sell CKI-designed products was validly terminated by CKI following Spectrum's failure to pay royalties.  CKI argues that Spectrum's right to continue to sell CKI-designed products was conditioned on its continued payment of royalties to CKI.  CKI further argues that even if the payment of royalties was not a condition to Spectrum's use of the designs/Designs, then it was a covenant, and Spectrum's material breach can result in the power of the licensee to recapture the transferred rights.  CKI asks the Court to find and enter judgment that Spectrum's license rights for all the CKI designs were validly terminated by CKI effective May 1, 2006.

2.      The DSA provides that CKI owns Designs and copyrights, but grants Spectrum the exclusive worldwide right to use Designs on Products sold by Spectrum.  In the event of default or material breach, the parties may cancel the Agreement after notice and an opportunity to

cure.  DSA § 11.[23]  However, the "term" provision states that "Upon expiration or termination of this Agreement for any reason, Spectrum shall maintain its theretofore acquired rights hereunder and continue to pay to CKI all compensation delineated in Section 3 above for Products sold.  By assignment of these rights CKI does not waive any of its rights as indicated in this Agreement."  DSA § 10.

3.     The Court rejects CKI's argument that payment of royalties was a condition precedent to Spectrum's use of the Design licenses.  According to Nimmer, "[i]n most cases, payment of royalty obligations is not a precondition to the right to exercise the rights granted under the license" and, absent contractual language to the contrary, "the presumption will typically not be that non-payment of royalties automatically terminates the right to use the licensed subject matter."  *See* Nimmer, Modern Licensing Law § 7:24.  "To transform royalty payment into a condition, the contractual language would have to be very explicit and the parties' performance must have been consistent with enforcing that provision."  *Id.*  Nowhere does the DSA condition the transfer of the license or its use on payment of royalties.  Rather, it provides that, should Spectrum fail to pay royalties, CKI could terminate the contract upon notice and an opportunity to cure.  This provision is not consistent with a finding that payment of royalties is a condition to use of the license.

4.     CKI further argues that, if payment is not a condition to the license, it is a covenant and Spectrum's breach entitles "recapture" of the licenses.  In support of this position, CKI cites *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1045 (D.C. Cir. 1981), *Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394 (2d Cir. 1974), and 3 Nimmer on Copyright § 10.15[A] at 10-119, 10-121-22.  In *Costello*, the D.C. Circuit stated that "it is established that even without an express reversion clause, the power to recapture may be exercised if a breach of contract is so material as to create a right of rescission in the grantor."  *Costello*, 670 F.2d at 1045.[24]  The court further stated, "an action for copyright infringement would lie if the breach is so material that it allows the grantor power to recapture the rights granted so that any further use of the work was without authority."  *Id.*  In *Nolan*, the court noted that, "before rescission will be permitted the breach must be found to be 'material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract.'"  *Nolan*, 499 F.2d at 1397.

5.     Other courts in addition to *Nolan* have recognized rescission as a remedy for material breach.  "A breach will justify rescission of a licensing agreement only when it is so material and substantial in nature that [it] affect[s] the very essence of the contract and serve[s] to defeat

---

[23] Consistent with the UCC, the Court construes the term "cancel" as used in the DSA to mean terminate, not rescind.

[24] Nimmer on Copyright, citing *Costello* and other cases, states that "a breach of covenant will give rise to a reversion of rights to the grantor only if such breach is so material as to create a right of rescission in the grantor."  Nimmer at 10-119.  Nimmer further states that "[t]he classic example of material breach is failing to pay royalties due to the assignor or licensor."  *Id.*  However, Nimmer also acknowledges that "the terms of the contract govern."  *Id.* at 10-120.

the object of the parties.... [T]he breach must constitute a total failure in the performance of the contract." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1143 (9th Cir. 2003). Some courts, however,  including in one decision cited by CKI, have held that failure to pay some of the royalties due, even if a substantial portion, is not so substantial as to permit rescission.  *Nolan v. Sam Fox Publishing Co.*, 499 F.2d 1394 (2d Cir. 1974) (licensee failed to pay 74% of royalties due).  To the extent these cases appear to deal with total rescission, however, and not simply termination of the license going forward, which is what CKI is attempting here, the Court finds them inapposite.

6.      The Court agrees with CKI that there is case law supporting the position that a licensee's failure to pay royalties allows the licensor to recapture the license and prevent the licensee's future use of the license.  However, the Court finds that general proposition inapplicable here, where the DSA provides the remedies for failure to pay royalties (termination) but also provides that Spectrum's rights will survive termination of the DSA *for any reason*.  When an express agreement "'makes clear that the trade-off for the proprietary copyright interest is not a job, but the payment of royalties,' and an 'unambiguous compact occupies the field,' rescission is not necessary because the contract makes explicit what consequences will flow from a breach." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1143 (9th Cir. 2003) (quoting  *Royal v. Leading Edge Prod. Inc.*, 833 F.2d 1, 3-4 (1st Cir.1987)).  Here, the DSA provides that CKI may terminate the DSA if Spectrum fails to pay *any* amount of the royalties due; but the DSA also gives Spectrum a license that appears not to be revocable for failure to pay royalties because it states that "*upon expiration or termination of this Agreement for any reason*, Spectrum shall maintain its theretofore acquired rights hereunder and continue to pay to CKI all compensation delineated in Section 3 above for Products sold." Thus, though CKI could terminate the contract for Spectrum's failure to pay royalties, the failure to pay royalties expressly does not provide for reversion of any licenses or rights to CKI.  Rather, Spectrum expressly retained its rights, and CKI's remedy is to sue for damages.[25]

7.      The Court finds that this conclusion is further supported by the fact that the parties did include an express reversion clause for failure to reasonably commercialize the Designs.  Had the parties intended to bargain for the right to a reversion based on failure to pay royalties, they could have incorporated that reversion right into the DSA, just as they did for the reasonable commercialization reversion clause.  Instead, they bargained that Spectrum would

_____

[25] The Copyright Act does allow for revocation of exclusive licenses after the expiration of a certain amount of time.  In the case of any work other than a work made for hire, the exclusive or nonexclusive grant of a transfer or license of copyright or of any right under a copyright, executed by the author on or after January 1, 1978, otherwise than by will, is subject to termination under the following conditions: "Termination of the grant may be effected at any time during a period of five years beginning at the end of thirty-five years from the date of execution of the grant; or, if the grant covers the right of publication of the work, the period begins at the end of thirty-five years from the date of publication of the work under the grant or at the end of forty years from the date of execution of the grant, whichever term ends earlier."  17 U.S.C. § 203.

retain its rights, including its exclusive license, upon termination of the DSA for any reason. It would not make sense to say, as CKI argues, that CKI may terminate the DSA for nonpayment of royalties under the DSA and, though the DSA states that Spectrum shall retain its rights upon termination of the DSA for any reason, which would include nonpayment of royalties, that that nonpayment of royalties would then justify reversion of the license. The DSA provides that Spectrum shall retain its rights and continue to pay CKI its royalties to clarify that CKI retains its rights to royalties despite the termination of the DSA; that language does not then create a condition or covenant that would justify reversion when the DSA expressly provides that Spectrum shall retain its rights despite termination for any reason, including failure to pay royalties.

8.     CKI's request for a declaratory judgment that Spectrum's failure to pay royalties constitutes a material breach that entitles CKI to rescind and recover any and all license rights that may have been granted to Spectrum is therefore denied. CKI shall take nothing on its claim of copyright infringement against Spectrum.

## H. FRAUDULENT INDUCEMENT, CKI vs. SPECTRUM

1.     CKI asserted a claim against Spectrum for fraudulent inducement. At the summary judgment stage, the Court granted summary judgment on this claim except as it related to CKI's claim that Spectrum did not have a CAD Department for CKI to work with.

2.     The Court concludes that CKI has failed to prove by a preponderance of the evidence that Spectrum fraudulently induced CKI to enter into the DSA. The evidence shows that Spectrum did have an employee with CAD capabilities and that CKI (Dave Simpson) worked with Spectrum's CAD department at least initially. The fact that eventually the factories produced the CAD drawings and that Spectrum later insisted (erroneously) that CKI must develop the CAD drawings is not persuasive evidence that, at the time the parties entered the contract, Spectrum did not intend to have its CAD operator develop the CAD drawings. Accordingly, the Court concludes that CKI should take nothing on this claim.

## I. TORTIOUS INTERFERENCE WITH CONTRACT, SPECTRUM vs. UTTERMOST

1.     The elements of a claim of tortious interference with an existing contracts are: (1) the existence of a valid contract subject to interference; (2) a willful and intentional act of interference; (3) that was the proximate cause of the plaintiff's damages; and (4) that actual damage or loss occurred. *Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74 (Tex. 2000); *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996).

2.     Interference with a contract is tortious only if it is intentional. *Southwestern Bell Te. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex. 1992). The intent required is an intent to interfere, not just an intent to do the particular acts that were done. *Id.* To support a claim for tortious interference with an existing contract, a plaintiff must produce evidence that the

defendant actually caused or brought about a breach of the agreement and that the actionable conduct was willful and intentional with actual knowledge of the contract in question. *Sabine Prod. Co. v. Frost Nat'l Bank*, 596 S.W.2d 271, 275 (Tex. Civ. App.–Corpus Christi 1980, writ dism'd). Thus, the defendant must be more than just a "willing participant." *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993). The plaintiff must prove that the defendant took an active part in persuading the party to breach its contract; proof that the defendant benefitted from a broken contract is not sufficient to establish proximate cause. *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139-40 (Tex.App.–Eastland 1992, writ denied). Merely entering into a contract with a party with knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. *Texaco, Inc. v. Pennzoil Co.*, 729 S.W.2d 768 (Tex.App.–Houston [1st Dist.] 1987, writ ref'd n.r.e.), *cert dism'd*, 485 U.S. 994 (1988). However, when the intentional acts of a person serve to frustrate the purpose of another's contract with a third party, thereby causing damage, such acts can constitute the requisite interference. *Exxon Corp. v. Miesch*, 180 S.W.3d 299, 339 (Tex. App. Corpus Christi 2005, pet. granted) (citing *Samedan Oil Corp. v. Intrastate Gas Gathering*, 78 S.W.3d 425, 446 (Tex. App.–Tyler 2001, pet. dism'd by agr.)).

3.     Ordinarily, merely inducing a contract obligor to do what it has a right to do is not actionable interference. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

4.     "A third party's efforts to induce another to exercise his right to dissolve a contract at will or to terminate contractual relations on notice does not constitute tortious interference with contract under Texas law" if "a legitimate purpose of their own" was served. *C.E. Services, Inc. v. Control Data Corp*, 759 F.2d 1241, 1248 (5th Cir. 1985); *Kingsberry v. Phillips Petroleum Corp.*, 315 S.W. 2d 561, 576 (Tex. Civ. App.-Austin 1958, writ ref'd n.r.e.).

5.     As concluded above, there was a valid contract between Spectrum and CKI that was subject to interference by Uttermost.

6.     Spectrum contends that Uttermost received confidential information in violation of section 16 of the DSA and used this confidential information to make a decision to go forward with fixed wire designed by Kinder. Spectrum argues that Uttermost's Mac Cooper received a copy of the DSA in December 2004[26] and also received confidential information from Kinder and Woolson (Cooper's brother-in-law), and that he used this information to pursue Kinder-designed fixed wire for sale to Home Depot. Spectrum asserts that, though Cooper/Uttermost knew of the potential problems with Spectrum's contract and that there was "at least a claim that Uttermost's designs were copies of Spectrum['s], Uttermost made an intentional and calculated decision to continue to roll out fixed wire, doing no independent investigation," but instead relying on Kinder. Spectrum contends that Uttermost's actions (via Mac Cooper's persistence) caused Kinder to breach the contract with Spectrum. Specifically, Spectrum contends that "Cooper knew that there were problems between CKI and Spectrum, and he kept Kinder from negotiating with Spectrum

_____

[26]The Court has found that Cooper did not receive a copy of the DSA until December 2005.

in good faith throughout 2005" and instead "helped Kinder try to find ways around her contract with Spectrum while pressing Kinder to do fixed wire lighting for Uttermost, even going so far as to give CKI an ultimatum the very same day that Kinder terminated the Spectrum contract." He "knew of CKI's strained relationship with Spectrum, but pressured Kinder knowing such pressure was interfering with her performance under the contract and her duty to negotiate in good faith."

7.   Uttermost contends that it did nothing more than induce CKI to do what it had a right to do. The Court generally agrees. It is undisputed that nothing in the DSA prevented CKI from doing design work for other companies, including Uttermost, and that nothing in the DSA prevented CKI from designing fixed wire lighting for Uttermost for sale to anyone, including Home Depot (so long as Home Depot specifically authorized the sale). Cooper's efforts to induce Kinder to design fixed wire lighting for him did not induce Kinder to breach the DSA. In addition, even construing Cooper's email and communications with Ray Woolson to be an "ultimatum," as urged by Spectrum, that ultimatum was not a tortious interference with the contract. At the time, as noted, CKI could design fixed lighting for Uttermost as Cooper wanted. The Court finds that CKI was capable of designing fixed lighting for Uttermost and Spectrum simultaneously. The Court does not find that Cooper's email induced CKI to terminate the DSA. But even if Cooper's "ultimatum" did cause CKI to terminate the contract, it only induced CKI to do what it had a right to do under the DSA – terminate the DSA based on Spectrum's failure to pay royalties. Insofar as the Court has found that CKI did not fail to negotiate in good faith, the Court likewise finds that Uttermost did not induce CKI to breach the contract in that regard.

8.   Spectrum further contends that Uttermost tortiously interfered with the DSA by stealing and misusing Spectrum's designs. Specifically, Spectrum argues that Scutaro's receipt of the AX-119 spreadsheet of designs in September 2006 aided CKI in violating its confidentiality obligations under the DSA. Thus, Spectrum argues, Uttermost intentionally interfered with Spectrum's contract by interfering with CKI's duties under the contract to keep Spectrum's designs confidential. The Court has found that Bob Kinder's giving the design spreadsheet to Maria Scutaro was a technical breach of section 16. However, the Court does not find that Uttermost interfered with the DSA by Scutaro's requesting and receiving the design spreadsheet. There is no evidence that Scutaro's motive in requesting the designs in any way involved inducing CKI to breach the DSA. Accordingly, the Court finds that Spectrum has failed to demonstrate a willful and intentional act of interference.

9.   Spectrum's third cause of action alleges that "Uttermost in conspiracy with CKI willfully and intentionally interfered with" the DSA. Thus, Spectrum appears to allege a claim of conspiracy to tortiously interfere with the DSA against both Uttermost and CKI. CKI argues that it cannot be liable for tortious interference with its own contract, *see Holloway v. Skinner*, 898 S.W.2d 793, 794-95 (Tex. 1995), and therefore it cannot conspire to interfere with that contract because conspiracy requires an independent underlying tort, *see Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). Because the Court has found that

Uttermost did not tortiously interfere with the DSA, the Court finds that Spectrum's conspiracy claim also fails.

## J. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS (SPECTRUM vs. CKI and UTTERMOST)

1.   In order to establish tortious interference with prospective business relations, the plaintiff must demonstrate that the defendant's conduct was independently tortious or unlawful. *Wal-Mart Stores, inc. v. Quest Global Angling Adventures, L.C.*, 52 S.W.3d 711, 726 (Tex. 2001). This means the plaintiff must prove that the defendant's conduct would be actionable under a recognized tort." *Id.* at 726. Conduct that is merely "sharp" or "unfair" is not actionable. *Sturges*, 52, S.W.3d at 726. Thus, "an action for interference with a prospective contractual or business relation provides a remedy for injurious conduct that other tort actions might not reach . . . , but only for conduct that is already recognized to be wrongful under the common law or by statute." *Id.* at 713.

2.   The Court concludes that Spectrum has failed to establish its claim for tortious interference with prospective business relations.  While it appears undisputed that Uttermost wanted to sell lamps to Home Depot and its related entities and that it also wanted to sell fixed wire, at least to some Home Depot entities, Spectrum has not established by a preponderance of the evidence that Uttermost engaged in any independently tortious conduct in pursuit of that goal.

3.   The Court further concludes that Spectrum has failed to establish its claim of tortious interference with prospective business relations against CKI.  Nothing in the DSA precluded CKI from designing portables for Uttermost to sell to Home Depot.  Further, the parties did not breach the DSA by designing fixtures for Uttermost to sell to Home Depot after the DSA was terminated.  While it is undeniable that CKI always preferred to sell Home Depot through Uttermost instead of Spectrum, CKI and Uttermost did not engage in any independently tortious or unlawful activity to achieve that goal.  The evidence shows that CKI could have performed under the DSA while also designing portables and fixtures for sale through Uttermost, and nothing either party did tortiously interfered with Spectrum's sales to Home Depot.

## K. MISAPPROPRIATION OF TRADE SECRETS (SPECTRUM VS. CKI and UTTERMOST)

1.   As stipulated by Spectrum, this claim is limited to misappropriation of Spectrum's confidential designs.

2.   Trade secret misappropriation is established by showing:  (1) a trade secret existed; (2) the trade secret was acquired through a breach of a confidential relationship or discovered by improper means; and (3) use of the trade secret without authorization from the plaintiff. *Guy*

*Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003); *Alcatel, U.S.A. v. DGI Technologies, Inc.*, 166 F.3d 772, 784 (5th Cir. 1999).  A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Assocs. Int'l v. Altai, Inc.* 918 S.W.2d 453, 455 (Tex. 1994)

3.     Spectrum's trade-secret misappropriation claim is premised on the fact that, in September 2006, Bob Kinder gave Maria Scutaro a cd with the spreadsheet of all designs submitted by CKI to Spectrum (AX-119).  Spectrum asserts that it is undisputed that Spectrum's designs are trade secrets and that the designs contained in AX-119 are Spectrum's trade secrets.

4.     Uttermost argues that its acquisition of the cd is not actionable because: (1) the DSA only defined "designs being considered as Designs" as confidential; (2) the DSA terminated on June 6, 2005; (3) on May 1, 2006, CKI terminated all licenses previously extended to Spectrum; (4) on August 4, 2006, Spectrum produced to CKI and Uttermost a spreadsheet containing the same information; (5) Scutaro asked Kinder for the cd so she could determine whether Uttermost was violating Spectrum's rights; (6) Scutaro looked at the cd briefly and then gave it to Cooper; and (7) Scutaro did not use any information on the cd to copy Spectrum's products.  The Court rejects the first four of Uttermost's arguments.  The DSA applied to designs accepted by Spectrum and the confidentiality clause expressly survives termination of the DSA.  DSA § 16.  Further, CKI did not effectively terminate Spectrum's licenses, as discussed above.  Last, the fact that Spectrum produced to CKI and Uttermost the same spreadsheet via discovery in this lawsuit does not make the disclosure outside of the litigation privileged.  However, the Court finds that Spectrum's misappropriation of trade secrets claim fails because Uttermost did not use the trade secret.  The Court finds Scutaro's testimony that she wanted to see the designs to determine whether Uttermost products were infringing to be credible.  The Court further finds her testimony that she viewed the spreadsheet briefly and then gave it to Mac Cooper to be credible.  The Court concludes that there is no evidence that Uttermost "used" the spreadsheet in any impermissible way for purposes of a misappropriation claim.  Though Spectrum argues that Uttermost could use the designs, and intended to use the designs, to "design around" Spectrum's products, knowing "how close is too close," there is no evidence that Uttermost actually did use the spreadsheet in designing its own products.

5.     Spectrum further argues that such use by Uttermost violates the protective order, which limits the use of confidential information obtained in discovery to preparation and trial of this litigation. The Court concludes that the disclosure was not a violation of the protective order because CKI did not obtain the spreadsheet in discovery from another party.

## L. BREACH OF FIDUCIARY DUTY, SPECTRUM vs. CKI

1.     Spectrum's fifth cause of action alleges that CKI breached a fiduciary duty owed to Spectrum during the time it was providing designs for Spectrum.

2.     Under Florida law, "[f]iduciary relationships implied in law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties. Courts have found a fiduciary relationship implied in law 'when confidence is reposed by one party and a trust accepted by the other.'"  *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 518 (Fla. Dist. Ct. App. 1994).  A fiduciary relationship must be established by competent evidence, and the burden of proving such a relationship is on the party asserting it. *Kislak v. Kreedian*, 95 So.2d 510, 514-15 (Fla.1957).  To establish a general fiduciary relationship, "a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins v. NCNB Nat'l Bank of Fla., N.A.*, 622 So.2d 1063, 1065 (Fla. Dist. Ct. App. 1993).

3.     Spectrum has not established the existence of a fiduciary relationship.  The DSA expressly provides that "[e]ach party hereto is acting solely as independent contractors under this Agreement.  It is expressly understood and agreed by the parties hereto that nothing in this Agreement, its provisions or transactions and relationships contemplated hereby shall constitute either party as the agent, employee, partner or legal representative of the other for any purpose whatsoever, nor shall either party hold itself out as such."

4.     Spectrum provided no evidence to show that CKI and Spectrum had the sort of special relationship that would create a fiduciary duty on the part of CKI.  Spectrum has also failed to brief this claim or point to any evidence in support of this claim.  Accordingly, the Court concludes that Spectrum shall take nothing on this claim.

5.     Spectrum does assert that CKI's giving the AX-119 spreadsheet was a breach of fiduciary duty because the protective order created a fiduciary duty.  As noted by CKI, Spectrum points to no case law in support of this assertion.  Further, as the Court has noted, the transfer of CKI's own spreadsheet by Kinder to Scutaro was not subject to the protective order.

6.     While the transfer of AX-119 may have been a breach of contract, the Court concludes it was not a breach of fiduciary duty.

## M. CIVIL CONSPIRACY, SPECTRUM vs. CKI and UTTERMOST

1.     Spectrum alleged a claim for civil conspiracy against CKI and Uttermost.  Under Texas law, proof of a civil conspiracy requires: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."  A plaintiff asserting such a claim must prove that the defendants conspired to accomplish an unlawful purpose or used unlawful means to accomplish a lawful purpose. *Murray v. Earle*, 405 F.3d 278, 293 (5th Cir. 2005).  Under Florida law, the elements of a civil conspiracy are: (a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to

plaintiff as a result of the acts performed pursuant to the conspiracy. *Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County*, 616 So.2d 562 (Fla. Dist. Ct. App. 1993).

2.      Spectrum alleges that CKI and Uttermost conspired to tortiously interfere with Spectrum's contract, misappropriate Spectrum's trade secret designs, share Spectrum's confidential trade secret information, and ultimately unfairly compete with Spectrum.  In furtherance of these objectives, Spectrum argues, both Uttermost and CKI acted together to steal Spectrum's designs and proprietary business information, which is unlawful under Texas law (Penal Code § 31.05).

3.      The Court finds no evidence to support Spectrum's civil conspiracy claims.  Accordingly, Spectrum shall take nothing on this claim against either Defendant.

## N. COMMON-LAW UNFAIR COMPETITION, SPECTRUM vs. CKI and UTTERMOST

1.      Spectrum has pled several intentional torts, including tortious interference with contract, tortious interference with prospective business relations, and trade secret misappropriation, which it also asserts under the umbrella of unfair competition.  Spectrum asserts that the same facts that support its intentional tort claims constitute unfair competition.

2.      For the reasons discussed above with regard to the individual causes of action, the Court concludes that Spectrum shall take nothing on its unfair competition claims.

## O. FALSE/INVALID COPYRIGHT REGISTRATION, CKI vs. SPECTRUM

1.      CKI seeks a declaratory judgment that "certain copyright registrations (Ex. D-J) were fraudulently obtained and are false and invalid."  Exhibits D through J of CKI's Second Amended Counterclaim are certain copyright registration applications filed by Ray Lively. Exhibit D is a copyright registration dated November 12, 2004 for a San Marino Design Outdoor Wall Sconce.  Exhibit E is a copyright registration dated December 12, 2004 for a San Marino Design Table Lamp.  Exhibit F is a copyright registration dated November 19, 2004 for a Tropics Design Table Lamp.  Exhibit G is a copyright registration dated November 12, 2004 for a San Marino Design Wall Sconce.  Exhibit H is a copyright registration dated November 12, 2004 for a Tropics Design Island Light.  Exhibit I is a copyright registration dated November 12, 2004 for a West Indies Design Pendant.  Exhibit J is a copyright registration dated November 12, 2004 for a Tropics Design Flush Mount. Each of these copyright applications was filed by Ray Lively of Spectrum and listed Spectrum Creations, Inc. as the author of the work.

2.      A copyright registration certificate creates a *prima facie* presumption as to the validity of the copyright.  Thus, when there is a registration certificate, the defendant has the burden of proving the invalidity of the copyright.

3.    CKI has not addressed this claim in its post-trial briefing.  In addition, CKI offered no evidence of fraudulent intent.  *See Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 828 (11th Cir. 1982) (holding that errors and omissions in copyright application do not invalidate copyright absent fraudulent intent) (cited with approval by *One Treasure Ltd, Inc. v. Richardson*, 202 Fed. Appx. 658 (5th Cir. 2006) (unpublished)). The Court will therefore deny relief to CKI on this claim.

## P. COPYRIGHT INFRINGEMENT, SPECTRUM vs. UTTERMOST

1.    Spectrum has asserted a number of claims of copyright infringement against Uttermost.

2.    "Copyright protection subsists in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include pictorial, graphic, and sculptural works ..."  17 U.S.C. § 102(a).

3.    To prevail on a copyright infringement claim, Spectrum must prove that it owns a valid copyright and that Uttermost impermissibly copied or otherwise infringed upon that copyright.  *See Quintanilla v. Texas Television Inc.*, 139 F.3d 494, 500 (5th Cir. 1998) (citing *DSC Communications Corp. v. DGI Techs., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996)).  As direct evidence of copying is rarely available, factual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity.  *Peel & Co. v. The Rug Market*, 238 F.3d 391, 394 (5th Cir. 2001).  Not all copying is legally actionable, however.  *Id.*  To prevail on a copyright infringement claim, a plaintiff also must show substantial similarity between the two works:  "To determine whether an instance of copying is legally actionable, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'"  *Id.*

4.    Under the Copyright Act, ownership of a copyright in a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a); *Lulirama Ltd., Inc. v. Axcess Broadcast Serv., Inc.*, 128 F.3d 872, 876 (5th Cir. 1997).  The owner of copyright has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.  17 U.S.C. § 106.

5.      A copyright owner may transfer his ownership in whole or in part by any means of conveyance or by operation of law. See 17 U.S.C. § 201(d). Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred and owned separately.  17 U.S.C. § 201(d)(2).  The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner.  *Id.*

6.      "A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." *Id*. § 204(a).  A "transfer of ownership" for copyright purposes includes an exclusive license.  17 U.S.C. § 101.

7.      A written agreement assigning interests in a copyright must clearly establish that the parties intended to transfer a copyright interest. *See Schiller & Schmidt, Inc. v. Nordisco Corp*., 969 F.2d 410, 413 (7th Cir. 1992).  The writing requirement "ensures that the creator of a work will not give away his copyright inadvertently." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 556-57 (9th Cir. 1990).  To the extent that the transfer is ambiguous, the Court may consider parol or extrinsic evidence to construe the transfer.  *See Real Estate Data, Inc. v. Sidwell Co.*, 809 F .2d 366, 376 (7th Cir. 1987) (parol evidence may be admitted to establish parties' intent with respect to copyright ownership).

8.      The Court construes the DSA as giving Spectrum an exclusive license to use Designs on Products sold by Spectrum.  Because this is an exclusive license, it is a "transfer of ownership" and must satisfy the Copyright Act's writing requirement.  The DSA, which is signed by CKI, the owner of the rights conveyed, is sufficient under section 204(a).  *See Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1304 n.12 (11th Cir. 2007), *pet. for cert. filed* 76 U.S.L.W. 3050 (July 26, 2007).  As discussed above, the DSA grants Spectrum an exclusive license in Designs accepted both before and after the December 2, 2003 effective date of the DSA.

9.      The DSA states that "CKI will produce for Spectrum certain Designs (which includes the entire Family thereof), for Spectrum's sole and exclusive use, on a worldwide basis, to make, have made, distribute and sell Products that incorporate the Designs, as such Designs shall be further described and defined in the Design Documentation."  As the Court previously noted, Designs are defined in the DSA as "specific designs and design families within fixed lighting, as further defined in Section 7 below [Design Documentation], including finishes, accepted by Spectrum."  *See* docket no. 303 at 18 ("[T]he Court agrees with Uttermost that 'Designs' is a defined term and means 'specific designs and design families within fixed lighting as further defined in Section 7 ...., including finishes' that are 'accepted by Spectrum.'"); DSA intro.

10.    Previously, Uttermost moved for summary judgment on some of Spectrum's copyright claims, arguing that the designs were rejected by Spectrum, and thus Spectrum obtained no copyright rights in those designs.  The Court agreed, noting that, under the plain language of the DSA, Spectrum only acquired exclusive rights in Designs and Designs had to be accepted by Spectrum.  However, because fact issues remained on the issue presented for summary judgment – whether Spectrum had accepted or rejected certain designs – the Court denied summary judgment.  Uttermost also moved for summary judgment on the basis of the DSA's reversion clause: "Any such Designs for which Products in a Family are not reasonably commercialized during any eighteen (18) continuous months shall be deemed abandoned by Spectrum, and such Designs will revert to CKI."  The Court noted in its order that "It is not until designs are accepted and become Designs that this 18-month period would begin."  Further, because fact issues "remain[ed] regarding when and if some of the designs were ever accepted and became Designs such that the 18-month period would apply," the Court denied summary judgment on that ground as well.  Docket no. 303 at 27.

11.    At trial, Spectrum produced evidence that it accepted every design that CKI submitted, and the Court has found that Spectrum accepted every design that CKI submitted except for the Twisting and Crystal Contemporary designs.  Further, the evidence showed that this acceptance triggered CKI's duty to provide the full Design Documentation under section 7 (conceptual drawings, design finishes, instructions suitable for Spectrum's factories, and color step panels developed in factory identifying the finish color process).  However, while acceptance of a design is necessary to turn a design into a Design, acceptance is not alone sufficient to confer rights on Spectrum under section 5 of the DSA.  Section 5 gives Spectrum "the exclusive worldwide right(s) to use Designs on Products sold by Spectrum."  As noted, Designs are defined by the DSA as "specific designs and design families within fixed lighting as further defined in Section 7 below, including finishes, accepted by Spectrum."  Thus, the DSA plainly contemplates that Designs for which Spectrum would receive an exclusive license would be Designs with finishes as defined in Section 7, accepted by Spectrum.  Section 7 provides that Designs shall cover a Product Family and, for each set of Designs, CKI shall provide conceptual drawings, design finishes, and instructions suitable for Spectrum's factories for each of the 14+ Products in the Family, along with color step panels identifying the finish color process.  This is again emphasized by section 1 of the DSA, which states that "CKI will produce for Spectrum certain Designs (which includes the entire Family thereof), for Spectrum's sole and exclusive use, on a worldwide basis, to make, have made, distribute and sell Products that incorporate the Designs, *as such Designs shall be further described and defined in the Design Documentation*."  DSA § 1 (emphasis added).  Thus, when section 5 grants Spectrum the right to use Designs on Products sold by Spectrum, it contemplates the completed Design, as defined in the Design Documentation.  The parties did not contemplate giving Spectrum an exclusive license to use designs that were no more than concept sketches, since all parties agree that these could not be manufactured and sold.  The 18-month reversion clause also presupposes a completed design, for it would be unfair and illogical to start the 18-month clock for commercialization at a point in time before the Design could be reasonably commercialized (*i.e.*, before it is brought to completion by CKI).

101

The DSA does not give Spectrum an exclusive license or the correspondent right to file copyright registrations and pursue infringement actions on design sketches, even if it accepts them for development; rather, it does so only for completed Designs, as defined in Section 7, that are accepted by Spectrum.[27]   Accordingly, under the plain language of the DSA, Spectrum received an exclusive license only in completed and accepted Designs, which Spectrum contends includes only the Tropics, West Indies, San Marino, Madrid, and Vienna Designs.   Spectrum has asserted that Uttermost infringed the Tropics and West Indies Designs.   It asserts no copyright infringement claims with regard to the San Marino, Madrid, and Vienna Designs.

12.     Spectrum alleges that a number of Uttermost products directly infringe on its registered copyrights.   These include: (1) a five-light chandelier (Anders ex. 56) that infringes the Athena collection; (2) a table lamp (Anders ex. 57) that infringes the Santorini collection; (3) two table lamps (Anders ex. 58 & 59) that infringe the Meridian collection; (4) a torchiere (Anders ex. 60) that infringes the Coronado collection; (5) a table lamp (Anders ex. 61) that infringes the Austria collection; (6) a floor lamp (Anders ex. 62) that infringes the West Indies design floor lamp; (7) a floor lamp (Anders ex. 63), an inverted pendant (Anders ex. 67), and a six-light chandelier (Anders ex. 68) that infringe the Thick Long Leaves collection; (8) another table lamp (Anders ex. 64) that infringes the Austria table lamp; (9) a table lamp (Anders ex. 65) that infringes a Tropics table lamp; (10) a hard-wired semi-flush fixture (Anders ex. 66) that infringes a Tropics design flush mount; and (11) an inverted pendant (Anders ex. 69) that infringes the West Indies design dome pendant.   Spectrum also identified a number of additional works it has characterized as derivative that allegedly infringe Spectrum's exclusive license.   The Court concludes that Spectrum shall take nothing on all copyright infringement claims.   The Court has concluded that Spectrum did not obtain

_____

[27]The Court acknowledges that its order on summary judgment contained some overly broad language that the term "Designs" in the DSA means "designs that are accepted by Spectrum." Docket no. 303 at 19.   However, the Court made these statements in the context of the issue presented in the motion for summary judgment – whether acceptance was required to convert a design into a Design such that Spectrum obtained an exclusive license.   Because the focus of the motion was whether acceptance was required to convert a design into a Design, the Court erroneously implied that acceptance was alone sufficient to convert a design into a Design for which Spectrum obtained an exclusive license.   In the same order, however, the Court recognized that "Designs" is a defined term in the DSA as discussed herein.   Further, Spectrum's position at trial comports with the Court's construction of the term "Designs" in the DSA.   Pat Kryza testified at trial on behalf of Spectrum that "Capital D [Designs] would be a full CAD drawing that gave us dimensions, and the color finish and all – everything that you need to get to the finished product." Tr. 80.   Further, when asked "according to your understanding, and Spectrum's understanding, to get to the capital D format, what had to occur from those [design] sketches?" Kryza responded, "From the sketches, we had to be able to get a drawing that would have all of the specs, would give you the height, the width, how many light fixtures, was it five-light, three-light, what was the finish, and basically it would be turned into a CAD drawing that gave you all of that information." Tr. 76. She also stated "[f]inish had to be on there." Tr. 76.

an exclusive license or rights under § 5 for the Athena, Santorini, Meridian, Coronado, Thick Long Leaves, and Austria collections.  The claims related to the West Indies and Tropics Designs are analyzed below.

13.     In order to recover for copyright infringement, the plaintiff must show ownership and copying of original constituent elements.  *Apple Barrel Productions, Inc. vs. Beard*, 730 F.2d. 384, 387 (5th Cir. 1984).  A certificate of copyright registration constitutes prima facie evidence of copyright ownership. See 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").  Accordingly, submission of a certificate of registration by the copyright holder shifts to the alleged infringer the burden of proving invalidity.[28]

14.     In order to rebut the presumption of validity, an alleged infringer must offer some evidence to dispute the copyright holder's prima facie case of infringement.  Because originality is a prerequisite for copyrightability, the alleged infringer may rebut the presumption of validity by showing that the copyright holder's work is not original.  Thus, even where copying is found or assumed, the defendant may argue that the plaintiff's work itself lacked originality because it was copied from other sources.  Nimmer on Copyright at § 12.10[B][2].  In such cases, the defendant bears the burden of proving that the plaintiff copied from a prior source and was not original.  *Id.* at § 12.11[B][1] at 12-202.  If the defendant offers proof of lack of originality by plaintiff through evidence that plaintiff copied from prior works, or from the defendant itself, the burden then shifts to the plaintiff to overcome that evidence.  *Id.* at 12.11[B][1] at 12-203.

15.     Uttermost argues that Spectrum's designs are not original because they are in fact "copies" of Kinder designs that Uttermost was selling before Spectrum obtained its license.  However, as at the summary-judgment stage, Uttermost has provided no authority for the proposition that a work is not original if the author copies her own prior work.  Spectrum points out that "original" when used in the copyright sense, means only that a work is original to the author and exhibits a minimum level of creativity.[29]  Spectrum asserts that its position that treats this

---

[28]Uttermost argues that because the copyright registrations show CKI as the author and, other than the registrations filed by Ray Lively, do not mention Spectrum, that Spectrum does not benefit from the presumption of ownership.  However, the copyright registrations, together with the DSA, provide sufficient evidence of ownership of the five identified accepted Designs (West Indies, San Marino, Tropics, Madrid, and Vienna).  *See* Nimmer on Copyright § 13.01[A] at 13-7.

[29] In *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 345-46 (1991), the Supreme Court said, "The sine qua non of copyright is originality.  To qualify for copyright protection, a work must be original to the author.  Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity....  Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.  To illustrate, assume that two poets, each ignorant

as competing licenses (an exclusive license for Spectrum versus an non-exclusive license for Uttermost) is a more appropriate method for analyzing the issue.  The Court concludes that, because Uttermost has not provided any case law to support its position and because Spectrum's position makes logical sense and is supported by authority, the Court will reject Uttermost's argument that Kinder's use of her own previous design ideas (to the extent she did so) rendered the designs not original and uncopyrightable.

16.    Nevertheless, the Court must consider the copyrightability of the lighting designs insofar as this case involves "pictorial, graphic, and sculptural works" that are also useful articles. "Pictorial, graphic, and sculptural works" ("PGS" works) include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans.  17 U.S.C. § 101.  Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in section 101, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.  17 U.S.C. § 101.  Thus, if an item qualifies as a "useful article" under the Copyright Act, it is entitled to copyright protection only to the extent that its artwork or creative design is separable from the utilitarian aspects of the work.   A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article."  17 U.S.C. § 101.

17.    The test for whether CKI and therefore Spectrum can copyright the designs proceeds in two steps.  *Galiano v. Harrah's Operating Co.*, 416 F.3d 411, 416 (5th Cir. 2005).  First, the Court determines whether the asset for which the creator seeks copyright protection is a "useful" article.  *Id.*  If it is not, there is no PGS bar to copyright protection.  *Id.*  If it is, the Court determines whether the "design incorporates [PGS] features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."  *Id.*  Answering the first question is easy; answering the second is not.  *Id.*  Lamps and lighting fixtures are useful articles.  *See Mazer v. Stein*, 347 U.S. 201 (1954).  "The hard questions involve the methodology for severing creative elements from industrial design features."  *Galiano*, 416 F.3d at 417.

18.    "Although the statutory language ostensibly requires that two conditions be satisfied, the consensus among courts and academics is that, because the statutory language was essentially lifted from a case predating the legislation, § 101's separateness requirements implement what is called the 'conceptual separability test.'  There are at least six distinct variations of that test, and courts 'have twisted themselves into knots trying to create a test to effectively

---

of the other, compose identical poems.  Neither work is novel, yet both are original and, hence, copyrightable."

ascertain whether the artistic aspects of a useful article can be identified separately from and exist independently of the article's utilitarian function.' *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 670 (3d Cir.1990)." *Galiano*, 416 F.3d at 417.

19.    The Fifth Circuit has noted that the Seventh Circuit's decision in *Pivot Point International, Inc. v. Charlene Products, Inc.*, 372 F.3d 913 (7th Cir. 2004) is a "sprawling, comprehensive exegesis of conceptual separability jurisprudence" and "represents, by orders of magnitude, the most thorough and persuasive analysis of this question in any circuit." *Galiano*, 416 F.3d at 417-18.  The Court noted that the Seventh Circuit had reframed the conceptual separability test: "'Conceptual separability exists, therefore, when the artistic aspects of an article can be "conceptualized as existing independently of their utilitarian function.'  This independence is necessarily informed by 'whether the design elements can be identified as reflecting the designers' artistic judgment exercised independently of functional influence.'  If the elements do reflect the independent, artistic judgment of the designer, conceptual separability exists.  Conversely, when the design of a useful article is 'as much the result of utilitarian pressures as aesthetic choices,' the useful and aesthetic elements are not conceptually separable." *Id.* at 418.  The Fifth Circuit did not reject the test, but declined to apply it in *Galiano* for several reasons, including courts' apparent reluctance to adopt it.  The Court adopted the "likelihood of marketability" standard (which asks whether the item could be marketed as a stand alone piece of art) for conceptual separability, but only for garment design cases.  Thus, the Fifth Circuit has not clarified the applicable standard for cases such as this one.

## 1. West Indies Design Collection

1.    Anders identified two Uttermost products that allegedly infringe the West Indies Design copyright.  These include the Nathan floor lamp (Uttermost product number 28052, Anders ex. 62, PX-3030) that allegedly infringes the West Indies Design floor lamp and the Genova 3-light pendant (Uttermost product number 21817, Anders ex. 69, PX-3039) that allegedly infringes the West Indies Design dome pendant.

2.    With regard to PX-3030, Anders testified that the dominant element of Spectrum's West Indies Design floor lamp was "the long, elongated element that is characterized by a bulge in the central portion and a bulge in the upper portion" and the dominant element of Uttermost's Nathan floor lamp was "the elongated base with the bulge in the center and another bulge at the top, so the silhouette, there is – they look substantially the same." Tr. 726.  He testified that there was probative similarity "[b]ecause there was access by the designer and the resultant infringing product is substantially the same in overall proportionality, shape as the copyrighted design." Tr. 727.

3.    With regard to PX-3039, Anders testified that the dominant element of Spectrum's pendant was "the structural members that connect the canopy portion with the glass portion." Tr. 744.  He concluded that Uttermost's Genova pendant was substantially similar because

"there was access through Carolyn Kinder, and I believe that she basically just tweaked the one design." Tr. 744.

4.      On cross-examination, when asked to identify any separable design elements that deserve copyright protection for the West Indies floor lamp and pendant, Anders stated "the sculptural shape of the canopy, I would think that the sculptural shape of the hooks that are holding the vase connecting the canopy to the dome. I think the sculptural shape of the hooks on the some part. I think the sculptural shape of the dome itself, and I think the sculptural shapes of the rods." Tr. 815. When asked to tell whether the Uttermost product duplicated precisely any of those design components, Anders stated, "I can't really tell from the poor reproduction of the photograph here." Tr. 815.

5.      Spectrum's designer, Dave Simpson, testified that the "common feature in the West Indies collection" is the "woven rattan band" and "that woven look, and the satin elements above and below it." Tr. 478. He agreed that the West Indies "woven look is actually at the top, the center, and at the bottom [base]" of the floor lamp. Tr. 479. Uttermost points out that the Spectrum product utilized in PX-1177 and in Anders' exhibit 62 (PX-3030) are different. The Spectrum product utilized in PX-1177 is a drawing that clearly depicts the woven elements. The Spectrum product utilized in Anders' exhibit 62 (PX-3030) is a picture of a completed lamp, which looks more similar to the Uttermost product than the drawing. Simpson stated that, "When I first saw this, as a slide show, it looked very similar. Upon looking at the actual evidence, there is no weave on the balls [on the Uttermost lamp], so I mean, the silhouette is the same, but, no. I don't see any problem with that one at all." Tr. 479. With regard to the Genova 3-light pendant that allegedly infringed Spectrum's West Indies pendant, Simpson stated that the Uttermost product did not have any similarities to any of Spectrum's products.[30] Tr. 479.

6.      On cross-examination, Simpson agreed that "[a] woven ball is probably not something [Kinder] thought up." Tr. 497. He agreed that the woven ball is not original and "is not an original concept." Tr. 519-20. He also agreed that there is no woven rattan ball on the Uttermost floor lamp, stating, "Other than the silhouette, there is no comparison to that piece" and "I don't think you can hang your hat on that one." Tr. 518-19.

_____

[30]Spectrum's counsel asked Simpson, "Now, the one on the right here [Uttermost's Genova 3-light pendant], does that have any similarities to any of the Spectrum products?" Simpson responded, "None that I can see. I mean, other than there is a little wire twist detailing, but that is nothing you can hang your hat on, I don't believe." He agreed that this Uttermost design did not "cause [him] any problems." Simpson went on to state that he did not see any problems with the other items designated as infringing by Liz Barnes and Pat Kryza. These other items are among those withdrawn by Spectrum after trial. At the conclusion of the West Indies design discussion, Lee asked, "Now, generally for the West Indies, did you have any problems with the West Indies?" Simpson responded, "In the comparison? ... No, not really." Tr. 481.

7.   Uttermost argues that the Register of Copyrights declined to register either of the designs in the West Indies collection that Anders concluded that Uttermost had infringed.  Uttermost cites to AX-451 and AX-454.  AX-454 is the copyright application filed by Ray Lively for the West Indies design floor lamp, which was rejected by the copyright office in January 2005.  Tr. 813.  AX-451 is Lively's application for a copyright on the West Indies design dome pendant, which was rejected by the copyright office.  Tr. 814.  Uttermost thus contends that Anders compared the Uttermost products to the designs rejected by the Copyright Office.

8.   "[N]o action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with [the Copyright Act]."  17 U.S.C. § 411.  The Fifth Circuit has described the registration requirement as jurisdictional.  *Galiano v. Harrah's Operating Co.*, 416 F.3d 411, 416 n.9 (5th Cir. 2005).

9.   In November 2004, Ray Lively submitted a copyright application for a West Indies design floor lamp.  AX-454.  He attached a picture of the West Indies design floor lamp.  On January 28, 2005, the Copyright Office rejected the application, noting that it could not register the work because it lacked the authorship necessary to support a copyright claim.

10.  Lively also submitted a copyright application for the West Indies design pendant and attached a picture of the pendant.  AX451.  The Copyright Office rejected the application because the pendant was a "useful article" that did not contain any separable features that are copyrightable.  Further, the Copyright Office wrote, "[e]ven though these works contain features which *might* be considered separable, they would still not be copyrightable because they represent an insufficient amount of original authorship, one or more of the non-copyrightable elements mentioned above, or a minor non-copyrightable variation thereof."[31]

11.  As pointed out by Uttermost, the picture of the inverted pendant that Anders used as the copyright design for his opinions was the same picture that Ray Lively attached to his copyright application, which was rejected.  However, in PX-1177, Spectrum utilized a design drawing rather than a picture of the completed lamp as the Spectrum copyrighted design.  Similarly, Anders used a picture of the West Indies lamp for his report, which was the same picture that Ray Lively had submitted with his copyright application, which was rejected.  However, in PX-1177, Spectrum used a design drawing of the floor lamp rather than the picture.

---

[31]Lively submitted copyright applications for a number of Spectrum products on November 2, 2004, including the Sedona and Mazatlan designs.  The Copyright Office rejected most of those, including the West Indies lamps.  The Copyright Office did note that it had "cleared the three additional works that we received together with these claims; you will receive the certificates of registration under separate cover."  AX-451.  The Court assumes that these three were the Tropics Design table lamp, flush mount, and island light, which were also submitted by Lively on November 2, and which the Copyright Office registered.

12.     On October 24, 2006, Spectrum's counsel, Ted Lee, filed a copyright application for the West Indies design. AX-98. This application contained numerous drawings of products within the West Indies design collection. It included the drawing of the lamp and the drawing of the pendant in PX-1177, and did not include the exact pictures attached by Ray Lively to the rejected applications. However, it did include a picture of an actual pendant (CKI0003281) and floor lamp (CKI0003288) that were similar to the pictures submitted by Ray Lively. Thus, although the two lamps in question were originally rejected for copyright by the Copyright Office, they were accepted as part of the bulk submission for the West Indies design. AX-98. Accordingly, Spectrum has a copyright registration for the Design and is entitled to the presumption of prima facie copyrightability.

13.     Uttermost contends that "the overall shape or configuration of lighting products is not subject to copyright protection, but original design elements incorporated into such lighting product designs are copyrightable." Thus, Uttermost argues, "the issue becomes whether any design in issue incorporates an original design element severable from the product depicted in the relevant application and capable of standing on its own." Uttermost asserts that "Spectrum's expert unequivocally testified that none of the products incorporate original design components." Spectrum responds that its lamps and lighting fixtures "clearly contain artistic designs that are separable from the lamps and fixtures themselves." Though Spectrum pointed out these separable designs for the Thick Long Leaves, Athena, and Austria designs, it did not do so for West Indies, instead inviting the Court to review the collections and find for itself that there are copyrightable design elements that are separable from the lamps and fixtures.

14.     In comparing the West Indies design floor lamp and the Uttermost floor lamp, the Court agrees that they share a similar silhouette. They are tall and narrow and both have a ball shape in the center and top under the shade. However, the Court would venture to say that many floor lamps would share this similar silhouette to some degree. The bases and shades are different. The Court can conceive of the woven ball on the West Indies lamp as a separate design apart from the functional aspects. However, the Uttermost floor lamp does not have any woven components, instead simply incorporating a smooth ball shape. The Court concludes that the two lamps and any individually separable design components are not substantially similar.

15.     In comparing the West Indies design pendant with Uttermost's Genova pendant, the Court finds very little similarity. Further, the Court finds no conceptually separable design features of the West Indies pendant that are copied or even similar in the Uttermost pendant. Thus, the Court concludes that the two lights and any individually separable design components are not substantially similar.

16.     The Court concludes that Spectrum should take nothing on its claims that Uttermost infringed the West Indies Design by manufacturing and selling product numbers 28052 and 21817.

**2. Tropics Design Collection**

1.    Anders identified two Uttermost products that allegedly infringe the Tropics design copyright
– the Leandro table lamp (Uttermost product number 27233, Anders ex. 65, PX-3034) that
infringes a Tropics table lamp and the Renata 2-light semi flush mount (Uttermost product
number 22210, Anders ex. 66, PX-3035) that infringes a Tropics design semi-flush mount.[32]

2.    With regard to PX-3034, Anders testified that the dominant element of the Spectrum lamps
was "the squarish rods that flare out at a sharp angle, about two-thirds of the distance up
from the bottom portion." Tr. 738.  He testified that there was probative similarity between
Spectrum's lamp and Uttermost's Leandro table lamp because "there was access by
Uttermost through Carolyn Kinder, and I think that she basically then tweaked the design that
was in the copyrighted design." Tr. 738.  He stated that "[t]here is substantial similarity
between the dominant elements" though "they are not exactly the same." Tr. 738.

3.    With regard to PX-3035, Anders testified that the dominant element of Spectrum's semi-
flush Tropics design was "the stem with the very busy leaves, sort of coming out from it."
Tr. 739.  He agreed that it didn't "appear to be quite as close as some of the others" but he
included it because he "thought that it was the tweaking of the appropriation of the dominant
element, which was the busy leaf portion, and then it was, I think, pretty simple to change
the shape of the glass globe." Tr. 739.  He stated that there was probative similarity because
there was access and Kinder "repeated the dominant design motif." Tr. 740.

4.    With regard to the Leandro table lamp (product number 27233), Simpson stated that "it has
the same silhouette [as the Tropics table lamp], but it doesn't use the ringed metal or the
pineapple concept of the Tropics." Tr. 488.  He agreed that it "has some similarity in the
parts" and that "[t]he shape is similar," but stated that "it is not a knockoff." Tr. 488.  With
regard to the Renata semi-flush mount (product number 22210), he stated that it did not
"cause [him] any problems" as compared to the Tropics, Tr. 488, though he thought it shared
some components with the San Marino design collection.

5.    On cross-examination, Simpson again stated that the Uttermost designs were "not really
close" to Spectrum's Tropics design, but shared more components with the San Marino
collection.  Tr. 537-38.

6.    Uttermost argues that any rights that Spectrum had in the Tropics Design reverted to CKI
under the DSA's 18-month reversion clause.  Relying on AX-130, Uttermost contends that
Spectrum claims it received and accepted the allegedly protected flush mount fixture design
on April 23, 2003.  Accordingly, Uttermost argues, because sales data provided by Spectrum
reflect no sales for the flush mount fixture between May 2002 and August 2006, AX-487,

---

[32]As noted, Ray Lively obtained copyright registrations for the Tropics Design table lamp
(AX-92) and the Tropics Design flush mount (AX-89).

Spectrum's rights reverted to CKI before Uttermost began selling its allegedly infringing product in early 2006.  AX-541.

7.      This eighteen-month period is the parties' contractual manifestation of the common "best efforts" clause contained in exclusive license agreements.  These clauses are commonly utilized to ensure that an author does not give an exclusive license without receiving any benefit, since often the author's only compensation comes through royalties from sales.  The reversion clause in the DSA states, "Any such Designs for which Products in a Family are not reasonably commercialized during any eighteen (18) continuous months shall be deemed abandoned by Spectrum, and such Designs will revert to CKI."  Based on the plain language of this clause and the DSA's definition of Designs, the Court rejects Uttermost's assertion that an individual product design within a Design family can revert to CKI when other Products in the family are being reasonably commercialized.  Based on the sales data provided by Spectrum, Spectrum did reasonably commercialize Products in the Tropics Design family, AX-487, and thus Spectrum retains its exclusive license in the Tropics Design regardless of whether certain items in the family were not commercialized.

8.      Uttermost argues that, on cross-examination, Anders admitted that there were differences between the lamps shown on PX-3034 and testified that he deemed "the overall configuration of the various individual components" to be the similarity.  Tr. 819.  Anders agreed that no design component in the Spectrum lamp (AX-92) was duplicated precisely in the Uttermost Leandro table lamp (product number 27233).  Uttermost argues that the "overall configuration" of a useful article is not copyrightable.  Uttermost also points out that Anders admitted on cross-examination that the Spectrum and Uttermost flush mounts have different lenses, different finials, different patterns molded into the rims surrounding the lenses, and different leaf designs.  Tr. 817-18.  Uttermost also points out that Anders acknowledged that the Uttermost product does not include a duplication of any design component in the Spectrum design.  Tr. 819.

9.      As with the West Indies Design, Spectrum has not identified for the Court any conceptually separable design elements in its Tropics lamp or flush mount.  To the extent the Court can conceive of some, the Court finds that they are not sufficiently copied in Uttermost's products.  Thus, the Court finds that the lamps and any conceptually separable design elements are not substantially similar.

10.     The Court concludes that Spectrum shall take nothing on its claims that Uttermost product numbers 27233 and 22210 infringe on its Tropics Design.

## Q. ATTORNEYS' FEES, UTTERMOST vs. SPECTRUM

1.      Uttermost argues that it is entitled to attorneys' fees under the Copyright Act, 17 U.S.C. § 505.  Uttermost asserts that, while such an award is within the Court's discretion, it is "the rule rather than the exception."  *Compaq Computer Corp. v. Ergonome, Inc.*, 387 F.3d 403,

411 (5th Cir. 2004).  "That these fees are routinely awarded, however, does not mean that they are automatically awarded." *Womack+Hampton Architects, L.L.C. v. Metric Holdings Ltd. Partnership*, 102 Fed. Appx. 374 (5th Cir. 2004).

2.  Section 505 does not set forth a standard for awarding attorneys' fees to a prevailing party; it merely authorizes an award of fees. In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994), the Supreme Court declined to align interpretation of section 505 with 42 U.S.C. § 1988, which governs civil rights claims and employs a standard of frivolousness. The Court listed the following nonexclusive factors to guide the Court's determination: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance consideration of compensation and deterrence."

3.  Uttermost relies in part on the fact that Anders testified about certain similar products, but Spectrum later withdrew that testimony and related exhibit after discovering that Anders had mistakenly compared two Uttermost products. Uttermost's post-trial brief at ¶ 88. However, that testimony was not offered as part of Spectrum's copyright claims. Rather, it was offered to establish Spectrum's claim that CKI breached the contract by not providing original designs. Tr. 691.[33] Accordingly, Spectrum's error in this regard cannot form the basis for an attorney's fee award to Uttermost under the Copyright Act.

4.  Uttermost further relies on the fact that Spectrum dropped ten of its infringement claims after trial, but "clung to copyright infringement claims for designs it never accepted, designs it knew Uttermost was selling prior to Spectrum's alleged acquisition of any copyright rights, and even designs for which the Library of Congress had declined to issue copyright registration." Uttermost also relies on the fact that Anders "testified without equivocation that the allegedly infringing designs did not satisfy the test for infringement embodied in the relevant statute." The Court agrees with Spectrum that none of these reasons warrants a finding that Spectrum's claims were frivolous or objectively unreasonable. The Court has ruled out most of Spectrum's copyright claims based on its construction of the DSA, which is an ambiguous, badly written, and confusing document. Unfortunately for Spectrum, the two copyright claims that survived were likely its weakest. However, as a whole, the Court cannot conclude that Spectrum's claims, which survived summary judgment, were frivolous or objectively unreasonable, and the Court finds no improper motive on Spectrum's part. The Court therefore declines to award Uttermost its attorney's fees under § 505.

---

[33] As noted, Spectrum's Complaint asserts, as an alternative to its copyright infringement claim, that CKI breached the DSA "by not providing original designs in which Spectrum had exclusive use." However, Spectrum withdrew Anders's testimony in support of this claim and did not mention or brief this claim in any of its post-trial briefing. Accordingly, the Court concludes that Spectrum has waived this claim.

## Conclusion

These fact findings and conclusions of law conclude the liability portion of this bench trial.

CKI and Spectrum shall confer and submit to the Court, within fourteen days of this Order, a proposed date for trial of the damages issues that remain.[34]

Plaintiff shall take nothing on its claims against Defendant The Uttermost Company. Defendant The Uttermost Company, as the prevailing party, is awarded its costs in accordance with Rule 54(d).  Uttermost shall file its Bill of Costs, in the form required by the Clerk of Court, within fourteen days of this Order.

It is so ORDERED.

SIGNED this 13th day of February, 2008.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[34]The parties may contact the Court's law clerk or courtroom deputy regarding possible dates. The Court requests that the parties select a date after April 7, 2008.